UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 10-CR-0053 |
| – against – | **Amended Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2)** |
| DAMIEN BANNISTER, DARRELL BANNISTER, CHRISTOPHER HALL, CYRIL MCCRAY, ERIC MORRIS, ROGER PATRICK, JAMES ROSS, DERRICK TATUM, INDIO TATUM, JAWARA TATUM, and PEDRO TORRES, | |
| Defendants. | |

JACK B. WEINSTEIN, United States District Judge:

**Appearances:**

Loretta Lynch, United States Attorney, Eastern District of New York, by Daniel S. Silver and Seth David DuCharme.

Joel Cohen, New York, N.Y., for defendant Damien Bannister.

Jeremy L. Gutman, New York, N.Y., for defendant Darrell Bannister.

Robert L. Moore, Quesada & Moore, LLP, West Hempstead, N.Y., for defendant Christopher Hall.

John S. Wallenstein, Garden City, N.Y., for defendant Cyril McCray.

Michael H. Soroka, Mineola, N.Y., for defendant Roger Patrick.

Erika McDaniel Edwards, Donaldson, Chilliest & McDaniel, LLP, New York, N.Y., for defendant Derrick Tatum.

Heidi C. Cesare, Federal Defenders of New York, Inc., Brooklyn, N.Y., for defendant Jawara Tatum.

Margaret M. Shalley, Fasulo, Shalley & DiMaggio, LLP, New York, N.Y., for defendant Pedro Torres.

1

Introduction ................................................................................................................. 7

I.  Facts .................................................................................................................... 9

   A.  Place ............................................................................................................. 9

      1.  Bedford-Stuyvesant ............................................................................. 9

      2.  Louis Armstrong Houses ................................................................... 12

         a.  Physical Environment ............................................................... 12

         b.  Residents ................................................................................... 15

   B.  Conspiracy ................................................................................................. 16

      1.  Members of Conspiracy ..................................................................... 17

      2.  Investigation of Conspiracy .............................................................. 19

   C.  History and Sociology ............................................................................... 21

      1.  Roots of African American Segregation and Poverty ...................... 21

         a.  Segregation and the Civil Rights Movement ............................ 21

         b.  Urbanization and Unemployment .............................................. 23

      2.  Government Efforts to Alleviate Poverty and Poor Living Conditions ................... 26

         a.  Public Housing ........................................................................... 26

         b.  Welfare Policy ........................................................................... 27

      3.  Economic and Social Conditions of Those in Defendants' Position .......................... 30

         a.  Racial Segregation ..................................................................... 31

         b.  Poverty and Unemployment ...................................................... 31

         c.  Health Problems ........................................................................ 34

         d.  Family Structure ........................................................................ 36

e. Undereducation................................................................38

f. Social Values...................................................................42

g. Prevalence of Crime.........................................................43

4. Victims of Crime ....................................................................... 46

D. Anti-Drug Abuse Act of 1986 ..................................................... 49

1. Historical Drug Sentencing Laws ............................................ 49

2. Congressional Awareness of Racial Disparity ......................... 50

3. Procedural Irregularities in Legislative History ...................... 51

4. Departures from Established Penal Policy ............................... 52

5. Racially Disparate Impact ....................................................... 53

E. Incarceration Policy ................................................................... 56

1. Mass Incarceration .................................................................. 56

2. Racial Disparity ...................................................................... 60

3. Consequences .......................................................................... 63

a. Inmates, Families, and Communities................................63

b. Collateral............................................................................64

c. Fiscal..................................................................................66

4. Alternatives ............................................................................. 67

a. Generally............................................................................67

b. Non-Incarceratory Sentencing ..........................................70

5. Effectiveness in Reducing Crime ............................................ 72

a. Rehabilitation.....................................................................72

      b.     Incapacitation ........................................................................76

      c.     General and Specific Deterrence ...........................................76

    6.     Employment and Social Integration of Ex-Prisoners ................................. 78

II.   Law ...........................................................................................80

  A.   Sentencing Rules .................................................................. 80

  B.   Equal Protection ................................................................... 82

    1.     Mandatory Minimum Sentences ............................................. 82

    2.     Framework ..................................................................... 84

    3.     Discriminatory Effect ........................................................ 85

    4.     Discriminatory Purpose ...................................................... 85

    5.     Conclusion as to Constitutionality .......................................... 88

  C.   Rationale ............................................................................. 91

    1.     General Deterrence ........................................................... 91

    2.     Specific Deterrence and Rehabilitation ..................................... 92

    3.     Incapacitation ................................................................. 92

    4.     Retribution .................................................................... 93

III.  Application of Law to Defendants ................................................. 95

  A.   Excessiveness ...................................................................... 95

  B.   Individual Defendants ........................................................... 95

    1.     Damien Bannister .............................................................. 95

      a.     Background .....................................................................95

      b.     Offense .........................................................................98

        c.      Sentence ...........................................................................................99

    2.      Darrell Bannister ......................................................................... 100

        a.      Background ................................................................................100

        b.      Offense .......................................................................................101

        c.      Sentence ....................................................................................102

    3.      Christopher Hall ........................................................................... 103

        a.      Background ................................................................................103

        b.      Offense .......................................................................................104

        c.      Sentence ....................................................................................106

    4.      Cyril McCray ................................................................................ 106

        a.      Background ................................................................................106

        b.      Offense .......................................................................................109

        c.      Sentence ....................................................................................110

    5.      Roger Patrick ................................................................................ 111

        a.      Background ................................................................................111

        b.      Offense .......................................................................................113

        c.      Sentence ....................................................................................114

    6.      Derrick Tatum ............................................................................... 115

        a.      Background ................................................................................115

        b.      Offense .......................................................................................118

        c.      Sentence ....................................................................................119

    7.      Jawara Tatum ................................................................................ 120

a.    Background ...........................................................................................120

b.    Offense .................................................................................................124

c.    Sentence ...............................................................................................125

8.    Pedro Torres ...................................................................................... 126

a.    Background ...........................................................................................126

b.    Offense .................................................................................................128

c.    Sentence ...............................................................................................128

C.    Summary of Sentences Covered in this Memorandum...................................... 130

IV.  Conclusion .........................................................................................................130

**Introduction**

Almost filling the jury box were the defendants—Damien Bannister, Darrell Bannister, Christopher Hall, Cyril McCray, Eric Morris, Roger Patrick, James Ross, Derrick Tatum, Indio Tatum, Jawara Tatum, and Pedro Torres—eleven males, ranging in age from twenty-one to forty-nine, ten African American and one Hispanic.  Fully occupying the well of the court were counsel for the defendants, assistant United States attorneys, agents of the Federal Bureau of Investigation, and a phalanx of United States Marshals.  Jammed into the gallery were defendants' anxious mothers, girlfriends, other family members, and friends.

The indictment embraced twenty-three counts connected by a conspiracy to sell, and the selling of, crack cocaine and heroin in the hallways of, and the streets surrounding, a public housing project in Brooklyn between September 2007 and January 2010.  Guns were carried. The lives of the residents were made miserable by the attendant depravity and violence.  These were serious crimes.

The unspoken questions permeating the courtroom were: How did these eleven come to this pass, and what should be done with them if they were convicted, as all of them eventually were, by guilty pleas?  Some of the unsatisfactory answers in such all-too-frequent urban tragedies are discussed in the memorandum that follows.

The issue of what should be done about these defendants, and others like them, is central to the law's rationale for the heavy mandatory minimum incarceratory sentences being imposed in this case.  For a number of the defendants, they are much heavier than are appropriate.  One of our most thoughtful jurists reminds us, "[o]ur resources are misspent, our punishments too severe, our sentences too long."  Justice Anthony M. Kennedy, Address at the American Bar

Association Annual Meeting, San Francisco, Ca. (Aug. 9, 2003), *available at* http://meetings.abanet.org/webupload/commupload/CR209800/newsletterpubs/Justice_Kennedy_ABA_Speech_Final.pdf. *See also id.* ("I can accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust.").

As a group, defendants grew up in dysfunctional homes characterized by a combination of poverty, unemployment, undereducation, crime, addiction to drugs and alcohol, physical and emotional abuse, and the absence of an adult male role model. They attended low-functioning public schools with limited resources to help students with their in- and out-of-school difficulties. Most dropped out of school, habitually abused drugs and alcohol from an early age, and found little lawful employment. They became involved in a gang of illegal narcotics distributors, which turned to guns and violence, contributing to the degradation of their community.

While the defendants are before this court because of choices they themselves have made, the limited options available to them are partly the fixed artifacts of history. Their story begins hundreds of years ago with the enslavement of African Americans. It runs through Reconstruction, Jim Crow, northward migration, *de jure* and *de facto* segregation, decades of neglect, and intermittent improvement efforts by government and others.

Protection of the public requires serious terms of incarceration. But enforcement of the harsh mandatory minimum sentences required by Congress imposes longer terms of imprisonment than are necessary. Such long years of incarceration and separation from relatives generally increase the likelihood of further crime by these defendants and their children.

Nevertheless, strong efforts will be made by the Bureau of Prisons to help educate the defendants and provide occupational training. Drug and alcohol treatment will be made available. Upon their release from prison, the court's probation service will provide strict, day-to-day supervision and assist in attempts to obtain essential jobs.

## I. Facts

### A. Place

#### 1. Bedford-Stuyvesant

The conspirators operated in and around Louis Armstrong Houses, a public housing development in the Bedford-Stuyvesant ("Bed-Stuy") section of Brooklyn. Bed-Stuy is a large neighborhood in northern Brooklyn bound by Flushing Avenue to the North, Broadway and Saratoga Avenue to the East, Atlantic Avenue to the South, and Classon Avenue to the West. Kenneth T. Jackson, *Encyclopedia of New York* 94 (1995). It is named for two nineteenth-century communities, Bedford and Stuyvesant Heights. The first Europeans to occupy the area were Dutch settlers who bought the land from Native Americans in the seventeenth century and farmed it with the labor of African slaves. It was home to communities of free Blacks as early as the 1830s. From the nineteenth century through the mid-twentieth century, Bedford and Stuyvesant were populated by a fluctuating mix of Dutch, Germans, Scots, Irish, Jews, Italians, and African Americans. *Id.* In the 1940s the area became known as Bedford-Stuyvesant, and subsequently it became home to a majority African American and Afro-Caribbean population. *See id.* at 94–95.

Most of Bed-Stuy's housing stock consists of brownstone and brick row houses. *Id.* at 95. Present also are numerous large housing projects, including some high-rise developments.

*See, e.g.*, New York City Hous. Auth., *NYCHA Housing Developments: Lafayette Gardens*, http://www.nyc.gov/html/nycha/ html/developments/bklynlafayette.shtml (last visited Mar. 14, 2011) (describing a complex of buildings up to twenty stories tall).

Bed-Stuy is the largest African American neighborhood in New York City. Jackson, *supra*, at 95. It is the northernmost of several predominantly black neighborhoods in Brooklyn lying east of Flatbush Avenue, which roughly bisects the borough. *See Mapping America: Every City, Every Block*, N.Y. Times, http://projects.nytimes.com/census/2010/explorer (last visited Mar. 11, 2011) ("*Mapping America*") (interactive map indicating racial distribution from 2005 to 2009). Other neighborhoods in this group are Crown Heights, East New York, Brownsville, East Flatbush, Flatlands, and Canarsie. *See id.*; New York City Dep't of City Planning, *New York: A City of Neighborhoods*, http://www.nyc.gov/html/dcp/html/neighbor/neigh.shtml (last visited Mar. 20, 2011) (map of New York neighborhoods). Neighborhoods lying west of Flatbush Avenue are primarily White; Hispanics and Asians are distributed throughout the borough. *See Mapping America*, *supra*.

As of the 2000 census, the population of Bed-Stuy was 77 percent African American, non-Hispanic; 18 percent Hispanic; and less than 2 percent White, non-Hispanic. New York City Dep't of City Planning, *Brooklyn Community District 3* 4 (2010), *available at* http://www.nyc.gov/html/dcp/pdf/lucds/bk3profile.pdf ("*District Report*"). In recent years, increasing numbers of middle-class residents of various races have moved to Bed-Stuy as pockets have become gentrified. Jeff Coplon, *The Tipping of Jefferson Avenue*, N.Y. Mag., May 21, 2005, http://nymag.com/print/?/nymetro/realestate/neighborhoods/features/11775/.

10

In 2000, 63 percent of Bed-Stuy's families with children under the age of eighteen were headed by a female with no husband present. *See District Report*, *supra*, at 5 (reporting 13,783 such households led by females, 1,671 by males, and 6,520 by both parents). Thirty-three percent of the residents were dependent on some form of government assistance in 2000; by 2009, the number had had risen to 45 percent. *Id.* at 1. Employment opportunities in the neighborhood are scarce, due in part to a lack of access to government work force development programs. New York City Dep't of City Planning, *Community District Needs for the Borough of Brooklyn: Fiscal Year 2011* 92 (2011) ("*District Needs*").

Health problems such as HIV/AIDS, obesity, and asthma plague the neighborhood. *Id.* The infant mortality rate in 2007 was 9.7 deaths per 1,000 births, compared to a national average of 6.75. *District Report*, *supra*, at 1; Jiaquan Xu, et al., Ctrs. for Disease Control & Prevention, *Deaths: Final Data for 2007*, Nat'l Vital Stat. Rep., May 20, 2010, at 1, *available at* http://www.cdc.gov/NCHS/data/ nvsr/nvsr58/nvsr58_19.pdf.

Residents of the seventy-ninth police precinct, in which Louis Armstrong Houses is located, live with a high rate of violent crime. "[Y]oung people and residents are menaced by the rise in gang culture and the proliferation of guns that are readily available in [Bed-Stuy's] public housing complexes." *District Needs*, *supra*, at 92. In 2010, there were twelve murders, twenty-nine rapes, 433 robberies, 422 felonious assaults, 408 burglaries, and 119 automobile thefts in the precinct. New York City Police Dep't, *CompStat: Report Covering the Week 2/28/2011 Through 3/6/2011*, *available at* http://www.nyc.gov/html/nypd/downloads/ pdf/crime_statistics/cs079pct.pdf. *See also* Al Baker & Janet Roberts, *New York City Crime Dips but Violent Crime Is Up*, N.Y. Times, Nov. 25, 2010, http://www.nytimes.com/2010/

11/26/nyregion/26crime.html (reporting that the seventy-ninth was among the three New York

City precincts with the highest increases in robbery from 2009 to 2010); Email from Joseph

Reek, Inspector, Hous. Bureau, New York City Police Dep't, Mar. 3, 2011 (on file with court)

("Reek Email") (reporting three murders, seven rapes, twenty robberies, and seventy-five

felonious assaults in Louis Armstrong Houses from 2006 through 2010).  Since many crimes in

similar areas are unreported because of victims' fear of reprisal, the actual crime rate in the

neighborhood is doubtless even higher.  *Cf. The Kerner Report: The 1968 Report of the National

Advisory Commission on Civil Disorders* 267 (Pantheon 1988) (1968) ("*Kerner Report*")

("[O]fficial statistics normally greatly understate actual crime rates because the vast majority of

crimes are not reported to the police.").

### 2.    Louis Armstrong Houses

#### a.    Physical Environment

Louis Armstrong Houses is a public development of two complexes of sixteen buildings,

each three, four, or six stories high, administered by the New York City Housing Authority

(NYCHA).  New York City Hous. Auth., *NYCHA Housing Developments: Armstrong, Louis

Houses*, http://www.nyc.gov/html/nycha/html/developments/bklynarmstrong.shtml (last visited

Mar. 14, 2012) ("*Armstrong Home Page*"); Email from Anne-Marie Flatley, Dir., Research &

Mgmt. Analysis, NYCHA (Feb. 22, 2011) (on file with court) ("Flatley Email 1").  The

development is spread over an eleven-block area in central Bed-Stuy bounded by Clifton Place

and Herbert Von King Park to the North, Tompkins Avenue to the East, Gates Avenue to the

south, and Bedford Avenue to the West.  *See Armstrong Home Page.*  The two complexes were

built between 1970 and 1974 with funding from the federal government's Model Cities program

under the names "Bedford Stuyvesant Model Cities Area Sites 3-69A" and "Bedford Stuyvesant

Model Cities Area Sites 11-14." *See* Flatley Email 1.  Their names were changed to Louis

Armstrong I and Louis Armstrong II in 1982.  *Id.*

Pictured is a portion of Louis Armstrong Houses along Clifton Place between Nostrand

and Marcy Avenues.



*Source: New York City Housing Authority.*

The neighborhood is of medium density and appears not to be overcrowded.  The low-

rise buildings of Louis Armstrong Houses are scattered among substantial brownstone homes

and apartment buildings, blended into good existing housing.  Small trees are planted in front of

the buildings.  Nearby, the large Herbert Von King Park and a community garden are well kept

and provide the neighborhood with breathing room.  Situated in the park are a baseball field, a

playground, handball courts, an amphitheater, and a recreational center.  New York City Dep't of Parks & Recreation, *Herbert Von King Park*, http://www.nycgovparks.org/ parks/ herbertvonking/highlights/152 (last visited Mar. 14, 2011).  The park, established in 1857, is one of the oldest in Brooklyn.  It was originally named for Daniel Tompkins, a vice president of the United States and governor of New York.  In 1985, it was renamed to honor a Bed-Stuy community leader.  *Id.*

Public transportation and local shopping seem acceptable.  Streets are clean.  Schools, houses of worship, a hospital, and a large outdoor swimming pool are within walking distance. *See* Google Maps, www.maps.google.com, enter "11216" (last visited Mar. 21, 2011) (interactive map displaying the area surrounding Louis Armstrong Houses).  Some of Manhattan's towers are visible.

The project is generally well maintained, although there is a broken cement stanchion eliminating one basket in the backyard basketball court.  The large concrete play area behind the houses on Clifton Place lacks benches or vegetation.

The aesthetics of the buildings bespeak poverty.  Corridors and stairwells are narrow, lined with painted cement blocks and cheap metal railings.  Entrances to the apartments and the buildings appear much like those for prison cells.

All in all, children in an integrated, well-motivated, and disciplined family could experience a good childhood here, not much different from those of millions of New Yorkers who lead stable, productive lives.  These defendants did not, however, grow up in such families. It was the dangers and impoverishment of their families and peers, combined with the bleak economic prospects facing their community, to which their difficulties can be traced.

### b.    Residents

Housed in Louis Armstrong Houses are 2,150 residents in 617 apartments.  Armstrong Home Page, *supra*.  Seventy-six percent are African American, 17 percent are Hispanic, and 5 percent are White.  *See* NYCHA, *Armstrong I Data Sheet* (Jan. 1, 2010) ("*Armstrong I Data*"); NYCHA, *Armstrong II Data Sheet* (Jan. 1, 2010) ("*Armstrong II Data*").  The average household earns a gross income of $23,251 and pays $419 per month in rent.  *See id.*  Half of all families receive income from employment.  Email from Anne-Marie Flatley, Director, Research & Mgmt. Analysis, NYCHA (Mar. 1, 2011) (on file with the court) ("Flatley Email 2").  Seventeen percent receive income from welfare, and only 8 percent are listed as receiving "full welfare" benefits. *See Armstrong I Data*, *supra*; *Armstrong II Data*, *supra*.  The rest are supported from Social Security benefits, Supplemental Security Income (disability payments), pensions, or other sources.  Flatley Email 2.

Data from the 2000 census indicate a high rate of joblessness and poverty and low rates of education in the Louis Armstrong Houses area.  The official unemployment rate for residents aged sixteen and over "in the labor force" was 20 percent.  *See District Report* at 17 (reporting 2000 census data for census tracts 243, 251, 263 and 265); *id.* at 6 (map of 2000 census tracts in Bed-Stuy).  Forty-nine percent of residents sixteen and over were not in the labor force.  *See id.* Their numbers, combined with those of the officially unemployed, amount to a 59 percent jobless rate.  *See id.*  Thirty-five percent lived below the poverty line.  *See id.* at 13, 15 (reporting data for relevant census tracts).  This line is an inexact measurement of need, especially in areas with high living expenses, such as New York City.  *See* Carmen Denavas-Walt, et al., United States Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States:*

15

*2009* 20 (2010), *available at* http://www.census.gov/ prod/ 2010pubs/p60-238.pdf ("The official poverty thresholds developed more than 40 years ago do not take into account rising standards of living . . . or geographic differences in the cost of living.").  Forty-one percent of residents at least twenty-five years of age in and around Louis Armstrong Houses have not completed high school.  *See District Report* at 15 (reporting data for relevant census tracts).  Nine percent have graduated from college.  *Id.*

Rates of poverty and joblessness are substantially higher, and rates of education lower, in the housing project itself; its residents account for a fraction of the population of the relevant census tracts.  *See id.* at 13 (reporting data for relevant census tracts); *Armstrong Home Page*, *supra*.  Rates of poverty and joblessness in the area are likely higher than the 2000 census indicated as a result of the current economic crisis.  *See*, e.g, Eckholm, *supra* (reporting that one in seven United States residents lived in poverty in 2009, the highest rate recorded since 1994).

### B.    Conspiracy

Defendants were members of a drug distribution organization called the Clifton Place Crew ("the crew").  The crew controlled the heroin and crack cocaine trade in part of Louis Armstrong Houses along Clifton Avenue, near the building pictured above.  Daily it sold drugs from residences and public spaces in and around the complex.  Presentence Investigation Report of Derrick Tatum ("Derrick Tatum PSR") ¶ 2.  The crew membership fluctuated, generally consisting of five to ten men.  *Id.* at ¶ 4.

There are no facts in the record concerning the market for illegal drugs in the neighborhood or the identity of those who bought drugs from the crew.  There is no indication

that they sold to children.  No information has been provided concerning the operations of other drug networks with whom the crew may have competed for market share.

### 1.    Members of Conspiracy

Members of the crew came from similar deprived backgrounds.  They lacked appropriate male models in their homes, they had an inadequate education, and they grew up in an environment of personal abuse, illegal drugs, and general poverty.  *See* Part IV.B, *infra* (detailed histories of defendants in connection with the sentence imposed).

Derrick Tatum established the crew in September 2007.  He led it until the arrest of most of its members on January 27, 2010.  It was he who selected and supervised conspirators, negotiated major transactions, and determined compensation.  *Id.* at ¶¶ 3–7, 10.

Indio Tatum, Derrick Tatum's nephew, joined the conspiracy in late 2007 and was promoted the following summer to serve as Derrick Tatum's top lieutenant.  Presentence Investigation Report of Indio Tatum ("Indio Tatum PSR") ¶ 7.  He obtained heroin and cocaine powder from wholesale suppliers, processed or "cooked" powder cocaine into crack, distributed drugs to dealers in street-ready packages, and collected revenues.  *Id.* at ¶ 5.  On occasion, Derrick Tatum performed some of these functions himself.  Derrick Tatum PSR ¶ 5.

The other nine members of the conspiracy served as street-level dealers, working in shifts.  Their dates of involvement in the conspiracy were as follows: Damien Bannister, August 2008– January 2010, Presentence Investigation Report of Damien Bannister ("Damien Bannister PSR") ¶ 6; Darrell Bannister, July–September 2008, Presentence Investigation Report of  Darrell Bannister ("Darrell Bannister PSR") ¶ 6; Christopher Hall, September 2007–January 2010, Presentence Investigation Report of Christopher Hall ("Hall PSR") ¶ 6; Cyril McCray,

September 2007–January 2010, Presentence Investigation Report of Cyril McCray ("McCray PSR") ¶ 8; Eric Morris, late 2007–January 2010, Presentence Investigation Report of Eric Morris ("Morris PSR") ¶ 6; Roger Patrick, August 2008–January 2010, Presentence Investigation Report of Roger Patrick ("Patrick PSR") ¶ 6; James Ross, June 2008–January 2010, Presentence Investigation Report of James Ross ("Ross PSR") ¶ 7; Jawara Tatum, September 2009–January 2010, Presentence Investigation Report of Jawara Tatum ("Jawara Tatum PSR") ¶ 5; and Pedro Torres, August 2008–June 2009, Presentence Investigation Report of Pedro Torres ("Torres PSR") ¶ 5. Many of the dealers used drugs themselves. *See generally* Part II, *infra.* At least four of them—Cyril McCray, Roger Patrick, Jawara Tatum, and Pedro Torres—lived on Clifton Place near where the crew sold drugs. *See* McCray PSR 2; Patrick PSR 2; Jawara Tatum PSR ¶ 43; Torres PSR 2. Three street-level sellers—Hall, Morris, and Ross—were entrusted occasionally by Derrick and Indio Tatum with picking up bulk quantities of drugs and delivering them to the other dealers, but none of the three held supervisory roles. Hall PSR ¶ 8; Morris PSR ¶ 6; Ross PSR ¶ 7.

Most members of the crew carried or maintained access to guns to defend against robbers and protect their territory from rival drug dealers. Derrick Tatum, Indio Tatum, Hall, McCray, Morris, Ross, and Torres personally possessed guns. Derrick Tatum PSR ¶ 7; Indio Tatum PSR ¶ 10; Hall PSR ¶ 6; McCray PSR ¶ 6; Morris PSR ¶ 7; Ross PSR ¶7; Pedro Torres PSR ¶ 5. Damien Bannister, Roger Patrick, and Jawara Tatum did not carry guns but had access to those controlled by the conspiracy. Damien Bannister PSR ¶ 5; Patrick PSR ¶ 6; Jawara Tatum PSR ¶ 6. Darrell Bannister neither carried guns nor had access to them. Darrell Bannister PSR ¶ 6. On one occasion, Hall and Torres were involved in a shootout. Hall PSR ¶ 6; Torres PSR ¶ 6.

Members of the crew stored drugs and guns in nearby residences.  They moved them frequently to avoid detection and seizure by police.  Derrick Tatum PSR ¶ 5.

### 2.    Investigation of Conspiracy

The New York City Police Department and the Federal Bureau of Investigation jointly investigated the crew from late 2007 to January 2010 using a combination of surveillance, search warrants, and videotaped purchases of drugs and guns.  Over seventy-five videotaped purchases were executed, resulting in the seizure of over 100 grams of heroin and 100 grams of crack.  Seized from residences linked with the organization were fourteen guns, ammunition, a machete, a police radio scanner, about $15,000 in cash, and about fifteen "G-packs" of heroin (approximately 75 grams).  *Id.* at ¶ 3.  A G-pack is a bulk quantity of processed drugs worth about $1,000 and packaged into retail quantities.  *G Pack*, Urban Dictionary, http://www.urbandictionary.com/define.php?term=g%20pack (last visited February 23, 2011).

It is estimated that more than 4.5 kilograms of crack and three kilograms of heroin were distributed by the crew over the course of the conspiracy.  Derrick Tatum PSR ¶ 9.

Following are notable incidents:

- September 2007: Derrick Tatum founded the crew.  *Id.*

- October 23, 2007: Police recovered two loaded pistols, 249 glassines of heroin, and $1,190 in cash in a vehicle driven by Cyril McCray.  McCray PSR ¶ 6.  A glassine is a small envelope or bag made of transparent or semitransparent paper.  *See* Webster's Third New International Dictionary 963 (1993).

- Summer 2008: Indio Tatum was promoted as Derrick Tatum's top lieutenant.

19

- August 31, 2008: Indio Tatum and Derrick Tatum sold a loaded .32 caliber pistol to a confidential informant in a videotaped transaction.  Derrick Tatum PSR ¶ 7; Indio Tatum PSR ¶ 8.

- September 2008: Christopher Hall and Pedro Torres were involved in a shootout at a location on Clifton Place where members of the crew regularly sold drugs. Hall fired shots.  Torres was shot in the leg, and another individual was shot in the leg and chest.  It is not known whether Hall was responsible for any injuries.  Hall PSR ¶ 6; Torres PSR ¶ 6.

- December 18, 2008: Eric Morris sold a loaded pistol to a confidential informant. Morris PSR ¶ 7.

- February 16, 2009: Police recovered a pistol and ammunition from Morris's home.  *Id.*

- June 30, 2009: Police recovered a loaded gun and thirty-five bags of heroin, about two grams' worth, from an apartment used by Hall.  Hall PSR ¶ 6.

- July 9, 2009: Torres was placed in custody after being sentenced for a weapons offense on June 8, 2009.  Torres PSR ¶ 22.

- August 9, 2009: Damien Bannister was arrested with forty-eight bags of crack cocaine and ninety glassines of heroin.  Damien Bannister PSR ¶ 39–40.

- October 19, 2009: Police recovered a loaded .380 caliber pistol belonging to Indio Tatum from an abandoned vehicle parked on Clifton Place.  Indio Tatum PSR ¶ 8.

- January 21, 2010: Damien Bannister was sentenced for the August 9, 2009 drug offense described above.  Damien Bannister PSR ¶ 39–40.

20

- January 26 and 27, 2010: Investigators arrested nine of the eleven defendants in this case. *See*, *e.g.*, Derrick Tatum PSR ¶ 1. Torres and Damien Bannister were already in custody. Upon arresting Derrick Tatum, investigators recovered approximately $10,000 in cash. *Id.* at ¶ 8.

## C.    History and Sociology

Because the saga of deprivation, isolation, and crime that characterize life in neighborhoods such as Louis Armstrong Houses is relevant to sentences, the history and sociology of such areas are discussed below. *See* Philip J. Cook & Jens Ludwig, *The Economist's Guide to Crime Busting*, Wilson Q., Winter 2011, at 62 ("Most of us choose to abstain from crime in part because we have a lot to lose if we get caught. . . . The calculus for an unemployed dropout with readily available criminal options and few licit prospects is likely to be quite different.").

### 1.    Roots of African American Segregation and Poverty

#### a.    Segregation and the Civil Rights Movement

The poverty and *de facto* racial segregation in which defendants have lived have their immediate roots in the nineteenth century, as the American South coped with the economic and social transformations wrought by the Civil War, the abolition of slavery, and the gains made by African Americans during Reconstruction. Under the protection of the federal government, the condition of newly freed African Americans improved. Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* 29 (2010). Racial oppression returned as the federal government indicated an unwillingness to protect African Americans, troops were withdrawn from southern states, and courts issued decisions validating racial segregation as

lawful. *Id.* at 30–35; Lawrence M. Friedman, *A History of American Law* 382 (3d ed. 2005) ("*History*"); Herbert Hill, *Black Labor and the American Legal System: Race, Work, and the Law* 12–14 (1985 Univ. of. Wisc. Press) (1977).

The Jim Crow system compelled segregation and oppression of African Americans.  In the South they were put to work in quasi-servitude under the sharecropping system.  Nicholas Lemann, *The Promised Land: The Great Migration and How It Changed America* 6, 18–20 (1991); Friedman, *History*, *supra*, at 321.  They were prohibited from holding many jobs, particularly in the skilled trades, or from joining labor unions.  Hill, *supra*, at 12–25.  They were forced to live, work, and conduct their daily business under rules of rigid racial separation. Friedman, *History*, *supra*, at 383–84.  Criminal vagrancy laws were enforced, ensuring that African Americans continued to work for the benefit of White employers.  Those who were convicted of crimes were forced to work for little or no pay as prisoners.  Douglas A. Blackmon, *Slavery by Another Name: The Re-Enslavement of Black Americans from the Civil War to World War II* 7–8 (2008); Alexander, *supra*, at 31.  African Americans were further suppressed through a terrorist campaign of lynchings, bombings, and mob violence.  Alexander, *supra*, at 30; Lawrence M. Friedman, *Crime and Punishment in American History* 187–91 (1993) ("*Crime*"). *See also* Orlando Patterson, *Black Americans*, in *Understanding America: The Anatomy of an Exceptional Nation* 385 (Peter H. Schuck & James Q. Wilson, eds., 2008) (describing the Jim Crow period as a "seventy-five year disaster: a vicious system of terror during which some five thousand African Americans were slaughtered, many of them ritually burnt alive").

The Jim Crow system—*de facto* and *de jure* racial segregation and political and civic disenfranchisement—remained intact for over half a century, due in large part to the complicity

22

of the federal government.  *See*, *e.g.*, Michael G. Long, *Marshalling Justice: The Early Civil Rights Letters of Thurgood Marshall* 72–73 (2011) (criticism by Thurgood Marshall, in a 1940 letter to President Franklin Roosevelt, of the Federal Housing Administration's embrace of racially restrictive covenants and its refusal to insure loans to African Americans buying homes in White areas); *id.* at 74–75 (criticism by Thurgood Marshall, in a 1940 letter to Secretary of the Navy, Frank Knox, complaining of segregation in the United States military).

Jim Crow was dismantled from the 1940s through the 1960s, as courts and federal lawmakers began to recognize the necessity of meeting widespread demands of African American citizens for equality.  *E.g.*, *Shelley v. Kraemer*, 334 U.S. 1 (1948) (holding that state court enforcement of racially restrictive covenants violated the Equal Protection Clause). Resisted by citizens of all backgrounds were attempts by segregationists, through both legal and extralegal channels, to enforce demeaning control.  By the mid-1960s, with some school desegregation following *Brown v. Board of Education*, 347 U.S. 483 (1954), and with the Voting Rights Act and the Civil Rights Act having been passed, the movement for equal legal rights and equal opportunities began to achieve substantial success.  Alexander, *supra*, at 35–38; s*ee generally* Jack Greenberg, *Crusaders in the Courts: Legal Battles of the Civil Rights Movement* 2004) (recounting the role of the NAACP Legal Defense Fund in civil rights litigation); Jack Greenberg, Brown v. Board of Education*: Witness to a Landmark Decision* (2004) (chronicling the litigation of *Brown*).

### b.    Urbanization and Unemployment

Concurrent with the dismantling of the Jim Crow system was the migration of African Americans from the rural South to urban centers across the United States.  Lemann, *supra*, at 6.

23

*See also* Patterson, *supra*, at 381 ("As late as 1940, over a half of the black population was still rural (52.4 percent); within a decade, 62 percent was urban, and by 1960 nearly three in every four.").

African Americans migrated to northern cities in part to escape racial persecution and in part for jobs. Jackson, *supra*, at 113. The decline of the sharecropping system and the advent of chemical herbicides and the mechanical cotton picker had reduced the demand for farm labor in the South. Lemann, *supra*, at 70. Northern cities offered the lure of well-paying industrial jobs. *Id.*; Patterson, *supra*, at 381. During the 1940s and 1950s, the result of this migration was a far higher standard of living in urban areas than African Americans had experienced in the rural South. William Julius Wilson, *When Work Disappears: The World of the New Urban Poor* 53–54 (1996). *See also id.* at 26–27 ("The traditional American economy featured rapid growth in productivity and living standards. . . . In this system plenty of blue-collar jobs were available to workers with little formal education.").

Economic gains for African Americans in the industrialized North were, however, limited. "[I]n 1939 half of all Negro wage earners in New York were receiving less than $850 per year." Robert A. Caro, *The Power Broker: Robert Moses and the Fall of New York* 491 (Vintage ed. 1975) (1974). "40 percent of New York City's African American population in 1940 remained on relief or dependent on federal funds for temporary work relief." Jackson, *supra*, at 114. Despite the need for labor to support the war effort, some factories excluded Black workers entirely. *See id.*

Subsequently, unemployment worsened. In the 1950s, the unemployment rate for African Americans in New York City was twice that of Whites. *Id.* In 1965, it was observed

that African American unemployment, particularly in northern urban areas, had been at "disaster

levels" for thirty-five years, with the exception of the World War II and Korean War years.

United States Dep't of Labor Ofc. of Pol'y Planning & Res., *The Negro Family: The Case for*

*National Action* 20 (photo. reprint 2011) (1965) (emphasis removed). *See also id.* at 26 ("The

most conspicuous failure of the American social system in the past 10 years has been its

inadequacy in providing jobs for Negro youth. Thus, in January 1965 the unemployment rate for

Negro teenagers stood at 29 percent. This problem will now become steadily more serious.");

*Kerner Report*, *supra*, at 13 ("Between 2 and 2.5 million Negroes—16 to 20 percent of the total

Negro population of all central cities—live in squalor and deprivation in ghetto

neighborhoods."); *id.* ("[D]espite continuing economic growth and declining national

unemployment rates, the unemployment rate for Negroes in 1967 was more than double that for

whites.").

Unemployment in large cities was cited by the presidentially appointed Kerner

Commission as a primary cause of the wave of rioting in African American neighborhoods in the

late 1960s. *Kerner Report*, *supra*, at 1, 24. Other identified causes of disorder included

pervasive discrimination and segregation; the exodus of White residents from inner-city areas

and in-migration of African Americans; and the frustration of hopes of advancement that had

been raised by the Civil Rights Movement. *Id.* at 10.

Conditions worsened after the 1960s. Just as the promise of work in the industrial north

brought African Americans in large numbers to northern cities in the Great Migration, the

closing of factories contributed to the partial unraveling of African American communities. *See*

Lemann, *supra*, at 201 ("From 1960 to 1994, manufacturing employment increased nationally by

3 per cent but fell in New York, Chicago, Los Angeles, Philadelphia, and Detroit, and later the drop in urban unskilled manufacturing jobs became more precipitous."); William Julius Wilson, *supra*, at 31 ("The number of employed black males ages 20 to 29 working in manufacturing industries fell dramatically between 1973 and 1987 (from three of every eight to one in five).").

Much of the new job growth in recent decades has occurred in high-technology fields that are inaccessible to workers with limited education and training. *Id.* at 29. Most jobs for workers with limited skills are not in manufacturing but in the service sector, which hires more women than men. *Id.* at 27. Typically, these jobs are located in suburban or exurban areas far from inner-city neighborhoods, and sometimes inaccessible by public transportation. *Id.* at 37–41; David Hilfiker, *Urban Injustice: How Ghettos Happen* 9 (2002). *See also* Alfonso Castillo, *MTA Plans to Cut Most of LI Bus Routes*, Newsday, Mar. 2, 2011, at 2 (reporting service cuts that would leave certain neighborhoods with no access to public transportation).

### 2.    Government Efforts to Alleviate Poverty and Poor Living Conditions

#### a.    Public Housing

NYCHA was organized in the 1930s with the hope of "eliminat[ing] the crime, illness, poverty, and moral decay bred by slums[.]" Jackson, *supra*, at 954. The earliest NYCHA housing developments were low-rise buildings provided for families with moderate incomes; the destitute were ineligible. Like the neighborhoods in which they were located, these developments were racially segregated. *Id.*

Building of high-rise housing projects began in 1939. *Id.* Under a slogan of "slum clearance," blocks of low-income housing in old, poorly maintained tenements were razed and replaced with "superblocks" of high-density buildings with small, cheaply constructed

26

apartments.  Nicholas Dagen Bloom, *Public Housing that Worked: New York in the Twentieth Century* 129–132, 142–43 (2008); Caro, *supra*, at 611; Jackson, *supra*, at 954–55.  Tenants, particularly African Americans and Puerto Ricans, were evicted with little notice and little hope of finding decent housing elsewhere.  Caro, *supra*, at 968–976, Jackson, *supra*, at 955.  The methods of slum clearance were criticized for uprooting communities and disrupting the fabric of city neighborhoods.  *E.g.*, Jane Jacobs, *The Death and Life of Great American Cities* 4, 270–72 (1961).

By the 1960s, after many White, middle-class New Yorkers migrated to suburban areas, housing projects were inhabited mostly by poor African Americans and Hispanics.  Jackson, *supra*, at 915; *see also* Bloom, *supra*, at 211 (discussing the increased population of welfare recipients in NYCHA projects during the 1960s); William Julius Wilson, *supra*, at 48 ("Since smaller suburban communities refused to permit the construction of public housing, the units were overwhelmingly concentrated in the overcrowded and deteriorating inner-city ghettos—the poorest and least socially organized sections of the city and the metropolitan area.").

A significant portion of New York City's population now lives in housing under the management of NYCHA, the largest public housing system in North America.  It serves more than 650,000 people—over 8 percent of city residents.  New York City Hous. Auth., *About NYCHA: Fact Sheet*, http://www.nyc.gov/html/nycha/html/about/factsheet.shtml (revised May 20, 2010).

      **b.**        **Welfare Policy**

Noteworthy attempts at improving the lives of those in defendants' position have been made.  Foremost among initiatives to aid poor families was Aid for Families with Dependent

Children (AFDC), a federally-funded and state-run program in which low-income families were given money equivalent to 12 percent to 55 percent of poverty-level income for a family of three. Hilfiker, *supra*, at 88.  From AFDC's inception in the 1930s until the 1960s, only about one in three eligible families received welfare; most were widows with children.  An increased number of applications for aid, and the higher rate at which applications were accepted, resulted in a dramatic expansion of AFDC in the 1960s; nine out of every ten eligible families received this aid.  *Id.* at 78.

In the 1960s, as part of a set of initiatives labeled the War on Poverty, a "community action" program was implemented.  Social services were to be delivered to inner-city residents through a decentralized network of federally funded offices.  Lemann, *supra*, at 133; Hilfiker, *supra*, at 77.  This system failed to significantly ameliorate poverty conditions.  "There is no clear example of a community action agency in a poor neighborhood accomplishing either the original goal of reducing juvenile delinquency or the subsequent goal of reducing poverty." Lemann, *supra*, at 192.  Federal funding was terminated in 1974.  Hilfiker, *supra*, at 78.

The federal government launched Model Cities, a program managed by the Department of Housing and Urban Development, in the late 1960s.  It "was supposed to spend billions to rehabilitate the ghettos physically and otherwise . . . fixing slums up rather than tearing them down."  Lemann, *supra*, at 187.  Developed after a pilot community development program launched in Bed-Stuy, it was conceived as an improvement over the community action program. *Id.* at 198.  Its primary benefit was not to improve living conditions for residents of impoverished neighborhoods but to provide jobs to those employed in Model Cities programs, many of whom used their newfound economic stability to relocate outside ghetto neighborhoods.  *Id.* at 251.

28

Federal social welfare expenditures were not focused on the poor.  Medicare and social security, which delivered benefits to elderly Americans regardless of income, accounted for most federal social support expenditures.  As a result, 75 percent of welfare funding from the mid-1960s through the early 1970s was devoted to the non-poor.  Hilfiker, *supra*, at 80.  Nor were many steps taken during the War on Poverty to remedy the causes of poverty.  There was no attempt to replace welfare with a program designed to move poor people into the mainstream of society by boosting employment.  Lemann, *supra*, at 219.

There were a number of enduring legislative achievements, including Medicare, Medicaid, and Head Start, an early intervention program for low-income children.  Friedman, *History*, *supra*, at 508; Lemann, *supra*, at 350.  Nevertheless, the perceived failure of some programs prompted many to conclude that any broad attempts by government, particularly the federal government, to remedy poverty were doomed to fail.  Lemann, *supra*, at 219.  *See also id.* at 344 ("Rhetorically, the war on poverty was made to sound more sweeping than it really was, and so set itself up to seem as if it had ended in defeat when it didn't vanquish all poverty.").  Government intervention did succeed in making a lasting difference benefiting upwardly mobile, middle-class African Americans.  Hilfiker, *supra*, at 76 ("[M]any war on poverty programs were successful by almost any measure."); Lemann, *supra*, at 201; *id.* at 219 ("The black middle class grew faster during the Great Society period than at any other time in American history.").

A significant portion of the federal welfare system was overhauled in 1996.  AFDC had for years utilized a number of controversial provisions discouraging work or marriage.  "Essentially all work income was deducted from [AFDC] benefits, and mothers going to work

also lost Medicaid and childcare benefits, making it almost impossible to transition from welfare to work.  Since a marriage partner's income was deducted from benefits, it was better to keep the relationship informal and not get married."  Hilfiker, *supra*, at 88.  Under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), enacted in 1996, AFDC was replaced with a new program—Temporary Assistance for Needy Families (TANF).  Eligibility for TANF benefits was made contingent on meeting work and work preparation requirements.  Recipients were allowed to receive cash assistance for no more than two to five years over their lifetimes; childless individuals were allowed only three months of food stamps every three years.  *Id.* at 88–90.  PRWORA appears not to have substantially reduced poverty.  Forty percent of families who left the welfare rolls had neither work nor other cash assistance.  In a three-city study, 93 percent who were dropped from the welfare rolls due to sanctions remained in poverty.  *Id.* at 95–96.

Few anti-poverty programs today are targeted at unemployed men.  "Many of today's antipoverty programs focus . . . on single mothers and their children.  Although men obviously play important roles in these families and their communities, they are often excluded or overlooked by efforts to encourage poor mothers to transition from welfare to work or to improve the life-chances of poor children."  Margery Austin Turner & Lynette A. Rawlings, Urban Inst., *Overcoming Concentrated Poverty and Isolation: Lessons from Three HUD Demonstration Initiatives* 33 (2005).

### 3.    Economic and Social Conditions of Those in Defendants' Position

The problems associated with poverty, segregation, and lack of jobs for low-income African Americans, particularly males, continue.

### a.    Racial Segregation

Persistent *de facto* racial segregation remains a fundamental aspect of life for low-income African Americans.  "[A]lthough legalized segregation has long been abolished and antiexclusionary laws strictly enforced, the great majority of blacks still live in highly segregated communities."  Patterson, *supra*, at 376.

> [A]lmost 60 percent of blacks would have to move to realize a distribution across neighborhoods that reflected their actual proportion of the population. . . .  Both the level of segregation and the extent to which it is changing vary considerably by region.  The highest segregation rates in metropolitan areas are surprisingly in the "liberal" regions of the Northeast and Midwest . . . [including] New York[.]

*Id.* at 395.  *Cf.* Kerner Report, *supra*, at 13 (stating that in 1960, 86 percent of African Americans would have had to move in order to create an unsegregated population distribution).

To a significant degree, this lack of integration results from the segregated conditions in public housing.  William Julius Wilson, *supra*, at 48 ("[P]ublic housing . . . has isolated families by race and class for decades, and has therefore contributed to the growing concentration of jobless families in the inner-city ghettos in recent years.").

### b.    Poverty and Unemployment

The economic situation of low-income, poorly educated African Americans in defendants' position has deteriorated in relation to both poor Whites and middle- and upper-class Blacks.  Patterson, *supra*, at 392.  While the African American middle class has grown substantially over the past decades, a third of African Americans remain in the lowest economic quintile, compared to about 18 percent of Whites.  *Id.* at 390–91 (citing 2006 United States Census figures).  Income inequality by race is underscored by disparity within the lowest income

quintile; the average Black household in this category earns $7,869, compared to $16,440 for White households.  *Id.* at 391.

African Americans from inner-city communities who enjoy economic success are likely to leave their neighborhoods for more affluent communities.  Elijah Anderson, *Code of the Street: Decency, Violence, and the Moral Life of the Inner City* 145 (2000) ("Because of all the vice and crime in the neighborhood, those who can leave tend to do so, isolating the very poor and the working poor even more.").  *Accord* William Julius Wilson, *supra*, at 46.  *See also* Lemann, *supra*, at 347 ("The impressive record of black success in America's cities since the 1960s has been almost entirely bound up with leaving the ghettos rather than improving them[.]").

Many experts agree that a key cause of poverty among African Americans is unemployment and underemployment.  Statistics underestimate unemployment partly because the criminal system and large-scale incarceration result in taking sentenced men like defendants out of the labor market.

> The overall rate [of black unemployment and underemployment] has remained twice that of whites from the early 1970s, even while falling to historic lows of under 10 percent in the late 1990s and again in 2006 when it stood at 8.8 percent, compared with the white rate of 3.8 percent.  But an increasing proportion of the impoverished are working people who, because of inadequate skills and education, cannot earn enough to rise above the poverty line.  And general unemployment rates conceal the exceedingly high youth unemployment rate of 37 percent among young black men.  The true rate . . . is even higher because it neglects the substantially lower labor force participation rate among young black men and the astonishingly high proportion of young black men in prison or jail, who are not included in the employment figures.

Patterson, *supra*, at 398.

The blighted hopes of low-income African American families have been exacerbated by the recent economic crisis and its effect on employment. "'The impact is potentially devastating on black families in the city. This has kicked more black families into poverty, families who were clinging to working-class lives.'" Ryan Strong & Lore Croghan, *'Labeled, Judged' & Can't Find a Job: Black New Yorkers Hit Hard by Unemployment*, N.Y. Daily News, Dec. 14, 2010, at 4 (quoting Michelle Holder, Cmty. Serv. Soc. of New York). *See also* Erik Eckholm, *Recession Raises Poverty Rate to a 15-Year High*, N.Y. Times, Sept. 16, 2010, http:// www.nytimes.com/2010/09/17/us/17poverty.html ("The share of [United States] residents in poverty climbed to 14.3 percent in 2009, the highest level recorded since 1994. The rise was steepest for children, with one in five affected.") (citing data from the United States Census Bureau). *Cf.* Hon. Carolyn Maloney, Chair, U.S. Cong. Joint Econ. Comm., 111th Cong., *Income Equality and the Great Recession* 2 (2010), *available at* http://jec.senate.gov/public/ *?a=Files.Serve&File_id=91975589-257c-403b-8093-8f3b584a088c* ("Between 1980 and 2008, [the share of total national income accrued by the wealthiest 1 percent of households] rose from 10.0 percent to 21.0 percent, making the United States . . . one of the most unequal countries in the world.").

For African American men living in New York City, the unemployment rate doubled between 2006 and 2009. The 2009 rate was 17.9 percent, compared to 6.3 percent for White men. Strong & Croghan, *supra*, at 4. For African American men aged 16 to 24, the unemployment rate from January 2009 through June 2010 was 33.5 percent, and the labor force participation rate was 38 percent. Steven Greenhouse, *Study Shows Depth of Unemployment for Blacks in New York*, N.Y. Times, Dec. 13, 2010, http://economix.blogs.nytimes.com/2010/

12/13/study-shows-depth-of-unemployment-for-blacks-in-new-york/. *See also* Motoko Rich,

*Few New Jobs as Jobless Rate Rises to 9.8%*, N.Y. Times, Dec. 3, 2010, http://

www.nytimes.com/2010/12/04/business/economy/04jobs.html?ref=motokorich ("More than 15

million people are out of work, among them 6.3 million who have been jobless for six months or

longer.").

The cost of joblessness is not merely economic. Its psychological and sociological

effects are devastating.

> [W]ork is not simply a way to make a living and support one's family. It also constitutes a framework for daily behavior and patterns of interaction because it imposes disciplines and regularities. Thus, in the absence of regular employment, a person lacks not only a place in which to work and the receipt of regular income but also . . . a system of concrete expectations and goals. Regular employment provides the anchor for . . . daily life. It determines where you are going to be and when you are going to be there. In the absence of regular employment, life, including family life, becomes less coherent. Persistent unemployment and irregular employment hinder rational planning in daily life, the necessary condition of adaptation to an industrial economy.

William Julius Wilson, *supra*, at 73. *See also id.* at 75 ("The problems associated with the

absence of work are most severe for a jobless family in a low-employment neighborhood

because they are more likely to be shared and therefore reinforced by other families in the

neighborhood[.]").

### c.     Health Problems

Adverse health effects of life in inner-city neighborhoods were memorialized by the

Kerner Commission. "The residents of the racial ghetto are significantly less healthy than most

other Americans. They suffer from higher mortality rates, higher incidence of major diseases,

and lower availability and utilization of medical services. They also experience higher

admission rates to mental hospitals." *Kerner Report*, *supra*, at 269.  This situation is reflected in the instant case among defendants suffering from asthma, depression, trauma, and deep psychological problems.

Racial disparities in health persist.  "Infants born to black women are 1.5 to 3 times more likely to die than infants born to women of other races/ethnicities."  Thomas R. Frieden, Director, Ctrs. for Disease Control & Prevention, *Foreword, Morbidity and Mortality Weekly Report: CDC Health Disparities and Inequalities Report*, Jan. 14, 2011, at 1, *available at* http://www.cdc.gov/mmwr/pdf/other/su6001.pdf.  African Americans account for about 45 percent of people diagnosed with HIV in the United States.  Ctrs. for Disease Control and Prevention, *HIV among African Americans* 1 (2010), *available at* http://www.cdc.gov/hiv/ topics/aa/pdf/aa.pdf (reporting 2006 data).  Blacks also suffer higher rates of heart disease, stroke, high blood pressure, and preventable hospitalizations.  Frieden, *supra*, at 1.  The asthma rate among African American children is 60 percent higher than the rate for White children. Angela Zimm, *Children Sicker Now than in Past, Harvard Report Says*, Bloomberg, June 26, 2007, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a8jD2znv51pU.

Difficulties of life in public housing are closely linked to psychological problems, including depression.

> Public housing households are some of the poorest households in the United States, and the concentration of problems that many residents experience in addition to high levels of crime—poor nutrition, obesity, low social capital, illiteracy, racial segregation— have been linked to poor mental health, including high levels of depression and other mental illnesses[.]

Caterina G. Roman & Carly Knight, Urban Inst., *An Examination of the Social and Physical Environment of Public Housing in Two Chicago Developments in Transition* 1 (2010), *available*

*at* http://www.urban.org/uploadedpdf/412134-chicago-public-housing.pdf. *See also id.* at 22 ("[E]conomic stressors, which include threats of eviction, not being able to pay bills, or buy food for oneself, [are] associated with depression."). African Americans are more than four times more likely than Whites to be diagnosed as schizophrenic, apparently due in part to misdiagnosis of depression. Shankar Vedantam, *Racial Disparities Found in Pinpointing Mental Illness*, Wash. Post, June 28, 2005, http://www.washingtonpost.com/wp-dyn/content/article/ 2005/06/27/ AR2005062701496.html.

### d.    Family Structure

A high percentage of African Americans are raised in families headed by single females. "An almost equal number of black families are headed by a single female (44.7 percent) as a married couple (46.5 percent) compared with white families, 82 percent of which are headed by a married couple and only 13 percent by a single woman, or Hispanics, among whom the rates are 71 and 20 percent, respectively." Patterson, *supra*, at 402.

Much of the decline in family structure can be attributed to unemployment and under-employment. Studies have demonstrated a close correlation between the income of young African American men and their likelihood of being married. William Julius Wilson, *supra*, at 95. "As jobs become scarce for young black men, their success as breadwinners and traditional husbands declines. The notion is that with money comes control of the domestic situation." Anderson, *supra*, at 175. *See also Kerner Report*, *supra*, at 260 ("If men stay at home without working, their inadequacies constantly confront them and tensions arise between them and their wives and children. [M]any of these men flee from their responsibilities as husbands and fathers[.]"). Men whose joblessness and undereducation make them ill-suited as husbands and

fathers are often viewed with mistrust and resentment by women.  William Julius Wilson, *supra*, at  98–99.

In the absence of suitable, reliable men, women bear the onus of rearing children and supporting families financially.  *See* Anderson, *supra*, at 58 (quoting a fatherless woman from a low-income neighborhood in Philadelphia) ("'I see all of the weight shifted on the mother.  And the mother really has to be strong if she wants her kids to do something in society.  It really takes a lot to do it by yourself.'").  *Cf.* William Julius Wilson, *supra*, at 123–24 (discussing the tendency of some employers to view African American women as more dependable than their male counterparts).

The absence of fathers and the prevalence of single-female-headed families gravely impairs the ability of children, particularly boys, to internalize positive values as they mature.  "Young men who lack . . . [an] effective father figure, both as a role model and as a viable presence in their lives, are often hard-pressed to organize their lives in accordance with his standards, standards handed down from generation to generation[.]"  Anderson, *supra*, at 237. *See also* Michael C. Lu, et al., *Where is the F in MCH? Father Involvement in African American Families*, 20 Ethnicity & Disease S2-49, S2-49 (2010) ("[C]hildren growing up in father-absent families are at greater risk for various educational or behavioral problems and poorer developmental outcomes, even after controlling for parental education, income and other factors."); Kenneth W. Griffin, et al., *Parenting Practices as Predictors of Substance Use, Delinquency, and Aggression Among Urban Minority Youth: Moderating Effects of Family Structure and Gender*, 14 Psych. of Addictive Beh. 174, 174 (2000) ("[R]esearch has shown that

youth from single-parent families often have higher rates of problem behaviors including substance use, aggression, school dropout, and teenage pregnancy.") (citations omitted).

e.        Undereducation

African American children remaining in ghetto neighborhoods have demonstrated a marked lack of academic preparation relative to students of other racial groups.  Boys lag behind Hispanic students and far behind White students in ways that cannot be explained satisfactorily by poverty alone.  Trip Gabriel, *Proficiency of Black Students Is Found to Be Far Lower than Expected*, N.Y. Times, Nov. 9, 2010, at A22 (reporting results from a 2010 study by the Council of the Great City Schools).  "Only 12 percent of black fourth-grade boys are proficient in reading, compared with 38 percent of white boys, and only 12 percent of black eighth-grade boys are proficient in math, compared with 44 percent of white boys."  *Id.*  It has been suggested that the undereducation of many African American males may result in part from parenting practices. *Id.*

Many African American students attend racially segregated schools.  "A half-century after the Court's decision in Brown, approximately 40% of black and Latino students attended schools with 90–100% minority enrollment, and more than one-in-six black children attended schools made up of 99–100% minority students."  Matthew Scutari, Note, *"The Great Equalizer": Making Sense of the Supreme Court's Equal Protection Jurisprudence in American Public Education and Beyond*, 97 Geo. L.J. 917, 920–21 (2009).  Racial integration in schools rose through the 1970s but has fallen steadily since 1988.  *Id.* at 921.  In New York City, African American students are more likely than White students to attend poorer performing schools.  *See* New York City Indep. Budget Ofc., *Demographics, Performance, Resources: Schools Proposed*

*for Closing Compared with Other Schools* 5 (2011), *available at* http://www.ibo.nyc.ny.us/ iboreports/schoolclosingjan2011.pdf (reporting that twenty-five underperforming New York City schools proposed for closing by the New York City Department of Education were 52 percent African American and 3 percent White, while the average city school was 31 percent African American and 14 percent White).

The failures of our school system are demonstrated by our high schools' unacceptably high dropout rates. In many areas with concentrated populations of low-income families from racial minorities, "up to half of all high school students drop out and up to half of these dropouts are simply idle, neither joining the work force nor seeking further education. Entire communities are thus being shut off from full participation in American society." Robert Balfanz, *Can the American High School Become an Avenue of Advancement for All?*, 19 Future of Children 17, 31 (2009).

Over the past three decades, high schools have shifted toward a universal college preparation curriculum intended to bolster the nation's sagging performance relative to other countries. Valerie E. Lee & Douglas D. Ready, *U.S. High School Curriculum: Three Phases of Contemporary Research and Reform*, 19 Future of Children 135, 142, 144–45 (2009); Balfanz, *supra*, at 25. The move to a college preparatory curriculum has coincided with a decrease in the prevalence of vocational and technical training programs to prepare high school students to enter the skilled trades. Balfanz, *supra*, at 26. Today, fewer than 3 percent of high school students attend vocational or technical schools, and the average student earns only 3.5 credits in vocational coursework. *Id.*

A significant campaign to reform urban public schools continues.  Numerous initiatives have been pursued: reliance on high-stakes testing to develop data with which to evaluate student progress, school performance, and teacher effectiveness; recruitment of young, highly educated people to become teachers and administrators; de-emphasis of tenure in favor of retention of teachers based on merit; reliance on mathematics and reading, often to the exclusion of science, social studies, physical education, art, and extracurricular activities; longer school days; promotion of parents' ability to choose schools for their children; creation of quasi-autonomous charter schools, managed and funded to varying degrees by corporations and non-profit organizations; contracting of public school teaching and administration to private companies; the closing of "failing" schools and dismissal of their administrators and faculty; and dividing large neighborhood high schools into small schools, often organized around a theme.  *See generally, e.g.,* Diane Ravitch, *The Death and Life of the Great American School System: How Testing and Choice are Undermining Education* (2010).

There is little evidence to date that these initiatives have worked significant salutary effects for children with histories like those of the instant defendants.  *See id.* at 225–229; Robert J. Samuelson, *School Reform's Meager Results*, Wash. Post, Sept. 6, 2010, http:// www.washingtonpost.com/wp-dyn/content/article/2010/09/05/R2010090502817_pf.html ("[N]o one has yet discovered transformative changes in curriculum or pedagogy, especially for inner-city schools, that are . . . easily transferable to other schools, where they would predictably produce achievement gains."); Gabriel, *supra* (quoting Michael Casserly, Council of the Great City Schools) ("'[T]here's not a lot of research to indicate that [strategies such as opening charter

schools, closing underperforming schools, and attempting to boost teacher quality] produce better results.").

Some school reforms may be jeopardized by reductions in school spending to respond to increasing fiscal pressures. *See* Thomas Kaplan, *As Schools Face Cutbacks, a Debate Over What's Fair*, N.Y. Times, Feb. 14, 2011, http://www.nytimes.com/2011/02/15/nyregion/15schools.html (quoting Billy Easton, Alliance for Quality Educ.) ("'The governor's budget hurts school kids across the board, because the cuts are enormous, and they are much larger in poor districts than rich districts[.]'").

Much school reform is focused on developing advanced skills and increasing college matriculation and graduation rates. Andrew Hacker, *Where Will We Find the Jobs?*, N.Y. Rev. Books, Feb. 24, 2011, http://www.nybooks.com/articles/archives/2011/feb/24/where-will-we-find-jobs/; Lawrence Mishel, *The Overselling of Education*, Am. Prospect, Feb. 23, 2011, http://www.prospect.org/cs/articles?article=the_overselling_of_education. There is, however, little evidence that a broad increase in college education will foster economic growth or reduce unemployment or income inequality. Michel, *supra* ("[T]he wages of all college graduates have been flat over the last 10 years, with those for men having markedly declined. . . . A major increase in the supply of college graduates would . . . drive down the wages of all college graduates[.]"); *id.* ("Wage gaps are primarily driven by increased inequalities among workers with similar educations . . . rather than by differences across education groups.").

Many social problems appear to be beyond the reach of educational reforms alone. *Cf.* Joie Tyrell, *Dividing by Three to Multiply Grads*, Newsday, Sept. 27, 2010, at A10 (quoting Prof. Alan Singer, Hofstra Univ.) ("'[School administrators] keep looking for solutions within

the schools because no one wants to address the underlying problem of racial isolation and

segregation. . . .  There are no miracle solutions. . . .  Kids will do better in schools when their

lives are better.'").  It appears that instead of pursuing reforms focused on preparing children for

college, "[t]he key challenge is to provide good jobs[.]"  Mishel, *supra*.

<strong>f.        Social Values</strong>

In place of steady jobs and the values and satisfactions that those jobs inculcate, low-

income African Americans in urban neighborhoods are left with an economic desperation that

can lead to antisocial behavior.  Anderson, *supra*, at 145.  "[W]hen jobs disappear and people are

left poor, highly concentrated, and hopeless, the way is paved for the underground economy to

become . . . an unforgiving way of life organized around a code of violence and predatory

activity."  *Id.* at 325.

A high premium is placed upon self-defense and "respect."  Children are conditioned by

their families and friends, perhaps more so than in middle-class and wealthy settings, to assert

themselves physically to prevent or avenge perceived insults or abuse.  *Id.* at 70–71.  Generated

among many young people is a constant competition for status and physical dominance acted out

on street corners and other gathering places.  *Id.* at 76–79.  Some young males, particularly those

who are engaged in crime, present themselves as ready to confront and fight anyone.  This may

reflect a sort of fatalism, as those without hopes for a long-term, positive future adopt the view

that they must accept whatever misfortune may befall them, even death; the outcome is out of

their hands.  *Id.* at 136.  To such young people, momentary gratification is more reliable than

future benefits.

Adverse factors in low-income, urban neighborhoods appear to affect boys and girls differently.  "[A] boy is under constant pressure to demonstrate his masculinity in destructive ways (chief among them, joining a gang) and doesn't have a parent of the same sex around, as girls do."  Lemann, *supra*, at 299.

### g.      Prevalence of Crime

For many boys, the cumulative result of poverty, racial segregation, antisocial ethics, and fatherlessness is often crime.  "Their career 'choices' and their major life changes largely result from, and are coextensive with, their background and the disturbed family systems in which they were raised and/or currently reside.  Persons who grew up in severely distressed households learned strategies that leave them ill-equipped for conventional society."  Bruce D. Johnson, et al., *Crack Distribution and Abuse in New York*, 11 Crime Prevention Stud. 19, 26 (2000).  *Accord* Glenn C. Loury, *Crime, Inequality & Social Justice*, Daedalus, Summer 2010, at 136–37 ("The factors that lead young people to crime—the 'root causes'—have long been known: disorganized childhoods, inadequate educations, child abuse, limited employability, delinquent peers.  These are factors that also have long been more prevalent among the poor than the middle classes[.]").

Lack of male parental guidance is a known, significant contributor to crime.

> With the father absent and the mother working, many ghetto children spend the bulk of their times on the streets . . . of a crime-ridden, violence-prone and poverty-stricken world.  The image of success in this world is not that of the "solid citizen," the responsible husband and father, but rather that of the "hustler" who promotes his own interests by exploiting others.  The dope sellers . . . are the "successful" men because their earnings far outstrip those [of] men who try to climb the economic ladder in honest ways.

> Young people in the ghetto are acutely conscious of a system which appears to offer rewards to those who illegally exploit others, and failure to those who struggle under traditional responsibilities.  Under these circumstances, many adopt exploitation and the "hustle" as a way of life. . . .

Kerner Report, *supra*, at 262.  *Cf.* Michelle Little & Laurence Steinberg, *Psychosocial Correlates of Adolescent Drug Dealing in the Inner City: Potential Roles of Opportunity, Conventional Commitments, and Maturity*, 43 J. Res. in Crime & Delinq. 357, 378 (2006) ("[A]dolescents who sold the most drugs were more likely to live in contexts characterized by high physical and social disorder, low parental monitoring, high rates of parental substance use and abuse, and high levels of peer deviance.  These results highlight the converging influence of broader socioeconomic factors[.]").

The lure of reliable, easy income through the sale of drugs is particularly appealing to many young people living in poverty.  Bruce D. Johnson, et al., *supra*, at 41.  "For many impoverished young black men of the inner city, the opportunity for dealing drugs is literally just outside the door."  Anderson, *supra*, at 114.  *See also* Rozanne Marel, et al., *Drug use Trends in New York City*, in Nat'l Inst. on Drug Abuse, *2 Epidemiological Trends in Drug Abuse: Proceedings of the Community Epidemiology Work Group* 180–82 (2006), *available at* http://drugabuse.gov/PDF/CEWG/Vol2_106.pdf (stating that the street sale of powder cocaine and crack occurs primarily in low-income African American and Hispanic communities, while in other areas drugs are distributed by delivery or from dealers' homes); Xiaoming Li, et al., *Exposure to Drug Trafficking Among Urban, Low-Income African American Children and Adolescents*, 153 Arch. Pediatrics & Adol. Med. 161, 161 (1999) (reporting estimate that 6 to 9 percent of nine- to fifteen-year-olds in low-income, urban settings are involved in the drug

trade).  Drug organizations often recruit from networks of trusted family and friends.  Bruce D.

Johnson, et al., *supra*, at 32.  Young people may also align themselves with gangs in order to

avoid ostracism and violence.

> At the age of eight or nine, boys . . . will begin to receive the
> attentions of gang recruiters.  They are asked to prove their fitness
> for gang membership by stealing, selling drugs, and . . .
> denouncing the authority of[] their mothers . . . all of which are
> signs of their having attained manhood; if they don't join, they are
> taunted, provoked, and sometimes beaten.

Lemann, *supra*, at 296 (describing gangs in a Chicago public housing development).

Young people are also lured to drug gangs by the dubious promise of economic gain.

"[M]any young adults who would prefer to avoid drug sales find that such illicit distribution is

the only economic activity available to them.  Their participation . . . is typically a sporadic and

intermittent way to earn some limited income."  Bruce D. Johnson, et al., *supra*, at 41.  The

primary economic motivation appears to be the hope of attaining the financial rewards enjoyed

by upper-level personnel in a drug hierarchy.  Steven D. Levitt & Sudhir Alladi Venkatesh, *An

Economic Analysis of a Drug-Selling Gang's Finances*, 115 Q.J. Econ. 755, 757 (2000).  Many

work as street-level sellers of drugs in retail quantities, serving a role roughly equivalent to that

of a store clerk.  Bruce D. Johnson, et al., *supra*, at 29.  They work part-time for little

compensation and often supplement their income by working in low-skilled jobs for legitimate

businesses.  Levitt & Venkatesh, *supra*, at 771 (stating that rank-and-file members in a Chicago

drug gang earned below the minimum wage).  In part, this is due to the "minimal skill

requirements of the job [of drug dealer] and the presence of a 'reserve army' of potential

replacements[.]"  *Id.* at 771.  Unable to afford separate residences, rank-and-file members often

live with family members.  *Id.*

The career of a drug dealer is often short.  Dealers often cycle in and out of the drug trade and the legitimate job market.  John M. Hagedorn, *Homeboys, Dope Fiends, Legits, and New Jacks*, 32 Criminology 197, 205 (1994).  For those who do not ascend in a gang's hierarchy, there may be little motivation to remain.  *See* Levitt & Venkatesh, *supra*, at 757.  Drug dealers face a high risk of injury or murder, particularly when rival gangs battle for control of the drug market.  *Id.* at 784 (observing that the members of a studied gang who were active in the gang continuously over a four-year period had about a 25 percent chance of death).  Because of the lack of legally enforceable contracts or property rights in the trade, violence is often a drug organization's only recourse to settling disputes.  *Id.* at 780.

### 4.    Victims of Crime

The costs of the crimes engaged in by young people in impoverished communities are borne primarily by their neighbors.  "[B]lacks are disproportionately *victims* of crime. . . .  Most crime is neighborhood crime; blacks trapped in ghettos are the most vulnerable people in society.  Two blacks are likely to fall victim to robbery, vehicle theft, or aggravated assault for every white; the black homicide rate is more than six times as great as the white rate, and has been so for over fifty years."  Friedman, *Crime*, *supra*, at 379.  *See also Kerner Report*, *supra*, at 267 ("Because most middle-class Americans live in neighborhoods [with low crime rates], they have little comprehension of the sense of insecurity that characterizes the ghetto resident."); *id.* at 268 (stating that law-abiding residents of ghetto neighborhoods "face much higher probabilities of being victimized than residents of most higher-income areas, including almost all suburbs[.]").

A 2010 study revealed close racial parity between murder victims and murder suspects in New York City.  Victims were 67 percent African American, 25 percent Hispanic, 4 percent

White, and 3 percent Asian; suspects were 62 percent African American, 31 percent Hispanic, 4

percent White, and 4 percent Asian.  Edgar Sandoval, et al., *Drugs & Guns Are Killing New*

*York*, N.Y. Daily News, Dec. 2, 2010, at 12.  *See also* Clyde Haberman, *In the Bronx, Looking in*

*the Mirror for Blame, and Solutions, on Gun Violence*, N.Y. Times, Sept. 28, 2010, at A25 ("[I]n

[a Bronx neighborhood,] as elsewhere in the city, no one is a greater threat to life and limb for

young black and Hispanic men than other young black and Hispanic men.").

Guns are carried for protection as well as aggression, leading to fatalities when a transient

conflict flares suddenly into gunfire.  The combination of young men and readily available guns

is deadly.  "Teenagers with guns, especially rapid-fire assault weapons, increase the danger in

these neighborhoods.  Adolescents are generally less likely to exercise restraint than mature

adults are.  Armed with deadly weapons, youngsters are tempted to solve temporary problems in

a very permanent fashion."  William Julius Wilson, *supra*, at 60–61.  *See also id.* at 61 ("The

sharp growth in the number of teenage male homicide victims is directly related to the sudden

rise in the number of young male killers.").

Guns and drug violence contribute to a climate of terror.

> [R]espondents [to a survey of ghetto residents in Chicago] revealed
> that the increase in drug trafficking heightened feelings that their
> neighborhoods had become more dangerous.  As a consequence,
> many residents retreated to the safety of their homes.  "More people
> are dying and being killed," reported one respondent.  "There are
> many drugs sold here every day.  It's unsafe and you can't even go
> out of your house because of being afraid of being shot."  Another
> stated, "I stay home a lot.  Streets are dangerous.  Killings are
> terrible.  Drugs make people crazy."  Similar sentiments were
> voiced by other residents who felt trapped.  One put it this way:
> "It's scary to see these people.  I'm afraid to go outside."

William Julius Wilson, *supra*, at 59–60.  *See also*, *e.g.*, *Kerner Report*, *supra*, at 14 ("Crime rates, consistently higher than in other areas, create a pronounced sense of insecurity."); Fernanda Santos, *At Sharpton's King Day Forum, a Focus on Gun Violence*, N.Y. Times, Jan. 18, 2011 (quoting Rev. Al Sharpton) ("'Our grandmothers are afraid to go to the corner store. . . . [T]hat's real life.'").  The fear of crime and the culture of violence surrounding it drive some residents, even those who are not involved in crime, to rely on firearms to protect themselves, to settle disputes, or to gain respect from peers.  William Julius Wilson, *supra*, at 61.

As a result of the prevalence of crime, residents in impoverished African American neighborhoods often view police with skepticism, criticizing them for failing to provide sufficient protection.  Friedman, *Crime*, *supra*, at 379.  African Americans and Hispanics are disproportionately stopped and frisked by police, frequently with no apparent legal basis.  Al Baker & Ray Rivera, *Study Finds Street Stops Unjustified*, N.Y. Times, Oct. 26, 2010, http://www.nytimes.com/2010/10/27/nyregion/27frisk.html (reporting that 6.7 percent of discretionary stops made by New York City police in 2009 had no constitutional basis, while 24 percent lacked any record from which constitutionality could be determined).  *See also* Al Baker, *Street Stops by the Police Hit a New High*, N.Y. Times, Feb. 22, 2011, http://www.nytimes.com/2011/02/23/nyregion/ 23stop.html (reporting that 600,601 stops were made by New York City police in 2010, more than in any year since such stops were first counted in 2002).  In 2009, guns were discovered in 0.15 percent of all such stops, and 13 percent of stops resulted in arrests.  Baker & Rivera, *supra*.

### D.    Anti-Drug Abuse Act of 1986

The Anti-Drug Abuse Act of 1986 ("1986 Act"), by which the penalties bearing on this case were enacted, was passed during an election-year push to respond to what was perceived as a dangerous spread of drugs, particularly crack cocaine. Sentencing provisions concerning crack cocaine have been repeatedly challenged in court on racial disparity grounds and upheld. Amelioration in 2010 by congressional amendment was limited. This punitive scheme is one manifestation of an ongoing pattern of racial disparity in the enactment and enforcement of drug laws continuing to the present.

### 1.    Historical Drug Sentencing Laws

The 1986 Act follows a long tradition of antidrug laws enacted, at least in part, with discriminatory design. Throughout the twentieth century, drugs have been linked to the racial fears of White Americans. "[Whites in the American] South feared that Negro cocaine users might become oblivious of their prescribed bounds and attack White society." David Musto, *The American Disease: Origins of Narcotic Control* 7 (1973). *Accord* James A. Iniciardi, *The War on Drugs II: The Continuing Epic of Heroin, Cocaine, Crack, Crime, AIDS, and Public Policy* 82, 148 (1992).

> If cocaine was a spur to violence against whites in the South, as was generally believed by whites, then reaction against its users made sense. The fear of the cocainized black coincided with the peak of lynchings, legal segregation, and voting laws all designed to remove political and social power from him. . . .  [E]vidence does not suggest that cocaine caused a crime wave [in the early 1900s] but rather that anticipation of black rebellion inspired white alarm. Anecdotes often told of superhuman strength, cunning, and efficiency resulting from cocaine. One of the most terrifying beliefs about cocaine was that it improved pistol marksmanship. . . .  These fantasies characterized white fear, not the reality of cocaine's effects, and gave one more reason for the repression of blacks.

49

Musto, *supra*, at 7.  *Cf.* Tom Feiling, *Cocaine: How the White Trade Took over the World* 29

(2009) (quoting Harry J. Anslinger, first head of the United States Bureau of Narcotics)

("'[R]eefer makes darkies think they're as good as white men.'").

The extent of cocaine use by African Americans was over-reported in the early twentieth

century.  Musto, *supra*, at 7.  Forgotten today is its popularity in the late nineteenth century as an

over-the-counter tonic, addiction cure, hay fever remedy, and soft drink ingredient for the middle

and upper classes.  *Id.* at 7; Iniciardi, *supra*, at 6–7.  *See also id.* (describing the use and

promotion of cocaine by Sigmund Freud and Pope Leo XIII,);  Musto, *supra* at 7 (discussing the

drug's endorsement by William Hammond, former surgeon general of the United States Army).

Racially motivated prohibition of cocaine a century ago was but one of a series of drug

prohibitions in American history prompted in part by fears of and distaste for distinct ethnic or

racial minority groups.  "Fear that smoking opium facilitated sexual contact between Chinese

and white Americans was also a factor in its total prohibition.  Chicanos in the Southwest were

believed to be incited to violence by smoking marihuana. . . .  Alcohol was associated with

immigrants crowding into large and corrupt cities."  Musto, *supra*, at 244–45.

## 2.    Congressional Awareness of Racial Disparity

It should have been anticipated that most of those sentenced under the crack laws would

be low-income African Americans.  Materials inserted in the congressional record stated that

"[m]ost of the dealers [of crack] . . . are black or Hispanic."  132 Cong. Rec. S00000-22 (daily

ed. June 17, 1986) (statement of Sen. Lawton Chiles) (quoting  Paul Blythe, *Buying Rocks Easy*,

Palm Beach Post & Evening Times).  *See also id.* ("Haitians also comprise a large number of

those selling cocaine rocks, authorities said. . . .   Whites rarely sell the cocaine rocks."); *id.*

("Less than a block from where unsuspecting white retirees play tennis, bands of young black men push their rocks on passing motorists, interested or not."); 132 Cong. Rec. S00000-22 (daily ed. June 17, 1986) (statement of Sen. Lawton Chiles) (quoting Paul Blythe, *It's Cheap, It's Available and It's Ravaging Society*, Palm Beach Post & Evening Times) ("Even though sellers usually set up shop in primarily black neighborhoods, their customers tend to be white."); 132 Cong. Rec. S00000-22 (daily ed. June 17, 1986) (statement of Sen. Lawton Chiles) (quoting Paul Blythe, *It Takes All Types*, Palm Beach Post & Evening Times) ("Although police said most dealers are black, cocaine rocks are sold in all types of neighborhoods by all types of people."); 132 Cong. Rec. S7123-01 (daily ed. June 9, 1986) (statement of Sen. Paula Hawkins) (quoting Tom Morganthau, et al., *Crack and Crime*, Newsweek, June 16, 1986, at 16) (discussing crack house dealers "recruited from poor Haitian and American black kids in New York"); *id.* (quoting Peter McKillop, *An Inferno of Craving, Dealing and Despair*, Newsweek, June 16, 1986, at 18) (describing a "big-shouldered Trinidadian" selling crack).

### 3.    Procedural Irregularities in Legislative History

The Anti-Drug Abuse Act of 1986 was enacted with unusual haste.  It was passed without many of the formalities that normally accompany important legislation, such as subcommittee hearings, markups of bills, and amendments passed at the committee level.  Testimony of Eric E. Sterling, President, Crim. Justice Pol'y Found., Before U.S. Sent'g Comm'n on Proposed Guideline Amendments for Public Comment 2 (Mar. 22, 1993) ("Sterling Testimony").

> The 1986 Act was expedited through Congress.  As a result, its passage left behind a limited legislative record.  While many individual members delivered floor statements about the Act, no committee produced a report analyzing the Act's key provisions. . . .

> Apparently because of the heightened concern [arising from media coverage of crack], Congress dispensed with much of the typical deliberative legislative process, including committee hearings.
>
> Of particular relevance to this report, the legislative history does not include any discussion of the 100-to-1 powder cocaine/crack cocaine quantity ratio *per se*.

U.S. Sent'g Comm'n, *Special Report to Congress—Cocaine and Federal Sentencing Policy* 117 (1995), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/ Congressional_Testimony_and_Reports/Drug_Topics/199502_RtC_Cocaine_Sentencing_Policy/ ("1995 U.S.S.C. Report").  Drug quantities triggering mandatory minimum sentences were determined based on anecdotal evidence, not statistical data.  Sterling Testimony at 2–3. There was little input into the process from administrative agencies with relative expertise or from the public.  *Id.*

### 4.    Departures from Established Penal Policy

The newly adopted mandatory minimum sentences for crack cocaine represented a significant departure from explicitly established policy.  Statements by lawmakers indicated that Congress intended that five-year mandatory minimums be targeted at "middle-level dealers," while ten-year sentences be given to "kingpins" and "masterminds."  *E.g.*, 132 Cong. Rec. S. 13741-01 (Sept. 30, 1986) (statement of Sen. Biden).

By setting the quantity thresholds for crack at five and ten grams, however, the legislation imposed unusually harsh punishment on low-level street dealers.  "Five grams of crack cocaine is indicative of a retail or street-level dealer rather than a mid-level dealer."  U.S. Sent'g Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 8 (1997) ("1997 U.S.S.C. Report") at 5.  Because the quantity thresholds were set so low, "[f]ully two-thirds of

52

the Federal crack offenders are street-level dealers compared to 29% of the powder cocaine offenders." Testimony of Alfred Blumstein, Nat'l Consortium on Violence Res., Before the United States Sentencing Comm'n 5 (Nov. 14, 2006) at 5.

A resulting incongruity was that the mandatory minimum sentences for low-level crack dealers, who manufactured or sold the drug at "the lowest levels of the drug distribution system," were often harsher than sentences for the higher-level dealers of powder cocaine, the drug from which crack is made. United States Sentencing Comm'n, *Fifteen Years of Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 132 (2004) ("2004 U.S.S.C. Report"). *See also id.* ("High penalties for relatively small amounts of crack cocaine appear to be misdirecting federal law enforcement resources away from serious traffickers and kingpins toward street-level retail dealers[.]"). The anomaly has distorted drug sentencing. "This disparity means that a major supplier of powder cocaine may receive a shorter sentence than a low-level dealer who buys powder form the supplier but then converts it to crack." *Kimbrough v. United States*, 552 U.S. 85, 95 (2007) (citing 1995 U.S.S.C. Report 193–94).

### 5.    Racially Disparate Impact

Overwhelming data, analyses, and judicial findings support the conclusion of a disparate racial impact in the mandatory minimum sentences for crack cocaine. Although the disparity has somewhat narrowed in the past two decades, it remains stark. In 2009, federal crack offenders were 79 percent African American, 10 percent White, and 10 percnet Hispanic. *See* Table A below.

Table A: Race of Those Sentenced for Federal Crack Offenses

|  | **1992** | **2000** | **2006** | **2009** |
|---|---|---|---|---|
| White | 3.2% | 5.6% | 8.8% | 9.8% |
| African American | 91.4% | 84.7% | 81.8% | 79.0% |
| Hispanic | 5.3% | 9.0% | 8.4% | 10.3% |

* U.S. Sent'g Comm'n, *Report to Congress: Cocaine and Federal Sentencing Policy*, 16 (2007); U.S. Sent'g Comm'n, *Overview of Federal Criminal Cases: Fiscal Year 2009* 6 (2010) ("*2009 Fiscal Year Report*").

Racial disparities exist for powder cocaine offenses as well, but they are less striking. Federal powder offenders were 28 percent African American, 17 percent White, and 53 percent Hispanic. *See* Table B below.

Table B: Race of Those Sentenced for Federal Powder Cocaine Offenses

|  | **1992** | **2000** | **2006** | **2009** |
|---|---|---|---|---|
| White | 32.3% | 17.8% | 14.3% | 17.1% |
| African American | 27.2% | 30.5% | 27.0% | 28.0% |
| Hispanic | 39.8% | 50.8% | 57.5% | 53.2% |

* *Id.*

The racial disparity in sentencing bears no apparent relationship to the race of the consumers whose demand for drugs drives their distribution.

> While 65% of the persons who have used crack are white, in 1993 they represented only 4% of the federal offenders convicted of

>trafficking in crack.  Eighty-eight percent of such defendants were
>black.  During the first 18 months of [Federal Sentencing
>Guidelines] implementation, the sentencing disparity between black
>and white defendants grew from preguideline levels: Blacks on
>average received sentences over 40% longer than whites. . . .  The
>Sentencing Commission acknowledges that the heightened crack
>penalties are a "primary cause of the growing disparity between
>sentences for Black and White federal defendants."

*United States v. Armstrong*, 517 U.S. 456, 479–80 (1996) (Stevens, J., dissenting) (citations

omitted).  *See also* 1997 U.S.S.C. Report, *supra*, at 8. ("[N]early 90 percent of the offenders

convicted in federal court for crack cocaine distribution are African-American while the majority

of crack cocaine users is white.").

Invidious racial disparity in crack cocaine sentences has made a substantial contribution

to the racial disparity in incarceration generally.  "This one sentencing rule contributes more to

the differences in average sentencing between African-Americans and White offenders than any

possible effect of discrimination."  2005 U.S.S.C. Report 132.  *See also* Douglas C. McDonald &

Kenneth E. Carlson, *Why Did Racial/Ethnic Sentencing Differences in Federal District Courts

Grow Larger under the Guidelines?*, 6 Fed. Sent'g Rep. 223, 225 (1994) (stating that the crack

sentencing ratio is the primary reason that African American offenders' average prison sentences

are longer than those of White offenders).

Based upon their experience and the statistics, courts have observed "[t]he

overwhelmingly disparate impact that crack cocaine sentences have had on young black men in

America."  *United States v. Wideman*, No. 05-10357, 187 Fed. Appx. 758, 760 (9th Cir. 2006).

*See also United States v. Moore*, 54 F.3d 92, 97 (2d. Cir. 1995) ("The statistical evidence

regarding discriminatory impact is, indeed, irresistible: approximately 88% of defendants

charged with crack cocaine-related crimes are Black (the percentage is even higher in some urban areas).").

There appears to be a disparate racial impact on those sentenced for heroin offenses as well, although it is less dramatic than that for crack cocaine.  In 2009, 28 percent of those convicted for federal heroin offenses were African American; 17 percent were White.  2009 Fiscal Year Report at 6 (2009).  In per capita terms, considering the universe of total national population, African Americans are about ten times more likely to be convicted of a federal heroin offense than Whites.  *See* U.S. Census Bureau, *State and County Quick Facts*, http://quickfacts.census.gov/ qfd/states/00000.html (last visited Mar. 20, 2011) (reporting that in 2009, Whites were 79.6 percent of the United States population and African Americans 12.9 percent).

### E.    Incarceration Policy

#### 1.    Mass Incarceration

By any meaningful measurement, the prison population of the United States is extraordinarily high, an "incarceration explosion . . . unmatched by any other society in any historical era."  Am. L. Inst., Model Penal Code: Sentencing xx (Tentative Draft No. 2, 2011) (not yet adopted).  The American prison population has more than quadrupled in the past three decades, growing from 500,000 in 1980 to 2.3 million in 2010.  Steven Hawkins, *Education vs. Incarceration*, Am. Prospect, Jan.–Feb. 2011, at A18.  "In 2008, the United States reached a new milestone: it incarcerated more than 1 percent of its adult population[.]"  Bernard E. Harcourt, *The Illusion of Free Markets: Punishment and the Myth of Natural Order* 198 (2011) ("*Illusion*").

56

Much of the swiftest growth has occurred in the federal system.  "Between 2001 and 2008, the federal prison population swelled by 56,000, accounting for more than a quarter of new inmates nationwide.  In 2002, for the first time in American history, the federal government was locking up more people than any single state[.]"  Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire* 349 (Picador 2010) (2009).  *See also* Hon. William K. Sessions III, *At the Crossroads of the Three Branches: The U.S. Sentencing Commission's Attempts to Achieve Sentencing Reforms in the Midst of Inter-Branch Power Struggles* 3 (forthcoming 2011 from J.L. & Pol'y), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1773045 (stating that the federal prison population increased 76 percent between 1999 and 2010 resulting in a 37 percent overcapacity).  In state prisons, the number of annual prison admissions increased 18 percent between 2000 and 2008.  Linh Vuong, et al., *The Extravagance of Imprisonment Revisited*, Judicature, Sept.–Oct. 2010, at 71.

From 1925 to 1973, about 110 people were incarcerated in the United States for every 100,000 members of the population.  Joan Petersilia, *When Prisoners Come Home: Parole and Prisoner Reentry* 21 (2003).  The rate increased dramatically beginning in the 1970s, as lawmakers and courts responded to high crime rates and the seeming failure of rehabilitative measures by relying on lengthy sentencing as the primary tool to deter crime and incapacitate criminals.  *Id.*; Perkinson, *supra*, at 331–39; James Austin, et al., JFA Inst., *Unlocking America: Why and How to Reduce America's Prison Population* 4 (2007).  "From 1980 to 2008, the U.S. incarceration rate climbed from 221 to 762 per 100,000.  In the previous five decades . . . [it] had been stable at around 100 per 100,000."  Bruce Western & Becky Pettit, *Incarceration and*

*Social Inequality*, Daedalus, Sum. 2010, at 9.  *See also* Perkinson, *supra*, at 6 ("Between 1965 and 2000, the U.S. prison population swelled by 600 percent[.]").

The high United States incarceration rate is unparalleled internationally.  Our national prison population of 1.6 million people is the world's largest—larger even than that of China, an authoritarian nation with three times our population.  *See* James Austin, *supra*, at 3.  The national rate of incarceration, 737 per 100,000 persons, exceeds that of Russia, which imprisons 581 per 100,000.  *Id.*  This rate is far higher than those of peer nations with democratic, market-based economies.  Such countries incarcerate between 63 and 196 people per 100,000.  Nicola Lacey, *American Imprisonment in Comparative Perspective*, Daedalus, Summer 2010, at 103, a rate comparable to that of the United States for much of the twentieth century.  Among our peer nations, the second-highest rate is found in New Zealand, which incarcerates 196 per 100,000 people.  *Id.*

The increased prison population is due in large part to longer sentences.

> For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, four times as long as Dutch prisoners, five to 10 times as long as French prisoners, and five times as long as Swedish prisoners.  Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.

James Austin, supra, at 4.  *See also id.* at 3 (stating that between 1990 and 1997, the prison population increased 60 percent even though admissions increased by only 17 percent).

The length of sentences is often a product of mandatory minimum sentencing statutes.

> Since 1991, the number of criminal statutes which have mandatory minimum sentences has increased by more than 78%.  There are now over 170 provisions which bear mandatory minimum sentences.  Twenty-eight percent of the federal criminal cases subject to the sentencing guidelines in 2009 involved statutes that

carried mandatory minimums.  That figure increases to 40% of the docket if immigration cases are excluded.

Sessions, *supra*, at 39.  *Cf.* Harcourt, *Illusion*, *supra*, at 198 ("In 2009, one of every eleven state and federal prisoners was serving a sentence of life imprisonment[.]").

Mandatory minimum sentencing deviated from the common law tradition of granting courts discretion to sentence criminals based on the varying circumstances of their backgrounds and offenses.  *See United States v. Polouizzi*, 687 F. Supp. 2d at 167–86 (discussing wide sentencing discretion afforded to judges and juries at the founding of the Republic).  Mandatory minimum sentences have been sharply criticized since at least the 1960s.  Am. L. Inst., Model Penal Code: Sentencing § 6.06 rep. note d, at 31–32 (Tentative Draft No. 2, 2011) (not yet adopted) (collecting sources critical of mandatory minimum sentencing); *id.* § 6.06 cmt. a, at 19 ("[T]here is no current mechanism in American law more misconceived than mandatory minimum penalty laws.").

Our emphasis on lengthy sentences began, in part, as a response to the high crime rates of the 1960s and 1970s, when the rehabilitation of criminals and attempt to address the root causes of crime were increasingly seen as futile endeavors.  *See*, *e.g.*, James Q. Wilson, *Lock 'Em Up: And Other Thoughts on Crime*, N.Y. Times Mag., Mar. 9, 1975, at 11 ("Considering that our society is in the grip of a decade-old crime wave . . . , it is strange that we should persist in the view that we can find and alleviate the 'causes' of crime, that serious criminals can be rehabilitated, . . . and that prosecutors and judges have the wisdom to tailor sentences to fit the 'needs' of the individual offender."); *id.* at 46 ("Wicked people exist.  Nothing avails but to set them apart from innocent people.").

While the movement to mass incarceration was prompted largely by concerns with violent crime, much of its focus is on nonviolent activities, particularly drug offenses.  In 2008 and 2009, only about 8 percent of federal prisoners were serving time for violent crimes.  *See* Heather C. West, et al., Bureau of Justice Stat., U.S. Dep't of Justice, *Prisoners in 2009* 33 (2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf.  Over half were incarcerated for drug offenses.  *Id.*

> Convictions for drug offenses are the single most important cause of the explosion in incarceration rates in the United States.  Drug offenses alone account for two-thirds of the rise in the federal inmate population and more than half of the rise in state prisoners between 1985 and 2000.  Approximately a half-million people are in prison or jail for a drug offense today, compared to an estimated 41,400 in 1980—an increase of 1,100 percent.

Alexander, *supra*, at 59.  *See also* Perkinson, *supra*, at 335 (stating that between 1982 and 1988, the number of federal drug prosecutions increased 99 percent, while nondrug prosecutions increased only 4 percent).

Today's high incarceration rate bears little relationship to the prevalence of crime.  "[T]he crime decline of the 1990s did coincide with a large increase in the prison population.  But the large crime *increase* during the preceding period coincided with an even bigger jump in imprisonment, and incarceration rates continued to climb after 2000 even though crime rates were relatively static[.]"  Cook & Ludwig, *supra*, at 64 (emphasis in original).

## 2.    Racial Disparity

Excessive incarceration has disproportionately affected African Americans.  "Today, a generation after the triumphs of the civil rights movement, African Americans are incarcerated at seven times the rate of whites, nearly double the disparity measured before desegregation."

Perkinson, *supra*, at 3. Racial disparities in investigation, prosecution, and sentencing have long existed in the United States.

> [T]hroughout the twentieth century, both before and after developments in civil rights, blacks have been arrested, convicted, and jailed entirely out of proportion to their share of the population. Southern chain gangs . . . were, to all intents and purposes, gangs of black semislaves. [B]lacks still constitute far more than their share of the prison population; they have done so for decades. Since 1933, the federal government's *Uniform Crime Reports* have kept track each year of the race of men and women arrested for serious crime. Blacks were arrested at a higher rate than whites even at the start; in 1940, 17 blacks per 1,000 were arrested, and only 6 whites. Arrest rates for both races have skyrocketed since 1933, but the gap remains, and it gets if anything wider. The figures for blacks are, indeed, staggering. . . . In 1978, 35 whites out of every 1,000 were arrested, and almost 100 out of every 1,000 blacks—nearly one out of ten.

Friedman, *Crime*, *supra*, at 377–78. *See also* Thorsten Sellin, *The Negro Criminal: A Statistical Note*, 140 Ann. Am. Acad. Pol. & Soc. Sci. 52, 59 (1928) ("The Negro is not only convicted more frequently than whites, but he seems to receive the heavier sentences").

Race-based differences in incarceration continue today.

> Other than sheer scale, [the] most salient feature [of prisons in the United States] is the heavy racial and ethnic imbalances among those incarcerated. Roughly 60 percent of the nations' prisoners are either African American or Hispanic. The current black-male imprisonment rate stands at nearly 7 times the rate for whites, while the Latino rate is 2.5 times the white rate. Today, 1 of every 100 adults is held in prison on any given day, including 1 of every 15 black males between the ages of 20 and 50. The U.S. Justice Department estimated that the lifetime likelihood of serving a state or federal prison term for a white male born in 2001 was 6.6 percent, while for a black male child it was a staggering 32.2 percent.

Am. L. Inst., Model Penal Code: Sentencing xx–xxi (Tentative Draft No. 2, 2011) (not yet adopted). *See also* Patterson, *supra*, at 398–99 (stating that in 2005, 25 percent of the United

States prison population was African American men between the ages of twenty and thirty-nine); Western & Petit, *supra*, at 11 (reporting a 68 percent risk of imprisonment for African American male high school dropouts born from 1975 to 1979, versus 28 percent for Whites of the same demographic). If African Americans and Latinos were sentenced at the same frequency at which Whites are sentenced, the American prison population would be cut in half. *See* James Austin, *supra*, at 8. African American men with little schooling are more likely to be incarcerated than employed. Western & Petit, *supra*, at 12. "The main sources of upward mobility for African American men—namely, military service and a college degree—are significantly less common than a prison record." *Id.* at 11.

Racial disparity in incarceration is particularly stark with regard to drug crimes. Between 1983 and 1987, African Americans and Whites were incarcerated for such offenses in roughly equal numbers. Petersilia, *supra*, at 29. Between 1983 and 1998, the population of African Americans imprisoned for drug offenses increased twenty-six times, compared to an eighteen-fold increase for Hispanics and a sevenfold increase for Whites. *Id.* at 28 (citing Michael Tonry, *Malign Neglect: Race, Crime, and Punishment in America* (1995)). African Americans comprised only 11 to 12 percent of the United States population during this period. *Id.* at 28.

Among those convicted of drug offenses, racial disparities exist in both the likelihood of imprisonment and the length of imprisonment. 2004 U.S.S.C. Report 122 ("The odds of a typical Black drug offender being sentenced to imprisonment are about 20 percent higher than the odds of a typical White offender, while the odds of a Hispanic drug offender are about 40 percent higher."); *id.* at 123 ("The typical Black drug trafficker receives a sentence about ten percent longer than a similar White drug trafficker. This translates into a sentence about seven

months longer."). *Cf. id.* at 129 (African Americans are less likely than defendants of other races to receive downward departures under the sentencing guidelines).

The disproportionate imprisonment of African Americans far exceeds other statistics related to poverty. "[A]t roughly seven to one, the black-white ratio of male incarceration rates dwarfs the two to one ratio of unemployment rates, the three to one nonmarital child-bearing ratio, the two to one black-white ratio of infant mortality rates, and the one to five ratio of net worth." Loury, *supra*, at 137.

It has been persuasively argued that the enactment of harsh sentencing schemes has been motivated in part by racial animus.

> Empirical research has established that support for highly punitive policies correlates with the tendency to think that Blacks have inherently criminal tendencies. The pattern is consistent at the state level: The size of a state's Black population is a stronger prediction of the prison population and its propensity to adopt the death penalty than its rate of violent crime.

Doris Marie Provine, *Unequal under the Law: Race in the War on Drugs* 102 (2007) (citations omitted).

### 3.    Consequences

#### a.    Inmates, Families, and Communities

Incarceration affects the lives not only of prisoners but of those around them. Families of prisoners face higher rates of divorce, separation, domestic violence, and developmental and behavioral problems among children than the families of non-prisoners. Western & Pettit, *supra*, at 15. Prisoners' children may experience numerous consequences of incarceration, including loss of contact with the incarcerated parent, strained relationships with caregivers, a diminished sense of stability and safety, economic insecurity, social stigma, shame, increased risk of drug

involvement, and susceptibility to adverse peer pressure and risky behavior.  *See generally* Patricia Allard & Judith Greene, Justice Strategies, *Children on the Outside: Voicing the Pain and Human Costs of Parental Incarceration* (2011), *available at* http:// www.justicestrategies.org/sites/default/files/publications/JS-COIP-1-13-11.pdf.  These children are at "greater risk of diminished life chances and criminal involvement, and at a greater risk of incarceration as a result."  Western & Pettit, *supra*, at 16.

As with incarceration itself, these adverse effects are multiplied when racial disparity is taken into account.  In 2008, 11 percent of African American children had lived with a parent being locked up, compared to 1.75 percent of White children.  *Id.* at 16.  High incarceration affects communities as well.  Disadvantaged communities are more likely to send more persons to prison, increasing their likelihood of becoming even more troubled in the future.  *See* Robert J. Sampson & Charles Loeffler, *Punishment's Place: The Local Concentration of Mass Incarceration*, Daedalus, Summer 2010, at 20.  "[T]he combination of poverty, unemployment, family disruption, and racial isolation is bound up with high levels of incarceration even when adjusting for the rate of crime that a community experiences."  *Id.* at 21.

### b.    Collateral

Beyond separating convicts from their families and the work force, incarceration imposes numerous collateral consequences.  "In every state and under federal law, there are hundreds of collateral consequences that apply automatically or on a discretionary basis, to people convicted of crimes.  Most of these apply for life . . . and can never be removed, or can be relieved only through virtually unavailable methods like a pardon from the President[.]"  Gabriel Chin, *The Constitution in 2020 and the Secret Sentence: Rethinking Collateral Consequences*,

Balkinization (Sept. 30, 2010), http://balkin.blogspot.com/2010/09/constitution-in-2020-and-secret.html (hyperlink omitted).

Consequences imposed by law include "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement."  Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010).  Felon disenfranchisement laws, which have their roots in attempts by Whites to suppress African American votes in the late nineteenth century, bar 13 percent of African American men from casting ballots.  Erika Wood, Brennan Center, *Restoring the Right to Vote* 6–7 (2d ed. 2009), *available at* http://brennan.3cdn.net/5c8532e8134b233182_z5m6ibv1n.pdf.  Ex-convicts' difficulties in finding work are discussed in detail below.

Other handicaps limit felons' ability to rehabilitate themselves in more tangible ways.  Ineligibility for federal student loans may bar those convicted of drug offenses, even misdemeanors, from attending college or pursuing vocational training after release.  *See* Pinard, *supra*, at 514.  Drug offenders are ineligible in many states for receipt of federal welfare benefits.  *Id.* at 494.  Felons are ineligible for receipt of public housing assistance for five years after their release from prison, and private landlords routinely, and lawfully, discriminate against applicants based on criminal history.  Alexander, *supra*, at 141–42.

The cumulative effect of such adverse consequences is to render an ex-convict a social pariah.

> [I]t is legal to discriminate against ex-offenders in ways it was once legal to discriminate against African Americans.  Once you're labeled a felon depending on the state you're in, the old forms of discrimination . . . are suddenly legal.  As a criminal, you have

65

> scarcely more rights and arguably less respect than a black man
> living in Alabama at the height of Jim Crow."

Michelle Alexander, *The New Jim Crow: How Mass Incarceration Turns People of Color into Permanent Second-Class Citizens*, Am. Prospect (Jan.–Feb. 2011), at A19–20.  Prior incarceration is a greater predictor of low upward mobility among low-income men than failure to complete high school or very low levels of cognitive ability.  Western & Petit, *supra*, at 14–15.

Beyond the direct and indirect consequences of imprisonment, the convict upon reentry must still face those problems that complicated his life before imprisonment but that remain unresolved: poverty; dysfunctional family relationships; addiction to drugs, alcohol, or gambling; and limited education and vocational skills.

### c.    Fiscal

Mass incarceration imposes serious costs upon the wider society.  "As of 2006, the U.S. imprisoned over 1.6 million of its people at a cost of $69 billion, an increase in cost of over six times during the prior quarter century."  Vuong, *supra*, at 70.  *See also* Western & Pettit, *supra*, at 18 (reporting the annual cost of imprisonment as $70 billion); Perkinson, *supra*, at 343 ("[B]y 2000, states were spending nearly $40 billion on corrections, one of every fourteen general revenue dollars.").  The average cost of incarcerating an inmate for a year was $22,650 in 2001, the latest year for which national data is available.  Vanessa Gregory, *Indefensible*, Am. Prospect (Jan.–Feb. 2011), at A11; Harcourt, *Illusion*, *supra*, at 202.  *Cf.* Carrie Johnson, *Budget Crunch Forces a New Approach to Prisons*, Nat'l Pub. Radio, Feb. 15, 2011, http://www.npr.org/ 2011/02/15/133760412/budget-crunch-forces-a-new-approach-to-prisons (quoting Adam Gelb, Pew Ctr. on the States) ("It costs 23 times as much to have somebody behind the walls as it does

in the community[.]").  Expenditures for corrections account for as much as 10 percent of state

budgets.  Harcourt, *Illusion*, *supra*, at 199.  In Connecticut, Delaware, Michigan, Oregon, and

Vermont, more state money is spent on corrections than on higher education.  *Id.* (citing 2007

data).

Much of the cost of incarceration is due to the imprisonment of nonviolent offenders.  If

the number of such inmates were cut in half, taxpayers would be saved an estimated $16.9 billion

annually.  Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating*

*Certainty vs. Severity of Punishment* 8 (2010), *available at* http://www.sentencing

project.org/doc/Deterrence%20Briefing%20.pdf.

>    **4.    Alternatives**

>    **a.    Generally**

Concerns about strained state budgets and prison overcrowding have prompted

lawmakers to reconsider lengthy incarceration as the preferred response to crime.  Carrie

Johnson, *supra*.  Some reforms are designed to eliminate or shorten sentences, often by

increasing judicial discretion.  Between 2000 and 2002, more than two dozen states implemented

sentencing reforms, "eliminating mandatory minimums, accelerating parole, or expanding

[prison] alternatives like drug treatment."  Perkinson, *supra*, at 344.  *But see* Heather Gillers,

*Daniels-Backed Prison Reform is Dealt a Blow by Prosecutors*, Indianapolis Star, Feb. 15, 2011,

http://www.indystar.com/fdcp/?1299882692541 (reporting that legislation in Indiana designed to

reduce incarceration due to budgetary pressures was amended at the pressure of state prosecutors

to include a provision that would result in longer sentences).  A provision that would eliminate

all mandatory minimum sentences is included in a draft of the Model Penal Code.  Am. L. Inst.,

Model Penal Code: Sentencing § 6.06(3) (Tentative Draft No. 2, 2011) (not yet adopted) ("The court is not required to impose a minimum term of imprisonment for any offense under this Code.").

In New York, a recent rescission of the vicious Rockefeller drug laws eliminated mandatory minimum prison sentences for first-time and many second-time nonviolent drug offenders and some drug-related property offenses, such as third-degree burglary. Noeleen G. Walder, *One-Year-Old Reform Saves 1,000 Drug Offenders from Prison, According to Preliminary Estimates*, N.Y. L.J. (Oct. 14, 2010), at 1. Courts may order drug treatment instead of imprisonment for many drug and property crime offenders, even over the objection of prosecutors. *Id.* Mandatory minimum sentences for certain felonies have been reduced from three years to two. Adrienne Austin, *supra*, at 12 (citing S. 56, 231st Legis. Sess. (N.Y. 2009)).

Numerous states have shortened or eliminated mandatory minimum sentences and allowed greater judicial discretion. Adrienne Austin, *supra*, at 12–13, 15–16 (citing H.B. 210, 142d Gen. Assemb. (Del. 2003) (decreasing mandatory minimum sentences for drug trafficking crimes and increasing the quantity threshold for crack-related offenses from five to ten grams); S.B. 1722, 110th Reg. Sess. (Fla. 2009) (requiring non-prison sentences for certain third-degree felons unless a risk of public endangerment is found); H.B. 1892, S.B. 358 112th Gen. Assemb., 1st Reg. Sess. (Ind. 2001) (eliminating mandatory minimums for certain nonviolent drug offenses, allowing judges to sentence offenders to home detention or work release, providing for drug treatment as an alternative to prison for some offenders, and exempting certain drug offenders from the state's "three strikes" scheme); H.B. 372, 2009 Reg. Sess. (Ken. 2009) (authorizing time served on parole to be credited toward a total sentence, except for violent

offenders, registered sex offenders, or parole violators convicted of new felonies); H.B. 225, 35th Reg. Sess. (La. 2009) (expanding from two to four years the period that a felon may be sentenced to house arrest instead of incarceration); Mich. Pub. Acts 665, 666, 670 of 2002 (eliminating most mandatory minimum sentences for drug offenses and eliminating a separate sentencing scheme for drug offenders); S.F. 802, 1st Reg. Sess. of 86th Legis. Sess. (Minn. 2009) (authorizing courts to disregard mandatory minimum sentences for individuals convicted of fifth-degree drug felonies); A.B. 239, 75th Reg. Sess. (Nev. 2009) (limiting "habitual offender" status, which requires a five-year mandatory minimum sentence, to offenders with prior felony convictions); S.B. 1866, 86th Legis. Sess. (N.J. 2009) (authorizing courts to waive or reduce mandatory minimum sentences for drug offenses within 1,000 feet of a school); S.B. 39, Gen. Assemb. (R.I. 2009) (removing mandatory minimum sentences for two categories of drug offenses and reducing maximum sentences from fifty years to twenty years and from life to thirty years); S1154, 118th Sess. Gen. Assemb. (S. Car. 2010) (eliminating mandatory minimum sentences for simple drug possession and eliminating a powder/crack sentencing disparity); H.B. 2073, 85th Legis. Assemb. (S. Dak. 2010) (allowing courts to suspend any portion of a sentence); H.B. 2338, 57th Legis., Reg. Sess. (Wash. 2002) (expanding opportunities for drug offenders to receive treatment instead of imprisonment)).

Some states have enacted laws expanding opportunities for inmates, particularly nonviolent ones, to qualify for early release, often based on their successful completion of programs such as training or counseling. Adrienne Austin, *supra*, at 13–15 (citing S.B. 1476, 48th Legis., 2d Reg. Sess. (Ariz. 2008); H.B. 1351, 1st Reg. Sess., 67th Gen. Assemb. (Colo. 2009); S.B. 193, 150th Gen. Assemb., Reg. Sess. (Ga. 2009); S.B. 14, 2007 Sess. (Kan. 2007);

S.B. 2136, 2008 Reg. Sess. (Miss. 2008); A.B. 510, Seventy-Fifth Reg. Sess. (Nev. 2007); H.B. 4, 2007 Sess. (Penn. 2008); S.B. 292, 2009–10 Reg. Sess. (Vt. 2009); A.B. 500, 99th Legis. (Wis. 2009); S.F. 32, 59th Legis. (Wyo. 2008)).  *Cf.* Second Chance Act of 2007, Pub. L. 110-199, § 231(g), 122 Stat. 657 (providing for a pilot program of home detention of certain elderly offenders who have completed ten years or 75 percent of their prison terms).

In general, reforms reducing the length of prison sentences are not expected to affect deterrence.  Wright, *supra*, at 9.

### b.    Non-Incarceratory Sentencing

As prison sentences are reduced or eliminated, non-incarceratory methods of rehabilitation can be used and improved to minimize the risk of recidivism.  Systems of probation, parole, and supervised release have proven to be effective when violations are met with swift, consistent, and predictable negative consequences.  *See* Mark A.R. Kleiman, *Smarter Punishment, Less Crime*, Am. Prospect, Jan.–Feb. 2011, at A5 (discussing a probation enforcement program for drug offenders in Hawaii).

"Problem-solving" or "behavioral" courts may order nonviolent offenders to undergo drug and alcohol treatment, counseling, or other programs as an alternative to incarceration.  In some circumstances, charges are dismissed when a convict has successfully complied with such a regimen.  Sasha Abramsky, *May It Please the Court*, Am. Prospect (Jan.–Feb. 2011), at A14. Crucial to post-release programs is job training to equip ex-convicts for lawful work.  *See* Adam Serwer, *Permanent Lockdown*, Am. Prospect (Jan.–Feb. 2011), at A16.  Non-incarceratory methods have proven effective when used in a coordinated fashion.

> By combining punishment and rigorous court monitoring with
> essential services like drug treatment, counseling, and job training,

> problem-solving courts have successfully reengineered how courts
> respond to societal dysfunction, especially low-level, nonviolent
> crime.  These courts have a demonstrated record of reducing
> recidivism and forging better outcomes for offenders, victims, and
> communities.

Hon. Jonathan Lippman, *Chief Judge Judith S. Kaye: A Visionary Third Branch Leader*, 84

N.Y.U. L. Rev. 655, 658 (2009).  *But see* Hon. Kevin S. Burke, *Just What Made Drug Courts

Successful?*, 36 New Eng. J. on Crim. & Civ. Confinement 39, 51 (2010) (arguing that drug

courts may coerce defendants, including victims of racial profiling, to accept guilty pleas); Nat'l

Assn' of Crim. Defense Lawyers, *America's Problem-Solving Courts: The Criminal Costs of

Treatment and the Case for Reform* 22–24 (2009), available at http://www1.spa.american.edu/

justice/documents/2710.pdf (criticizing problem-solving courts' tendency to direct resources to

nonviolent, first-time offenders instead of higher-risk offenders).

Technological advances promise useful innovations in non-incarceratory sentencing,

either after or in lieu of a custodial sentence.  Electronic monitoring of ex-convicts' movements

helps keep convicts confined to their homes and other permissible locations and enables

probation officers and police to locate them quickly when they stray—and to swiftly detect any

crimes they may commit.  *See* Graeme Wood, *Prison Without Walls*, Atlantic, Sept. 2010, at 88.

Biological monitoring systems detect alcohol use and could be used to identify the abuse of other

drugs or the presence of elevated tension.  *Id.* at 96.  Such tools promise the effective control of

criminals at much lower cost and without subjecting them to the anti-rehabilitative aspects of

prison life.  *Id.* at 88, 96.  Because would-be coconspirators may realize that associating with an

electronically monitored convicted felon increases the likelihood of their own detection and

capture, such tools may dissuade criminal conspiracies involving monitored ex-prisoners.

5.      **Effectiveness in Reducing Crime**

a.      **Rehabilitation**

The effectiveness of prisons as places for maximum rehabilitation is called into question by high rates of recidivism. "More than 40 percent of murders and robberies are committed by people on probation, parole, or pretrial release." Kleiman, *supra*, at A5. A 2002 study of 272,111 former state prisoners in fifteen states indicated high rates of recidivism within three years of release from prison: 68 percent were rearrested for new offenses, almost exclusively felonies and serious misdemeanors; 52 percent were returned to prison for new offenses or technical violations; 47 percent were convicted of new offenses; and 25 percent were resentenced to prison for new offenses. Patrick A. Langan & David J. Levin, Bureau of Justice Stat., Dep't of Justice, *Recidivism of Prisoners Released in 1994* 1 (2002), *available at* http://bjs.ojp.usdoj.gov/ content/pub/pdf/rpr94.pdf (reporting results for prisoners released since 1994). Thirty percent of ex-convicts were arrested for a serious offense in the first six months after release. *Id.* at 3.

Demographic data correlate with higher risks of recidivism. In the 2002 study, men were more likely to be rearrested than women (68 percent versus 58 percent) and African Americans more than Whites (73 percent versus 63 percent). *Id.* at 7. The risk of recidivism is inversely correlated with age; prisoners released as teenagers were those most likely to be rearrested or reconvicted within three years, and those released at the age of forty-five or older were the least. *Id.* at 7. The highest rearrest rates were seen for those initially convicted of property offenses: 74 percent. *Id.* at 8. Prisoners convicted of violent crimes and drug crimes had lower rearrest rates: 62 percent and 67 percent, respectively. *Id.*

The ability to relate such factors to recidivism risks has led some to suggest strong reliance on them in determining the length of prison sentences. *See* Am. L. Inst., Model Penal Code: Sentencing § 6B.09 cmt. A at 56 (Preliminary Draft No. 5, 2007) (not yet adopted) (citing Stephen D. Gottfredson & Laura J. Moriarty, *Statistical Risk Assessment: Old Problems and New Applications*, 52 Crime & Delinq. 178, 192 (2006)) ("Risk assessment may be defined as predicting who will or will not behave criminally in the future."). It has been argued that these instruments can reduce prison populations by allowing the release of inmates who pose little risk to the public. Bernard E. Harcourt, *Risk as a Proxy for Race* 1 (U. Chi. L. Sch., John M. Olin Law and Economics Working Paper No. 535, Public Law and Legal Theory Working Paper No. 323), *available at* http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=1677654&download=yes ("Risk"). The reliability of risk assessment tools may be undermined by faulty assumptions. *See generally*, *e.g.*, *United States v. C.R.*, No. 09-CR-155, draft op., at 243–297 (E.D.N.Y. Mar. 10, 2011) (discussing the limitations of risk assessment tools in detecting the danger to the public posed by some classes of child pornography offenders). From the 1920s to the 1970s, race and nationality were explicitly relied upon in making such determinations. Harcourt, *Risk*, *supra*, at 4–5. Racial disparity continues today through the use of prior criminal history as a tool for determining sentence length. *Id.* at 8. Criminal history may be a reflection less of a defendant's risk of recidivism than of disparities in investigation, arrest, prosecution, and sentencing.

Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment. Those who serve five years or less in prison have rearrest rates of 63 to 68 percent, with no discernible pattern relating to sentence length. Langan & Levin, *supra*, at 11. A 2002 study did note a lower rearrest rate—54 percent—among

those who served more than five years.  *Id.*  No conclusions regarding these longer sentences can be drawn because the report did not differentiate among them by length.  *See id.*  It appears that among low-risk offenders, recidivism may to a limited extent be fostered, not prevented, by lengthy imprisonment.

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences.  Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Wright, *supra*, at 7; *but see* Langan & Levin, *supra*, at 11 ("No evidence was found that spending more time in prison raises the recidivism rate.").

Because prisons are often located in rural areas, and because convicts' families and friends have limited ability to travel, convicts' relationships with people on the outside—the people most likely to motivate convicts to lead straight lives—may be eroded seriously during long terms of imprisonment.  *See* Jeremy Travis, et al., Urban Inst. Justice Pol'y Ctr., *Families Left Behind: The Hidden Costs of Incarceration and Reentry* 1 (rev. ed. 2005) *available at* http://www.urban.org/uploadedpdf/ 310882_families_left_behind.pdf (reporting that incarcerated fathers and mothers are housed an average of 100 and 160 miles, respectively, from their children); *id.* (stating that over half of incarcerated parents report never receiving a personal visit from their children).

Programs such as those for drug and alcohol treatment, adult basic education, vocational training, and prison industries reduce recidivism by 8 to 15 percent.  Petersilia, *supra*, at 17.  *See*

*also id.* at 34 (reporting a study of inmates in three states that found that those who underwent

prison education programs were 23 percent less likely than other inmates to be re-incarcerated).

Treatment for mental disabilities may have an even greater positive impact.  Nearly a third of

state prisoners and a quarter of federal prisoners suffer from a mental condition or physical

impairment.  *Id.* at 35.  Ten percent of state prisoners and 5 percent of federal prisoners have a

learning disability.  *Id.*  Among state prisoners, 19 percent are completely illiterate and 40

percent functionally illiterate, compared to 4 percent and 21 percent, respectively, of the non-

incarcerated population.  *Id.* at 32.  In 1999, 51 percent of released prisoners lacked a high school

education, and 11 percent had an eighth-grade education or less.  *Id.*

      Coinciding with the nationwide push for stiffer prison sentences since the 1970s has been

a de-emphasis on the rehabilitation of criminals and a preference for lengthy incapacitation.  *Id.*

at 13.  When rehabilitative measures were retained, it was often with the purpose of keeping

inmates manageable, not in reducing recidivism.  *Id.*  The continued existence of programs

effective at combating recidivism both for current and released prisoners may be threatened by

budgetary pressures.  *See* Kevin Johnson, *Budget Cuts Slice Programs for Ex-Inmates*, USA

Today, Feb. 9, 2011, at 7A (reporting concerns that state government spending for parole and

probation departments may be reduced, depleting resources for drug treatment, supervision of

offenders, and housing and job assistance).

      Recidivism may be promoted by the behavior traits prisoners develop while incarcerated.

To survive, they "tend to develop characteristics institutionally selected for survival:

circumspection, canniness, coldness, and cruelty."  Perkinson, *supra*, at 368.  After release, the

negative traits cultivated in prison may be received as virtues on the street.  "[P]rison usually

enhances one's prestige on the street, particularly in terms of . . . values like toughness, nerve, and willingness to retaliate for transgressions."  Anderson, *supra*, at 292.

### b.    Incapacitation

Some penologists have estimated that by incapacitating criminals, incarceration has caused between 10 and 25 percent of the decrease in violent crime rates of the 1990s.  Marc Mauer, *The Impact of Mandatory Minimum Penalties in Federal Sentencing*, Judicature, July–Aug. 2010, at 7; Perkinson, *supra*, at 370.  It is not known, however, whether this reduction through incapacitation is greater than what could have been accomplished through less restrictive measures, nor is there any indication that mandatory minimum sentences have appreciably affected the reduction.  Mauer, *supra*, at 7.

To some extent, the greater effectiveness of prisons in preventing crime through incapacitation may be decreasing as a result of technology.  Cellular telephones and Internet-capable "smartphones" smuggled into prisons enable inmates to freely maintain contact with people on the outside.  Kim Severson & Robbie Brown, *Outlawed, Cellphones are Thriving in Prisons*, N.Y. Times, Jan. 2, 2011, http://www.nytimes.com/2011/01/03/us/03prisoners.html.  Such devices are ubiquitous in some prisons, and they may be used by gang-affiliated prisoners to maintain contact with outside criminal networks and orchestrate violence and drug trafficking.  *Id.*

### c.    General and Specific Deterrence

A purpose of imprisonment is to deter people generally from engaging in crime.  Another form of deterrence directed to this particular criminal who has violated the law—specific deterrence—is designed to prevent recidivism.

Compelling arguments have been made that the deterrent value of a sentence is highest when the chances of its being administered are high and the offender is able to rationally consider the consequences of his or her actions.  It appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies.  *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011); Wright, *supra*, 1–2, 4–5.

General deterrence depends on potential offenders' rational assessment of the likely costs and benefits of crime.  Shawn D. Bushway & Peter Reuter, *Deterrence, Economics, and the Context of Drug Markets*, 10 Criminology & Pub. Pol'y 183, 184 (2011).  That the defendants in this case were rationally capable of making accurate cost-benefit assessments when they were young, before embarking on crime, seems doubtful.

Deterrent power of either type is reduced when potential offenders' reasoning ability is impaired due to alcohol or drug use.  *See* Wright, *supra*, at 2.  It may be similarly affected among young people due to the natural rate of brain development.  *See* B.J. Casey et al., *The Adolescent Brain*, 28 Developmental Rev. 62, 64 (2008) ("A cornerstone of cognitive development is the ability to suppress inappropriate thoughts and actions in favor of goal-directed ones, especially in the presence of compelling incentives."); *United States v. C.R.*, No. 09-CR-155, draft op., at 375 (E.D.N.Y. Mar. 10, 2011) (collecting sources).

General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the justice system.

> [Studies suggest] that knowledge of systematic injustice produced
> by the criminal justice system . . . can have a range of deleterious
> effects on people's attitudes and behavior.  People are less likely to
> comply with laws they perceive to be unjust.  They may also be

> less likely to comply with the law in general when they perceive
> the criminal justice system to cause injustice. . . .  [In contrast,] if
> the criminal justice system reflects ordinary perceptions of justice,
> it can take advantage of a range of psychological mechanisms that
> increase assistance, compliance, and deference.

Paul H. Robinson, et al., *The Disutility of Injustice*, 85 N.Y.U. L. Rev. 1940, 2016 (2010).

### 6.    Employment and Social Integration of Ex-Prisoners

Employment is a crucial antidote for recidivism.  *See* Jack McDonough & William D. Burrell, *Offender Workforce Development: A New (and Better?) Approach to an Old Challenge*, Fed. Probation, June 2008, at 71 (2008); Mark Sherman, *Reducing Risk Through Employment and Education*, Special Needs Offenders Bulletin, Jan. 2000, at 1–2.  "Employment helps ex-prisoners be productive, take care of their families, develop valuable life skills, and strengthen their self-esteem and social connectedness."  Petersilia, *supra*, at 112.  There are few reliable analyses of post-release employment, *id.* at 119, but the unemployment rate for former prisoners has been found to be as high as 50 percent within the first nine months of release, compared to an overall national unemployment rate of 9.4 percent.  *See* Steven Greenhouse, *Job Placement, with a Record: States Help Find Work (and Hope) for Ex-Convicts*, N.Y. Times, Jan. 25, 2011, at B4 ("Job Placement").

Ex-prisoners face numerous obstacles to employment.  Statutes and licensing regulations bar felons from holding certain jobs.  Petersilia, *supra*, at 113–15.  "The most common types of jobs with legal prohibitions . . . are in the fields of child care, education, security, nursing, and home health care[.]"  *Id.* at 113.  Many prohibitions are in areas with little connection to public safety.  *Id.* at 114–15.  In New York, as in numerous other states, drug offenders' drivers'

licenses are revoked.  *Id.* at 115.  Ex-offenders have difficulty meeting requirements of bonding against theft, required in many service businesses.  *Id.* at 114.

Employers are often reluctant to employ released prisoners.  A survey conducted in four major United States cities indicated that 60 percent of employers who had recently hired low-skilled workers were unwilling to hire applicants with criminal records.  *Id.* at 116.  A record is often seen by employers as a negative reflection on employee trustworthiness; employers also fear that by hiring a convict they may expose themselves to liability for suits for negligent hiring. *Id.* at 116–117.  Employers in the construction and manufacturing sectors are more likely to hire ex-convicts than those in businesses involving customer contact, child care, or elder care, but jobs in the former categories are diminishing.  *Id.* at 118.  Many of the areas in which released prisoners face significant obstacles to employment are those projected to show the greatest growth in coming years.  *See* Hacker, *supra* (reporting that among the occupations projected to grow most significantly by the year 2018 are long-haul truck driver, security guard, receptionist, home health aide, nursing aide, orderly, and customer service representative).

Ex-convicts are often eligible for only temporary or seasonal work.  Petersilia, *supra*, at 116.  The jobs they are able to secure yield wages 10 to 30 percent lower than similar jobs held by those who have not been incarcerated.  *Id.* at 119.  Ex-offenders face additional competition for jobs as a result of welfare reform.  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 instituted incentives for welfare recipients to join the work force; such recipients compete for the same low-skilled jobs as released prisoners.  *Id.* at 120.

Obstacles beyond job availability exist.  "Many offenders do not have the necessary skills or experience to find, compete for, and secure legitimate, full-time employment, even if they are

sufficiently motivated." McDonough & Burrell, *supra*, at 72. Often, released prisoners are hindered by limited education and work experience, substance abuse, psychological and mental problems, residence in inner-city neighborhoods far from available jobs, social connections to criminals, and embedded patterns of behavior learned from the criminal world. *See* Petersilia, *supra*, at 40, 113.

Limited programs have been implemented to prepare released convicts for entry into the job market. *See* Greenhouse, *Job Placement*, *supra*, at B1. In the federal court for the Eastern District of New York, the Probation Department offers a number of useful services to ex-convicts through an "Offender Workforce Development" program: counseling in seeking and retaining jobs; furnishing of clothing for work; and instruction and assistance in obtaining state identification cards and driver's licenses, searching for job openings, networking, filling out job applications, writing résumés, and interviewing. *See* Michelle A. Powell, *Report on Workforce Development Initiatives in the Eastern District of New York* 2–6 (2011). Probationers are eligible for subsidized training in such areas as food preparation, plumbing, pest control, and dental assistance through the New York City College of Technology in Brooklyn under the Second Chance Act of 2007, Pub. L. 110–199, 122 Stat. 657. *Id.* at 5.

## II.    Law

### A.    Sentencing Rules

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the sentencing guidelines referred to in section 3553(a)(4), the court shall indicate the specific reasons for imposing a sentence different from the guidelines. 18 U.S.C. §

3553(c)(2).  These "reasons must also be stated with specificity in the written order of judgment and commitment."  *Id.*  The mandatory nature of the guidelines has been excised, and they are now "advisory."  *United States v. Booker*, 543 U.S. 220, 245-46 (2005).  *See also Gall v. United States*, 552 U.S. 38, 50 (2007) (district judges "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented").  However, the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2).  *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006).

As to each defendant in this case, the "nature and circumstances of the offense and the history and characteristics of the defendant" were considered.  *See* 18 U.S.C. § 3553(a)(l).  Respectful consideration was given to the sentencing guidelines, the Sentencing Commission's policy statements, and all other factors listed under 18 U.S.C. § 3553(a) to ensure that the sentence was "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  *See* 18 U.S.C. § 3553(a).  Under section 3553, there are two major considerations: specific and general deterrence.  *Id.*  Under our common law tradition, sentencing courts also consider the need to incapacitate criminals and the possibility of rehabilitating them.  Wayne R. LaFave, 1 Substantive Criminal Law 38–39 (2d Ed. 2003).

Deviation from guideline sentences on policy grounds is permitted.  "[D]istrict courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those guidelines."  *Spears v. United States*, 129 S.Ct. 840, 843–44 (2009).  Such discretion may be exercised not only based on characteristics that distinguish a case from the "heartland" of cases contemplated by the guidelines, but also based on general policy considerations that apply "even in a mine-run case."  *Kimbrough v. United States*, 552 U.S. 85,

109 (2007). A court may substitute the congressional powder/crack ratio with a ratio of its own on the basis of such policy considerations. *Spears*, 129 S.Ct. at 844-45. *See also*, *e.g.*, *United States v. Whigham*, No. 6-CR-10328-NG, 2011 WL 4959882 at 12 (D. Mass. Nov. 30, 2010) ("I will apply a 1:1 ratio for all crack cocaine sentencings"). This authority is consistent with the frequently employed power of federal courts to impose non-guideline sentences. *See* United States Sent'g Comm'n, *U.S. Sentencing Commission Preliminary Quarterly Data Report, 4th Quarter Release* 1 (2010) (reporting that of sentences issued between October 1, 2009, and September 30, 2010, 43.6 percent deviated below the guidelines' recommended length, and 1.8 percent exceeded their recommended length).

### B.    Equal Protection

#### 1.    Mandatory Minimum Sentences

The defendants in this case face steep sentences according to the Sentencing Guidelines. Most face mandatory minimum sentences of five or ten years for offenses involving heroin, crack cocaine, or both. The sentencing provisions in effect for these crimes are those enacted in the Anti-Drug Abuse Act of 1986. *See* Part II.E, *supra*. Before the enactment of the 1986 Act, federal drug offenders were subject to maximum sentences and no statutory mandatory minimum sentences. *See*, *e.g.*, 21 U.S.C. § 841(b)(1)(A) (1982) (providing for a maximum sentence of fifteen years for offenses involving Schedule I or II narcotic drugs). As a result of the 1986 Act, mandatory minimum sentences were based primarily on the quantity of the drugs involved. *See* Table C below.

Table C: Amounts Necessary to Trigger Mandatory Minimum Sentences under the 1986 Act

| Drug | Five-Year Minimum | Ten-Year Minimum |
|------|-------------------|------------------|
| Cocaine base (crack) | 5 grams | 50 grams |
| Powder cocaine | 500 grams | 5 kilograms |
| Heroin | 100 grams | 1 kilogram |
| LSD | 1 gram | 10 grams |
| PCP (not in mix) | 10 grams | 100 grams |
| Marijuana | 100 kilograms | 1,000 kilograms |

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1002, 100 Stat 3207 (1986).

The mandatory minimum sentence for crack cocaine offenses was amended by Congress in the Fair Sentencing Act of 2010 (FSA). Under the FSA, a five-year mandatory minimum sentence is imposed for offenses involving twenty-eight grams of crack, and a ten-year sentence for offenses involving 280 grams of crack. Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372. In effect, the powder/crack sentencing ratio has been reduced from 100:1 to 18:1. These revised sentencing provisions are not implicated in the present case because they were enacted after the commission of the defendants' crimes and are not retroactive. *See United States v. Acoff*, No. 10-285-CR, 2011 WL 447043, at *1 (2d Cir. Feb. 10, 2011, Am'd Feb. 11, 2011) (citing Pub. L. No. 111-220, § 2, 124 Stat. 2372) (holding that the Fair Sentencing Act does not apply retroactively). *But see id.* at *2 (Calabresi, J., concurring) ("[T]here is something troubling about [non-retroactivity] with regard to a statute whose grossly different treatment of chemically identical drugs—the rock and powder forms of cocaine—has been criticized and questioned, particularly on grounds of racial injustice."). Even if the FSA applied retroactively, its amended thresholds would not affect defendants' sentences. Each is subject to a mandatory

minimum sentence on the basis of a heroin offense or an offense involving a quantity of crack cocaine in excess of 280 grams.

## 2.    Framework

The Supreme Court has established two elements for determining whether a superficially neutral law violates the Equal Protection Clause: "discriminatory effect" and "purposeful discrimination." *McClesky v. Kemp*, 481 U.S. 279, 292 (1987) (citing *Whitus v. Georgia*, 385 U.S. 545, 550 (1967); *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

In cases involving alleged racial discrimination, once a discriminatory purpose and a discriminatory effect are shown, the law is subject to strict scrutiny. Strict scrutiny requires a law to be "'narrowly tailored' to achieve a 'compelling government interest.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 9*, 551 U.S. 701, 720 (2007) (quoting *Adarand Contractors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)). Under strict scrutiny, the state bears the burden of rebutting a presumption of unconstitutionality. *Washington v. Davis*, 426 U.S. 229, 242 (1976) (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

If both a disparate impact and a discriminatory motive are not shown, in most cases a law is subjected to rational basis review, under which it can be overturned only if "it is [not] rationally related to a legitimate government purpose." *United States v. Stevens*, 19 F.3d 93, 96 (1994) (citing *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981)). This rational basis for legislative action may be wholly notional; it need only be conceivable by a court, not actually contemplated by lawmakers. *See United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)) ("Where . . . there are plausible reasons

84

. . . our inquiry is at an end.  It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.'").

### 3.    Discriminatory Effect

The Supreme Court described a discriminatory effect in *Palmer v. Thompson* as "state action affecting [African Americans] differently from whites."  403 U.S. 217, 225 (1971).  Laws which criminalize voluntary conduct may violate the Equal Protection Clause when they target conduct associated with members of a protected class.  *See Loving v. Commonwealth of Virginia*, 388 U.S. 1 (1967) (overturning a Virginia law criminalizing interracial marriage); *Craig v. Boren*, 429 U.S. 190 (1976) (overturning an Oklahoma law establishing differing ages for legal alcohol purchase and consumption based on gender).

### 4.    Discriminatory Purpose

Intent was not a clear requirement of Equal Protection violations before the Supreme Court's 1976 decision of *Washington v. Davis*.  Michael J. Perry, *The Disproportionate Impact Theory of Racial Discrimination*, 125 U. Pa. L. Rev. 540, 544 (1977) (discussing 426 U.S. 229).  Pre-*Davis*, some cases indicated that impact alone was sufficient basis for finding a violation.  *See, e.g., Hunter v. Erickson* 393 U.S. 385, 390-91 (1969) (holding that a law violated the Equal Protection Clause without explicitly addressing its intent, purpose, or legislative history).  The *Davis* Court rejected that approach, stating, "[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional [s]olely because it has a racially disproportionate impact."  426 U.S. at 238–39.  The origin of the rule of *Davis* is not clear.  *See* Daniel R. Ortiz, *The Myth of Intent in Equal Protection*, 41 Stan. L. Rev. 1105, 1109 (1989) (stating that the *Davis* Court followed the

85

unsupported assumption by Professor Paul Brest that "the Constitution prohibits government not from reaching unequal results but from pursuing suspect objectives") (citing Paul Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup. Ct. Rev. 95, 110, 116 (1970)).

Intent requires more than mere predictability of consequences. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Admin. of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

Equal Protection Clause violations do not depend on but-for causation. "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. . . . When there is a proof that a discriminatory purpose has been *a* [—not *the*—] motivating factor in the decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (emphasis added).

A discriminatory purpose need not be clear from the text of the statute; even a facially neutral provision can result in *de jure* segregation. *Davis*, 426 U.S. at 241. The task of recognizing intent is made particularly difficult by "the growing unacceptability of overtly bigoted behavior, and a growing awareness of the possible legal consequences of such behavior." *U.S. v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276, 1369 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987), *cert. denied*, 486 U.S. 1055 (1988). Consequently, "[d]etermining whether invidious discriminatory purpose was *a* motivating factor demands a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266 (emphasis added).

An initial indicator of discriminatory intent is a law's discriminatory impact itself, although such an impact, without more, is seldom dispositive.

> Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

*Id.* at 266 (citations omitted). *Accord Feeney*, 442 U.S. at 275.

A second factor is the foreseeability of such a discriminatory impact, especially "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979) (citation and quotation marks omitted); *Davis v. Bandemer*, 478 U.S. 109, 127-129 (1986). Foreseeability is to be determined through an objective reasonable person standard. *Arthur v. Nyquist*, 573 F.2d 134, 143 (2d Cir. 1978); *Hart v. Cmty. Sch. Bd. of Educ., New York Sch. Dist. #21*, 512 F.2d 37, 50 (2d Cir. 1975).

Third, a court should consider "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. A court should consider the "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence"; and "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* Courts may also

consider historical context dating from before the enactment of the law at issue.  *See Rogers v. Lodge*, 458 U.S. 613, 623–25 (1982).

Even where a sentencing law is constitutionally valid, its history and any disparate effect it works on those similarly situated to an individual defendant may be relevant to a court in determining an individual sentence.

### 5.    Conclusion as to Constitutionality

As already indicated, there is substantial evidence of racial impact and awareness of probable racially invidious effect when the applicable drug statutes were adopted to warrant a finding that the mandatory minimum sentences for crack cocaine were motivated in part by racial animus, in contravention of the Equal Protection Clause of the United States Constitution.

Such a finding would be justified by numerous factors: (1) the stark racial disparity itself; (2) the reasonable foreseeability of that disparity, as indicated by the repeated racial references in the legislative history of the 1986 Act; (3) the inconsistency between the sentencing scheme and Congress's established law enforcement priorities; (4) Congress's deviations from legislative procedures in its haste to enact the legislation; and (5) the historical pattern of enacting antidrug laws out of racial motivations.

Only a single published decision by a federal court has reached this conclusion.  *See United States v. Clary*, 846 F. Supp. 768, 791 (E.D. Mo. 1994), *rev'd*, 34 F.3d 709, 713 (8th Cir. 1994), *cert. denied*, 513 U.S. 1182 (1995) ("[R]acial discriminatory influences, at least unconsciously, played an appreciable role in promulgating the enhanced statutory scheme for possession and distribution of crack.").  *Cf. State v. Russell*, 477 N.W.2d 886, 889–891 (Minn. 1991) (holding that a law with a powder/crack disparity had no rational basis under Minnesota's

Equal Protection Clause because of the irrelevance of the crack/powder disparity to its statutory purpose and the lack of legitimate distinction between crack cocaine and powder cocaine or their respective users).

A holding in the instant case of unconstitutionality under the Equal Protection Clause is precluded by rulings of the Court of Appeals for the Second Circuit. That court held "that Congress and the Sentencing Commission did not enact the 100 to 1 ratio with a discriminatory intent." *United States v. Moore* 54 F.3d 92, 99 (2d Cir. 1995). *See also United States v. Teague*, 93 F.3d 81, 85 (2d Cir. 1996) (quoting *Feeney*, 442 U.S. at 279) ("There is no evidence that Congress reaffirmed the sentencing disparity 'at least in part "because of," not merely "in spite of," its adverse effects' upon blacks."). While the holding must be followed, this analysis, it is respectfully suggested, needs revisiting in view of the strong contradicting evidence.

The holding of the *Moore* Court dramatizes the limitations of the intent requirement that was introduced in *Davis*. *See* Perry, *supra*, at 544. The ease with which lawmakers can conceal improper motives behind permissible, racially neutral legislation makes proving discriminatory intent on the part of a legislature almost impossible. Charles R. Lawrence, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 Stan. L. Rev. 317, 319 (1987). Nor is it clear why a discriminatory impact that would be prohibited when inflicted intentionally by lawmakers is permissible when accomplished through negligence or reckless disregard. Laurence H. Tribe, *American Constitutional Law* 1518–19 (2d ed. 1988) (quoted in *Russell*, 477 N.W.2d at 888 n.2 (Minn. 1991)) ("[The intent requirement] overlooks the fact that minorities can also be injured when the government is 'only' indifferent to their suffering or 'merely' blind to how prior official discrimination contributed to it and how current acts will perpetuate it.").

89

*Cf.* Olatunde C.A. Johnson, *Disparity Rules*, 107 Colum. L. Rev. 374, 386 (2007) (stating that Equal Protection doctrine "provides little incentive for public institutions to address how their policies and practices perpetuate racial inequality.").  The cumulative effect of *Davis* and its progeny has been, some would charge, to suppress constitutional litigation and allow the perpetuation of inequality in such areas as sentencing.

> [T]he Supreme Court has closed the courthouse doors to claims of racial bias at every stage of the criminal justice process, from stops and searches, to plea bargaining and sentencing.  The Court has ruled that in the absence of conscious, intentional bias—tantamount to an admission or a racial slur—you can't even get in the courthouse doors with allegations of race discrimination in the criminal justice system.

Michelle Alexander, *How the Drug War Has Subjugated Poor People of Color and Nullified the Fourth Amendment*, Nieman Watchdog (Sept. 20, 2010), http://www.niemanwatchdog.org/ index.cfm?fuseaction=background.view&backgroundid=00486.  A number of alternatives to the current Equal Protection framework have been proposed.  *E.g. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 98–99 (1973) (Marshall, J., dissenting) (quoting *Dandridge v. Williams*, 397 U.S. 471, 520–21 (Marshall, J., dissenting) (suggesting that a balancing approach be adopted in place of the strict scrutiny/rational basis review structure); Perry, *supra*, at 560 (proposing a balancing test).

Although *Moore* precludes holding that the crack cocaine sentencing provisions of the Anti-Drug Abuse Act of 1986 were motivated by a discriminatory purpose, the facts concerning the history and impact of the law are relevant to a determination of the appropriate sentences in the instant case.  They suggest that the mandatory minimum sentences and sentencing guidelines at issue in this case should be enforced with restraint.

To date, other constitutional attacks on mandatory minima have been rejected, but they also suggest discretion in enforcement.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 400 (E.D.N.Y. 2008), *rev'd*, 564 F.3d 142 (2d Cir. 2009) ("[M]andatory minimum penalties may be unsoundly aggrandizing the power of the executive and legislative branches. . . .  Since the initial institution of the practice of widespread imprisonment in the United States, the legislature has assumed major responsibility for prescribing periods of incarceration for offenses.  The Supreme Court has recognized the power of Congress to do so.").

In sum, there is no significant basis for a finding of unconstitutionality that has not already been reviewed and rejected by the Court of Appeals for the Second Circuit.

### C.    Rationale

#### 1.    General Deterrence

There is little evidence that our regime of mandatory minimum sentences works any significant deterrent effect on potential offenders from backgrounds similar to those of the defendants in this case.  General deterrence is especially unlikely in the case of younger people with few educational or professional prospects; limited impulse control due to adolescent development; serious drug and alcohol abuse problems; limited guidance from responsible adults, particularly male ones; and pressure from peer groups in which criminal behavior is accepted and in which the penalty for deviance from the group's norms is embarrassment, ostracism, or physical punishment.  In light of these circumstances and given that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques.

### 2.    Specific Deterrence and Rehabilitation

Nothing suggests that the defendants will be rehabilitated or specifically deterred by lengthy incarceration.  Resources for providing them necessary education or job training are limited.  The experience of incarceration will remove them from their families and communities and whatever ties they may retain to the non-criminal world.  Their peers inside prison are unlikely to serve as positive role models.  Incarceration will give them opportunities to expand their networks of criminal acquaintances, develop antisocial behavior patterns and attitudes, and sharpen whatever criminal skills they have acquired on the streets.  Upon release, they are likely to return to their broken families and impoverished communities with underdeveloped skills, dismal job prospects, and a host of the lifelong punishments that are heaped upon ex-convicts in our society, all factors inclining them away from straight life and toward recidivism.

### 3.    Incapacitation

The most compelling justification for incarceration in this case is that it will prevent defendants from committing further crimes while they are in prison.  Excepting the possibility of organizing crimes outside the prison walls via cellular phone, incarcerated criminals can do little direct harm to the public.  The hope—and experience—is that as they grow older they become less violent.

There is little evidence, however, that incapacitating the members of this modest-sized drug organization will cause a net decrease in crime.  The sentences in this case will not suppress the demand for crack and heroin, nor are they likely to work any meaningful effect on the price or supply of drugs sold by other organizations near Louis Armstrong Houses.  *See* Bushway & Reuter, *supra*, at 190 (reporting that the inflation-adjusted prices of cocaine and heroin in the

United States have declined or remained relatively constant since the 1980s, while incarceration of drug offenders has increased dramatically).  In this respect, the mandatory minimum sentences at issue here have failed in their apparent intention of depleting the pool of cheap, unskilled criminal labor on which the drug trade relies.  Mark Osler, *What Would It Look Like if we Cared about Narcotics Trafficking?: An Argument to Attack Narcotics Capital Rather than Labor* 3 (unpublished manuscript) *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id= 1800370& (last visited Apr. 4, 2011).  There is no shortage of would-be players, veteran criminals, and directionless young people to replace the incarcerated defendants as managers, enforcers, and dealers in the drug trade.  *See id.* at 5 (stating that incarceration attempts "to shut [drug networks] down by taking away something they can easily replace.").

### 4.    Retribution

A meaningful regime of retribution requires a sober-minded assessment of proportionality and moral responsibility.  The imposition of lengthy prison sentences for drug offenses, particularly for nonviolent offenses committed by street vendors, often defies a fair sense of retribution.  Violent offenders must be punished appropriately for their crimes. Such crimes as murder, rape, or armed robbery warrant harsh sentences.  The same treatment may not be warranted for the consensual sale of a product, even a highly destructive one, to knowing, willing, adult purchasers in retail quantities.  *See United States v. Brewer*, 624 F.3d 900, 910 (8th Cir. 2010) (Bright, J., dissenting) (quoting Perkinson, *supra*, at 336) (discussing the frequency with which penalties for crack cocaine offenses exceed those for murder).  This is particularly true since the higher-up dealers in this country and abroad continue to supply the

enormous demand for drugs in this country.  Demand is not reduced by sentencing low-level purveyors such as these defendants to prison.

Illegal drugs are dangerous products.  They impair users' health, diminish their usefulness to their families and employers, and increase their likelihood of committing further crime.  But the moral burden for drug use is borne primarily by the users themselves.  Putting aside cases where users become helplessly addicted as children, drug habits are generally the product of voluntary choices.  The notion of the drug pusher preying upon defenseless, sober individuals, coercing them to sample addictive drugs so that they may become lifelong customers, has little congruence with reality as observed in court.

In moral terms, those working in the drug trade are primarily responsible not for drug abuse but for the trade itself and the violence and extortion attendant to it.  Those who engage in violence and extortion should be punished in accordance with the danger their actions represent to the community.  Street-level dealers are at least indirectly complicit in such acts; this commerce cannot continue without people serving their function.  But it cannot be assumed that such low-level players are morally in the same category as murderers, assailants, and major purveyors of monetary frauds.  They may be little more than cogs, easily replaced.  To fix their punishment under mandatory minimum sentences, not on the basis of their limited roles and acts but on the quantities of drugs they sell by chance or in cooperation with others of their ilk, ill accords with a fair sense of retribution.

**III.    Application of Law to Defendants**

**A.    Excessiveness**

A number of the sentences described in Part B, below, are excessive because of the requirement of statutory mandatory minimum terms of incarceration under present case law. They cannot as yet be said to violate the Constitution.  *See* Part III.B.5, *supra.  Cf. United States v. C.R.*, No. 09-CR-155, draft op., at 394–402 (E.D.N.Y. Mar. 10, 2011) (discussing unconstitutionality of five-year mandatory minimum as applied to nineteen-year-old charged with possession of child pornography).

Were four defendants—Darrell Bannister, Roger Patrick, Jawara Tatum, and Pedro Torres—sentenced to shorter, more appropriate terms, defendants and society would be better served.

For three defendants, sentences both met the applicable mandatory minimum sentence and were required by the defendants' offenses and criminal history.  They are Christopher Hall, Cyril McCray, and Derrick Tatum.

Damien Bannister was not subject to a mandatory minimum sentence.  He received a long sentence but less than five years because of his vicious behavior.

The remaining defendants are not discussed in this memorandum.

**B.    Individual Defendants**

**1.    Damien Bannister**

**a.    Background**

Damien Bannister is African American.  He was born in Brooklyn in 1984.  His parents were married and had three children.  Damien Bannister PSR ¶ 45.  He is the younger brother of

95

defendant Darrell Bannister, growing up together in the same household in Louis Armstrong Houses. *Id.* at ¶¶ 45, 48; Tr. of Sent'g of Damien Bannister 13 (Jan. 19, 2011) ("Damien Bannister Tr."). Their father was a heroin addict who used drugs at home, often with friends. Damien Bannister PSR ¶ 45. While the Bannisters were children, their father was "in and out" of drug treatment programs and often in jail on drug and gun-related charges. *Id.*; *see also* Darrell Bannister PSR ¶ 44. Their grandmother, who abused cocaine, lived with the family sporadically. Darrell Bannister PSR ¶ 45.

Defendant was raised by both parents until the age of nine or ten, when his father was "kicked out of the home" because of his drug abuse. Darrell Bannister PSR ¶ 45. The family struggled financially during defendant's childhood. Damien Bannister PSR ¶ 46. His mother, who worked for the New York City Department of Social Services, was the family's sole breadwinner; she received no financial support from the father, other family members, or public assistance. *Id.* at ¶ 46; Darrell Bannister PSR ¶ 45. Defendant was not physically abused as a child. Damien Bannister PSR ¶ 45.

In 1996, Bannister volunteered for the Bedford-Stuyvesant Volunteer Ambulance Corps as a janitorial worker. *Id.* at ¶ 79. His mother sent him to Hawaii in 1998 to live for a year with an uncle, a police officer, so that he could escape his home and neighborhood environment. He returned the next year because he was homesick. *Id.* at ¶ 51.

Defendant attended Grover Cleveland High School in Ridgewood, Queens; the John V. Lindsay Wildcat Academy High School, a charter school in Lower Manhattan; and a high school in Hawaii before dropping out of school in the tenth grade. *Id.* at ¶¶ 68–70. (A number of other defendants also attended Grover Cleveland High School.) Grover Cleveland has been identified

96

by the New York City Department of Education as poorly performing.  New York City Dep't of Educ., 2008–09 *Progress Report Measures for High Schools*, http://schools.nyc.gov/ Accountability/tools/report/default.htm#FindPR, select "PR Results 2009–10" and "High Schools" (last visited Mar. 20, 2011) (reporting a student performance grade of "D" for Grover Cleveland High School for the 2009–2010 school year).

In the summers of 1999 and 2000, Bannister performed maintenance work for NYCHA through the New York City Summer Youth Program.  Damien Bannister PSR ¶ 79.  His subsequent employment history consisted of intermittent work assembling office cubicles for a company in Long Island City, New York, and a four-month stint in 2003 and 2004 as a vertical blind installer in Brooklyn.  *Id.* at ¶¶ 75–76.  He has never filed a tax return.  *Id.* at ¶ 82.  He has expressed an interest in learning a trade, such as plumbing or electricity.  Damien Bannister Tr. 13.

When sixteen, defendant began smoking marijuana; while he has been enrolled in drug treatment programs, he has continued to smoke marijuana and drink cognac heavily.  Damien Bannister PSR ¶ 62.  He has twice been treated for substance abuse.  *Id.* at ¶¶ 63–65.  Before his arrest, he gambled on dice, cards, or sports events every other day.  *Id.* at ¶ 58.

Damien Bannister suffers from asthma.  He is otherwise in good health.  *Id.* at ¶ 60.

He has two children, ages five and seven, with his fiancée, whom he has dated for nine years.  *Id.* at ¶ 49.  She describes him as a devoted father.  *Id.* at ¶ 53.  She worked as an administrative assistant but is currently unemployed.  Damien Bannister Tr. 18.  She relies on public assistance to support the family.  Damien Bannister PSR ¶ 49.

Defendant's father died in 2008, at the age of fifty-seven, from a heart attack. His mother suffers from diabetes and lives in Chattanooga, Tennessee, where she receives disability payments. *Id.* at ¶ 47. She moved out of Louis Armstrong Houses about 2004. Defendant's sister continues to live in the development. Damien Bannister Tr. 20.

Bannister has a substantial criminal history. At the age of fourteen, he was found by police in a car with defendant Derrick Tatum and a loaded gun, but his record does not indicate that this incident resulted in a conviction. Derrick Tatum PSR ¶ 28–29; *see generally* Damien Bannister PSR. When sixteen, he stole a car from a woman at knifepoint, fled in the car, and used the knife to menace two people who pursued him. *Id.* at ¶ 21–22. When he was twenty-one, he, together with his brother Darrell Bannister and three others, stole merchandise from a store after intimidating an employee with a pair of scissors. *Id.* at ¶ 28.

### b.    Offense

Defendant was a street-level dealer in the crew, with no managerial role. He is personally charged with selling 150 grams of crack cocaine between August 2008 and January 2010. While he had no personal involvement with firearms, he maintained access to firearms shared with other members of the crew. *Id.* at ¶¶ 5–6.

Bannister was arrested on August 9, 2009, with forty-eight bags of crack and ninety glassines of heroin. On January 21, 2010, he was sentenced by the State of New York to a year of incarceration. He was transferred from state to federal custody on February 9, 2010. *Id.* at ¶¶ 39–40.

On July 27, 2010, he pled guilty to a lesser included offense within Count One of a twenty-four-count superseding indictment. Count One charged that between September 2007

and January 2010, defendant and others conspired to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  *Id.* at ¶ 1.

The total offense level was seventeen, and the criminal history category was V, yielding a guidelines range between forty-six and fifty-seven months.  Bannister's offense, unlike those pled to by other members of the crew, carried no mandatory minimum sentence.  The guidelines range of fine was from $5,000 to $1,000,000.

### c.   Sentence

Bannister was sentenced on January 19, 2011.  At his sentencing, he apologized to his mother and his family members.  Damien Bannister Tr. 17.

He was sentenced to three years' incarceration and five years' supervised release.  The three-year sentence was set to begin at the date of sentencing, rather than the date of arrest, because of a state sentence then being served.  Damien Bannister Tr. 21–22.  A $100 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  The remaining counts of the indictment were dismissed.

A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  This sentence balances the threat posed by Bannister's past crimes of violence with his involvement as a street-level dealer, his lack of personal involvement with firearms, his impoverished background in a fatherless home, his remorse for his crime, and his desire to reform his life and be a good husband to his fiancée and father to his children.  The sentence provides ample specific and general deterrence.  Given defendant's background, an excessively harsh sentence would lead only to a greater risk of recidivism.

2.    **Darrell Bannister**

a.       **Background**

Darrell Bannister is African American.  He was born in Brooklyn in 1979.  He is the

older brother of defendant Damien Bannister; the two grew up together in the same household in

Louis Armstrong Houses.  Darrell Bannister PSR ¶ 44; *see* Part IV.B.1.a, *supra*.  The troubled

relationship between defendant's parents cast him into depression as a child.  He attempted

suicide around 1989 by hanging himself and cutting his wrists.  *Id.* at ¶ 57.   His mother beat him

with a belt to discipline him, and he once reported her to Child Protective Services; the case was

eventually dismissed.  *Id.* at ¶ 46.  He was treated by a psychiatrist in 1989 and 1990.  *Id.* at ¶ 57.

As a teenager defendant volunteered with the Bedford-Stuyvesant Volunteer Ambulance

Corps, assisting with ambulance dispatching and CPR classes.  *Id.* at ¶ 78.  He attended Grover

Cleveland High School in Queens, but he failed all of his classes and had excessive absences.

He was expelled in the tenth grade for fighting with a school security officer after he tried to

bring a prohibited mobile phone to school.  *Id.* at ¶ 72.  He once left home to live with an aunt

because his mother was pressuring him to attend school.  *Id.* at ¶ 46.

Bannister suffered from schizophrenia as a child, experiencing his most recent episode

around 2007.  Tr. of Sent'g of Darrell Bannister 7–8 (Nov. 16, 2010) ("Darrell Bannister Tr.")

(testimony of defendant's mother).  He has experienced difficulties controlling his temper.  *Id.* at

9, 16 (testimony of defendant and his mother).  Like his brother Damien, he suffers from asthma.

Darrell Bannister PSR ¶ 61; Damien Bannister PSR ¶ 60.

When fourteen, defendant began smoking marijuana.  From the age of sixteen until his

arrest for the current offense, he smoked marijuana daily and marijuana mixed with cocaine

about once a week.  Darrell Bannister PSR ¶ 67.  He has used crack cocaine as well.  Darrell

Bannister Tr. 8.  He was treated for substance abuse in 1996 and 1997 while on probation for a

prior offense.  Darrell Bannister PSR ¶ 70.  He gambled several times a week before his arrest,

usually playing poker or dice on the street and wagering about $200 each time.  *Id.* at ¶ 59.

From 2003 to 2008, Bannister and his then-girlfriend, with whom he fathered two

children, lived in upstate New York and Tennessee.  He returned to New York periodically.  He

and his girlfriend broke up after he was arrested for the instant offense.  *Id.* at ¶ 52.

Darrell Bannister has held only two paying, legal jobs.  *Id.* at ¶ 74.  He reports that in

2003, he worked as an industrial laborer in Binghamton, New York, but this information could

not be verified.  *Id.* at ¶ 77.  He spent part of 2005 working in construction at Brooklyn College.

*Id.* at ¶ 76.  At his sentencing, he expressed an interest in receiving training in construction and

electrical work.  Darrell Bannister Tr. 16.

Before his arrest, he was primarily supported by his mother and former girlfriend.

Darrell Bannister PSR ¶ 74.  In his free time he watched his children and used drugs.  *Id.*

Bannister has a number of prior convictions, most from his adult years.  In 2005, while he

was twenty-five, he, together with his brother Damien and three others, stole merchandise from a

store after intimidating an employee with scissors.  *Id.* at ¶ 31.  At the age of nineteen, he

arrested for possession of a loaded, defaced gun, but he was not convicted.  *Id.* at ¶¶ 35–36.

**b.    Offense**

Bannister's tenure with the crew, from July 2008 through September 2008, *id.* at ¶ 6, was

the shortest among the defendants.  He worked as a street-level dealer with no managerial role.

He is charged with the sale of more than 100 grams of heroin.  It has not been shown that he

possessed or maintained access to firearms during the course of the conspiracy or that possession

of firearms by his coconspirators was part of his jointly undertaken criminal activity. *Id.* at ¶ 7.

Bannister was arrested on a state charge in October 2009, a year after his involvement

with the conspiracy ceased, for possession of marijuana, 500 grams of cocaine, and paraphernalia

for weighing and packaging drugs. A gun was recovered from the location where he was

arrested, but he was not charged with a firearms offense. *Id.* at ¶ 33.

Defendant was arrested for the instant offense on January 27, 2010. *Id.* at 1. On July 13,

2010, he pled guilty to a lesser included offense within Count One of a 24-count superseding

indictment. The lesser included offense charged that between September 2007 and January

2010, he and others conspired to distribute and possess with intent to distribute 100 grams or

more of heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(i). *Id.* at ¶ 1.

The total offense level was twenty-three, and the criminal history category was II,

yielding a guidelines range between fifty-one and sixty-three months. The offense carried a

mandatory minimum sentence of five years. *See* 18 U.S.C. § 841(b)(1)(B). The guidelines fine

range was from $10,000 to $2,000,000.

### c.      Sentence

Bannister was sentenced on November 16, 2010. At his sentencing, he stated, "I would

like to say sorry to the court and to my mother, my family, and friends, and most important, my

little brother[, Damien Bannister,] for looking at me as a role model[,] and I wasn't really a role

model." Darrell Bannister 13.

Defendant was sentenced to five years' incarceration and five years' supervised release.

A $100 special assessment was imposed. No fines were imposed because defendant does not

have any assets, and it is unlikely that he will have any in the future to pay a fine. A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The remaining counts of the indictment were dismissed.

This sentence, mandated by the Anti-Drug Abuse Act of 1986, is excessive under 18 U.S.C. § 3553(a) in view of Bannister's troubled upbringing, his childhood history of mental illness, his brief and low-level involvement in the conspiracy, his remorse for his crime, his lack of personal involvement during the conspiracy with firearms, and the fact that his criminal history includes but a single offense involving violence or the threat of violence. General and specific deterrence would be amply served by a sentence of two to three years; a five-year sentence serves only to diminish his potential for rehabilitation.

### 3.    Christopher Hall

#### a.    Background

Christopher Hall is African American. Hall PSR 2. He was born in an unknown location in North Carolina in 1986. He is the sole child of a nonmarital union. *Id.* at ¶ 37. His father's surname is unknown; the father died when defendant was an infant. Tr. of Sent'g of Christopher Hall 21 (Nov. 16, 2010) ("Hall Tr."). Hall reports an uneventful childhood. His mother smoked marijuana while he was a child, but not in his presence. She worked for the Metropolitan Transit Authority (MTA) as a bus traffic checker but was fired in 2007 or 2008 for failing a drug test. She received public assistance during defendant's childhood. Hall PSR ¶ 37. She also worked for the New York City Department of Parks and Recreation, but her position was terminated. Hall Tr. 21. In 2010, the family was living in a building with no heat or hot water. They

subsequently moved in with defendant's grandmother.  Presentence Hr'g Tr. 9–10 Aug. 16, 2010.

Despite being a poor student, Hall graduated from Grover Cleveland High School in 2004.  Hall PSR at ¶ 53.  In 2005, he worked as a maintenance worker through the New York City Summer Youth Program, and in 2005 and 2006 he performed janitorial work for the MTA. From mid-2009 to his arrest for the instant offense, he performed construction work for the Bedford Stuyvesant Restoration Corporation as part of a job training program.  *Id.* at ¶ 58–60. At his sentencing, he expressed an interest in receiving training in construction.  Hall Tr. 18.

Defendant enjoys generally good health, although it was reported that he has had occasional chest pains from an unspecified congenital lung condition.  Hall PSR ¶ 49.  He drinks occasionally and has no history of drug use.  *Id.* at ¶ 52.  He impregnated a girlfriend.  After his arrest, she left New York to live with her mother in an unspecified location "down South."  *Id.* at ¶ 40.

Hall has three prior convictions.  In 2008, while twenty-two, he was arrested for selling drugs and was found in possession of twenty glassines of heroin and $515.  He was twice convicted of disorderly conduct.  *Id.* at ¶¶ 29-30, 32-34.

### b.    Offense

Hall worked in the crew from September 2007 to January 2010 as a street-level dealer of heroin and crack.  He sold drugs once or twice a week, earning $150 for every $500 worth he sold.  He is charged with the sale of more than 4.5 kilograms of crack and three kilograms of heroin over the course of the conspiracy.  He held no managerial role but was occasionally

ordered by Derrick Tatum, the leader, to pick up packages of drugs from suppliers and distribute them to members of the crew. *Id.* at ¶¶ 6, 8.

Hall personally possessed a firearm in furtherance of the conspiracy. He purchased a .380 caliber handgun for $200 and a bulletproof vest for $100. *Id.* at ¶ 8. In September 2008, he and defendant Pedro Torres were at a location on Clifton Place where the crew regularly sold drugs. Several armed individuals approached, and an altercation ensued. Hall was armed. An unnamed individual was shot in the leg and chest, and Torres was shot in the leg. It is not known whether Hall fired any of the shots that wounded Torres or the unknown victim, and he has not been charged in connection with this shooting. *Id.* at ¶ 6; Torres PSR ¶ 6. On June 30, 2009, police recovered a loaded gun and thirty-five bags of heroin—about two grams' worth—from an apartment that was used by Hall. Hall PSR ¶ 6.

Defendant was arrested on January 27, 2010. *Id.* at 1. On May 13, 2010, he pled guilty to both counts of a two-count indictment. Count One charged that between September 2007 and January 2010, he conspired with others to distribute and to possess with intent to distribute one kilogram or more of heroin and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Two charged that between September 2007 and January 2010, he, together with others, possessed a firearm in furtherance of the drug trafficking crime charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *Id.* at ¶ 1.

The total offense level was thirty-three, and the criminal history category was I, yielding a guidelines range between 135 and 168 months. A two-point enhancement for the use of a firearm ordinarily would have been added, but none applied in order to avoid double counting, because defendant was convicted of an 18 U.S.C. § 924(c) gun offense. The guidelines range of

fine was from $17,500 to $4,000,000.  The offense carried a mandatory minimum sentence of ten years.  *See* 18 U.S.C. § 824(b)(1)(A).

### c.      Sentence

Hall was sentenced on November 16, 2010 to ten years' incarceration and five years' supervised release.  A $200 special assessment was imposed.  No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.

A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  This sentence is appropriate.  Defendant was raised in a fatherless home under impoverished conditions.  Nevertheless, the relative stability of his background, his completion of high school, and his work history indicate that he had substantial options beyond criminal activity.  The sentence is justified by his brazen use of guns.  Shootouts conducted in residential areas to protect drug operations are among the worst consequences of the illegal drug trade. They contribute to the climate of terror in which residents of drug-ridden neighborhoods are forced to live.  Defendant's acquisition of a bulletproof vest indicates a calculated decision to engage in such street combat.  The sentence imposed provides ample general and specific deterrence.  Given defendant's background, an excessively harsh sentence would lead only to a greater risk of recidivism.

### 4.      Cyril McCray

### a.      Background

Cyril McCray is African American.  McCray PSR 2.  He was born in Brooklyn in 1964. His parents were married, but they separated when he was two years old.  *Id.* at ¶ 64.  He never

knew his father.  Tr. of Sent'g of Cyril McCray 13 (Nov. 16, 2010) ("McCray Tr.").  An uncle occasionally cared for defendant and provided financial support.  McCray's mother worked as a schoolteacher and relied on public assistance to support the family.  She beat him with extension cords and hangers when he was a child for being rebellious, but he does not feel he was abused.  McCray PSR ¶¶ 64–66.

Defendant attended Boys and Girls High School in Bed-Stuy but dropped out after the tenth grade.  *Id.* at ¶ 91.  Boys and Girls High School has been identified by the New York City Department of Education as a poorly performing school.  New York City Dep't of Educ., *2009-2010 Progress Report Measures for High Schools*, http://schools.nyc.gov/Accountability/ tools/report/default.htm#FindPR, select "PR Results 2009–10" and "High Schools" (last visited Mar. 20, 2011) (reporting a student performance grade of "F" for Boys and Girls High School for the 2009–2010 school year).  *See also* Patrick Wall, *Boys and Girls High School Struggles to Survive*, Brooklyn Movement Ctr., http:// brooklynmovementcenter.org/node/39 (last visited Mar. 14, 2011) (reporting the attempts of the school's principal to change its rating as one of the city's "'persistently lowest-achieving' schools").

After dropping out of high school, McCray temporarily lived with friends in Brooklyn.  His mother then sent him to North Carolina, where he resided with grandparents for four years before returning to Brooklyn.  McCray PSR ¶¶ 73, 91.

He has worked as a security guard, day laborer, stock person, janitor, maintenance worker, and helper to a truck driver.  *Id.* at ¶¶ 98–109.  It was reported that he worked for a paving company for fourteen years, but this could not be verified.  *Id.* at ¶ 103.  He has held a number of unskilled positions while in state custody for prior offenses.  *Id.* at ¶ 101.  In 2006, he

received a security guard license after attending classes at a vocational college. *Id.* at ¶ 92. He was unemployed from 2006 to 2007 and from mid-2008 until his arrest in January 2010. *Id.* at ¶¶ 97, 99. He has expressed an interest in receiving training in electrical work and obtaining his graduate equivalency diploma (G.E.D.) while incarcerated. McCray Tr. 8.

McCray has an extensive history of serious, violent criminal offenses. In 1981, at the age of seventeen, he robbed a victim at gunpoint and attempted to rape her. McCray PSR ¶¶ 23–24. In 1986, he and two others attempted to break into an apartment and menaced a witness. *Id.* at ¶¶ 27–28. He was arrested in 1991 for assaulting a victim with a baseball bat, along with nine other individuals, but the charge was dismissed. *Id.* at ¶¶ 61–62. In 1998, he pushed a long-time girlfriend into a bathtub, injuring her. *Id.* at ¶¶ 34–35. He has been convicted of numerous offenses relating to car theft; driving with stolen license plates, falsified insurance information, and altered vehicle identification numbers; and fleeing from police who were attempting to effect traffic stops. *Id.* at ¶¶ 29–30, 36–41, 46–51, 54–57. In 1998, he and another individual intentionally blocked police officers' cars from pursuing a vehicle that a coconspirator had stolen. *Id.* at ¶¶ 36–37. In 2000, McCray was pursued by police as he fled with a stolen car; he sped through stoplights and stop signs, causing the collision of two police cars and injuries to two officers. *Id.* at ¶¶ 40–41. His driver's license has been suspended at least thirty times. *Id.* at ¶ 57.

Two orders of protection have been issued against McCray by a prior girlfriend. Details concerning these orders have not been provided. *Id.* at ¶ 72. McCray acknowledged physically abusing another girlfriend on one occasion. *Id.* at ¶ 69.

In 2005, Defendant was diagnosed with diabetes; he also suffers from high blood pressure and depression. *Id.* at ¶¶ 82, 85. Between 2005 and 2007, he drank three to four glasses of rum a day. *Id.* at ¶ 88. In 2007, he gambled at casinos in Atlantic City two weekends each month and lost $4,000 to $5,000 on each occasion. *Id.* at ¶ 80. It was reported in 2000 that he smoked marijuana daily. *Id.* at ¶ 87. He has also smoked crack cocaine. McCray Tr. 7. In 2002 he underwent drug and alcohol treatment while incarcerated for a prior offense. McCray PSR ¶ 89.

McCray has never been married, but he is engaged to his girlfriend of three years. She lives in Brooklyn and has three children from a prior relationship. She also has two adopted children. Defendant has a sixteen-year-old daughter with a prior girlfriend; the daughter lives with her mother in Brooklyn. McCray stated that before his arrest, he saw his daughter weekly and provided her with $100 to $150 of voluntary financial support every week or two. He has stayed in contact with his daughter since his arrest by writing her letters from jail. McCray PSR ¶¶ 68, 70. He has a son, now twenty-nine years of age, from another relationship; the two have not maintained contact. *Id.* at ¶ 71. Attempts by the Probation Department to contact McCray's mother and the mother of his daughter were unsuccessful. *Id.* at ¶ 63. His address of record is in Louis Armstrong Houses, near where the crew sold drugs. *See id.* at 2.

### b.    Offense

Defendant participated in the conspiracy throughout its duration, from September 2007 until January 2010, as a street-level dealer with no managerial role. He is charged with responsibility for the sale of more than 4.5 kilograms of crack and three kilograms of heroin. *Id.* at ¶¶ 5, 8.

He personally possessed firearms during the conspiracy.  On October 23, 2007, he was stopped by police near the intersection of Clifton Place and Nostrand Avenue, at a location where members of the crew regularly sold drugs, when police observed that the license plate on his car was assigned to a different vehicle.  In a hidden compartment, officers found a loaded .38 caliber revolver, a loaded .22 caliber revolver, 249 glassine bags of heroin, and $1,190 in cash. *Id.* at ¶ 6.

Defendant was arrested on January 26, 2010.  *Id.* at 1.  On July 22, 2010, he pled guilty to a lesser included offense in Count One of a twenty-four-count superseding indictment.  *Id.* at ¶ 1. Count One charged that between September 2007 and January 2010, McCray and others conspired to distribute and possess with intent to distribute one kilogram or more of heroin and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(i), and 841(b)(1)(A)(iii).  *Id.*

The total offense level was thirty-five, and the criminal history category was VI, yielding a guidelines range between 292 and 365 months.  The total offense level included a two-point enhancement for possession of a firearm during a drug offense.  The guidelines range of fine was from $20,000 to $4,000,000.  The offense carried a mandatory minimum sentence of ten years. *See* 18 U.S.C. § 824(b)(1)(A).

### c.    Sentence

McCray was sentenced on November 16, 2010 to ten years' incarceration and five years' supervised release.  A $100 special assessment was imposed.  No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  The remaining counts of the indictment were dismissed.

A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S.

220.  This sentence is high in light of defendant's impoverished background in a fatherless home,

his remorse for his crimes, his age and medical condition, and his desire to be a good father and

husband.  Nevertheless, his role in the conspiracy, his carrying of guns, and the threat to the

community indicated by his extensive history of violent crimes warrant the mandatory minimum

sentence.  The sentence provides ample specific and general deterrence.  To follow the

guidelines in this case would mean sending defendant to prison for over twenty years, at which

point he would emerge a sixty-six-year-old, diabetic ex-convict with little to no hope of a

productive life.

### 5.    Roger Patrick

#### a.    Background

Roger Patrick is African American.  Patrick PSR 2.  He was born in 1989 in Puerto Rico.

His parents were married and had six children.  *Id.* at ¶ 39.  His father frequently came home

drunk and abused Patrick, his siblings, and his mother by beating them with his hands and with

extension cords, sticks, an iron, and a frying pan.  He once threw an electric fan into Patrick's

mother's face.  Patrick received the worst of the abuse because he intervened to protect his

mother from his father's attacks.  *Id.* at ¶ 40.  This history of abuse was corroborated in letters

sent to the court by defendant's family members.  In 1995, to escape defendant's father's abuse,

his mother moved with her children from Puerto Rico to Antigua to live with her mother.  Patrick

PSR ¶ 40.  She then moved alone to New York City and had the children sent afterward to join

her.  In New York, the family lived in homeless shelters before finding an apartment.  They

would often go a day or two without food so that his mother could afford to keep their apartment,

when they had one.  *Id.* at ¶¶ 39, 41.  She supported the family by working as a home health aide.

*Id.* at ¶ 44.

Defendant smoked marijuana daily from the age of twelve until his arrest for the current

offense.  From the age of fifteen, he drank cognac or vodka each weekend to the point of losing

his memory of what happened the night before.  *Id.* at ¶ 57.  He has expressed an interest in

substance abuse treatment.  *Id.* at ¶ 60.

About 2002, codefendant Jawara Tatum, who had abused drugs and alcohol heavily

starting as a teenager, lived with Patrick's family.  Tatum again lived with the family for part of

2009, around the time that Tatum and Patrick were involved in the instant conspiracy.  Jawara

Tatum PSR ¶ 43.

Patrick attended Lafayette High School, in the Bath Beach section of Brooklyn, but he

withdrew in February 2005, while in the ninth grade, when he was arrested for a prior offense.

Patrick PSR ¶ 62.

He has two prior convictions, both for robberies committed while he was a teenager.  In

April 2004, while fifteen and under the influence of alcohol, he and several other teenagers were

on their way to a party when they robbed a man they saw on the street.  Defendant was armed

with a knife during the incident and struck the victim in the head with a long-handled dustpan.

*Id.* at ¶¶ 24–26.  While serving probation for this offense, in February 2005, he committed the

second robbery.  In it, Patrick and two others, wearing masks, attacked a victim by choking,

punching, and kicking him.  They also pistol-whipped him with a bb gun.  Patrick was

incarcerated for the second robbery and for a parole violation from September 2005 to April

2008.  *Id.* at ¶¶ 29–30.  While in custody, he committed several disciplinary infractions, including fighting.  *Id.* at ¶ 32.

Unskilled jobs defendant held while in custody constitute his entire employment history. *Id.* at ¶ 68.  He was released from prison in April 2008 at the age of nineteen.  *Id.* at ¶ 29.  He was enrolled in a G.E.D. program from 2008 until his arrest for the instant offense.  *Id.* at ¶ 61. He has expressed an interest in doing carpentry and electrical work.  Tr. of Sent'g of Roger Patrick 16 (Nov. 16, 2010).

Patrick has never been married and has no children.  Since 2008, he has been in a relationship with a college student, Shakeyia Tatum, who plans to become a parole or probation officer.  *Id.* at ¶ 46.  Shakeyia Tatum is the sister of Jawara Tatum and the niece of Derrick Tatum.  Jawara Tatum PSR ¶ 37; Tr. of Sent'g of Derrick Tatum 5 (Nov. 16, 2010) ("Derrick Tatum Tr.").

Defendant experiences pain from an untreated knee injury he suffered as a result of a car accident in 2002 or 2003.  Otherwise he enjoys good health.  *Id.* at ¶¶ 54–55.

His family lives in an apartment in Louis Armstrong Houses on the same block where Cyril McCray and Pedro Torres lived and near where the crew sold drugs.  *See id.* at 2.  Patrick has described the neighborhood as a "negative" environment where there is substantial pressure from peers to engage in crime.  *Id.* at ¶ 42.

### b.    Offense

Defendant began working with the crew in August 2008 as a street-level dealer, with no supervisory role.  He continued in that capacity until January 2010.  He is responsible for selling

more than a kilogram of heroin.  He maintained access to guns shared by members of the crew, but he did not personally possess firearms.  *Id.* at ¶ 6.

Defendant was arrested on January 27, 2010.  *Id.* at ¶ 7.  On July 27, 2010, he pled guilty to a lesser included offense in Count One of a twenty-four-count indictment.  Count One charged that between September 2007 and January 2010, he conspired to distribute and possess with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. §§ 841(b)(l)(B)(i) and 846.  *Id.* at ¶ 1.

The total offense level was thirty-one, and the criminal history category was VI, yielding a guidelines range between 188 and 235 months.  The offense level included a two-point enhancement because defendant maintained access to firearms used by the conspiracy.  The guidelines range of fine was from $15,000 to $2,000,000.  The offense for which he pled guilty under Count One carried a mandatory minimum sentence of five years.  *See* 18 U.S.C. § 824(b)(1)(B).

### c.    Sentence

It was stated orally at Patrick's sentencing on November 16, 2010 that he would be incarcerated for six years.  In general, sentence is imposed when orally announced.  Fed. R. Crim. P. 35(c).  It may then be corrected within fourteen days for arithmetical, technical, or other clear error.  Fed. R. Crim. P. 35(a).  It is the practice of this court for judgment to be entered promptly after sentence is orally announced.  In the case of this defendant, given the mandatory minimum sentence required by 21 U.S.C. section 841(b)(l)(B)(i), five years was the reasonable sentence under section 3553(a).  The sentence of six years, announced orally, violated 18 U.S.C. section 3553(a)(6), requiring consistency with like cases.  *See* Part IV.B.1.c, *supra* (three-year

114

sentence for Damien Bannister); Part IV.B.2.c, *supra* (five-year sentence for Darrell Bannister); Part IV.B.7.c, *infra* (five-year sentence for Jawara Tatum).  A hearing was held Mar. 24, 2011, and defendant was resentenced to five years' imprisonment and five years' supervised release.

A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  A $100 special assessment was imposed.  No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  The remaining counts of the indictment were dismissed.

Even a five-year sentence, mandated by the Anti-Drug Abuse Act of 1986, is excessive in view of Patrick's remorse for his crime, his childhood history of grave abuse and deprivation, the young age at which he became involved in this conspiracy, his lack of personal involvement with guns, and the fact that all of his prior offenses were committed while he was a minor.  It provides more than enough general and specific deterrence.  Given defendant's background, its excessive length can lead only to a greater risk of recidivism.

### 6.    Derrick Tatum

#### a.    Background

Derrick Tatum is African American.  Derrick Tatum PSR 2.  He was born in 1980 in Brooklyn.  *Id.* at 2, ¶ 44.  His parents were unmarried and had six children.  *Id.* at ¶ 44.  His father supported the family through plumbing and boiler work; his mother was a homemaker.  *Id.*

Derrick Tatum has described a bleak upbringing that is only partially corroborated.  He stated that he lived in poor conditions without heat or hot water, that the family "had nothing" and "barely had food," and that his father was an alcoholic who was intoxicated daily and beat Tatum's mother once or twice a week.  He stated that his older brother, Michael Tatum, used

drugs in the house.  *Id.* at ¶¶ 44, 45.  His mother confirmed that the family lived at times without heat or hot water, but she denied that the family went without food or had financial difficulties. She stated that Tatum's father drank alcohol only occasionally.  *Id.* at ¶ 51.  Tatum's fiancée expressed familiarity with his upbringing, but she said she was unaware of any drug or alcohol abuse or physical abuse in the household.  *Id.* at ¶ 52.

Derrick Tatum's older brother, Michael Tatum, has an extensive criminal history, including robbery and attempted robbery.  Defendant reported that Michael Tatum has been shot nine times.  A second brother, Jermaine Tatum, was killed in a car accident in 2002. Defendant's remaining five siblings are ages thirty-five to forty-three, live in Brooklyn, are single, and enjoy good health.  One sister is the mother of codefendant Indio Tatum; another is the mother of codefendant Jawara Tatum.  *Id.* at ¶ 47.

Defendant attended Grover Cleveland High School to the ninth grade.  He was expelled because he did not attend classes.  *Id.* at ¶ 71.  He then went to Street Academy in Bed-Stuy for the tenth grade, but he withdrew when he started selling drugs.  *Id.* at ¶ 70.

Tatum began smoking marijuana daily at the age of eighteen.  He was enrolled in multiple drug treatment programs between 1999 and 2005 but continued to smoke marijuana heavily—about three "blunts" of it per day—until his arrest for the present offense in January 2010.  *Id.* at ¶¶ 63, 65–67.  He declined to state how he financed his drug habit.  *Id.* at ¶ 64.  He has no history of other drug or alcohol use.  *Id.* at ¶ 63, 69.  He claims that he would be interested in receiving drug treatment.  *Id.* at ¶ 68.

Tatum has a lengthy history of serious criminal offenses.  In May 1998, while he was seventeen years old, he drove a vehicle into the wall of a building after almost striking several

children.  *Id.* at ¶ 26; Addendum to the Presentence Report of Derrick Tatum 2.  In October of

that year, he was observed by police in a car with codefendant Damien Bannister, who was then

fourteen years old, and two others in a car speeding and weaving from lane to lane.  Derrick

Tatum PSR ¶¶ 28–29.  Police recovered a loaded, defaced .25 caliber handgun from the car.  *Id.*

at ¶ 29.  In 2000, he was convicted for possession of drugs and sentenced to a year of

confinement after police executing a search warrant recovered twenty-eight bags of crack

cocaine and a loaded .357 Magnum pistol from a residence to which he was connected.  *Id.* at ¶¶

33–34.  In February 2001 he fired six shots at an individual with a stolen .9 millimeter handgun;

he explained to a probation officer that he did so because he "had a problem [that he] had to take

care of."  *Id.* at ¶¶ 35–36.  In July 2001 he was arrested for selling heroin.  *Id.* at ¶¶ 37–38.  He

was convicted of the shooting and the sale of drugs and sentenced to six years in prison.  *Id.* at ¶¶

35, 37.  While incarcerated he was cited for numerous violations, including fighting,

interference, and drug use.  *Id.* at ¶ 39.  He was discharged in July 2007.  *Id.* at ¶ 35.

Defendant has had little legal employment.  In 2000 and 2001, his late brother, Jermaine

Tatum, found him sporadic employment with a moving and storage company.  *Id.* at ¶ 78.  He

worked as a porter and group leader while incarcerated from 2001 to 2005, and he worked

briefly in 2007 as a laborer with a scrap metal company.  *Id.* at ¶¶ 74, 76–77.  He declined to

state how he supported himself between 2007 and 2010.  *Id.* at ¶ 74.  He has expressed an

interest in receiving culinary training and opening a restaurant.  Derrick Tatum Tr. 13.

Tatum has a ten-year-old daughter with a woman he has been seeing since 1995 and who

works as a 911 operator.  The two are engaged to be married.  He has no other children and has

never been married.  Derrick Tatum PSR ¶ 48.

117

Defendant gambled frequently.  He wagered $4,000 to $5,000 per month at various gambling spots in Brooklyn and took regular trips to Atlantic City and Las Vegas.  *Id.* at ¶ 56. He reported that his greatest gambling payout was $30,000 and that he used his gambling proceeds to finance his involvement in the current offense.  *Id.*  His fiancée is paying his legal bills.  *Id.* at ¶ 82.

### b.    Offense

The present conspiracy was initiated by Derrick Tatum in September 2007.  He led the crew until January 2010.  He recruited members, determined how much they should be compensated, negotiated major transactions, obtained bulk quantities of heroin and cocaine from suppliers, and received a portion of the proceeds of all sales.  *Id.* at ¶¶ 5–6.  Occasionally he packaged bulk quantities of drugs to distribute to street-level dealers and collected their proceeds from drug sales, but he typically delegated this role to others in the organization, particularly his nephew, Indio Tatum.  *Id.*; Indio Tatum PSR ¶ 10.

Defendant personally possessed and maintained access to multiple firearms.  Derrick Tatum PSR ¶ 7.  In August 2008, he negotiated the sale of a loaded .32 caliber pistol to a confidential informant, and he directed Indio Tatum to deliver it to the customer.  *Id.*  Derrick Tatum is charged with responsibility for the distribution of more than 4.5 kilograms of cocaine base and three kilograms of heroin over the course of the conspiracy.  *Id.* at ¶ 10.

He was arrested on January 27, 2010.  *Id.* at ¶ 10.  Officers executing a search warrant at his apartment on the day of his arrest recovered approximately $10,000 in cash, which was retained by the government.  *Id.* at ¶ 8.

118

On July 22, 2010, defendant pled guilty to Count One of a twenty-four-count indictment, charging that between September 2007 and January 2010, he conspired with others to distribute and possess with intent to distribute one kilogram or more of heroin and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 84l(b)(1)(A)(I), and 841(b)(1)(A)(iii). *Id.* at ¶ 1.

The total offense level was thirty-nine, and the criminal history category was IV, yielding a guidelines range of 360 months to life in prison. The offense level included a two-point enhancement for defendant's involvement with firearms and a four-point enhancement for his leadership role in the conspiracy. The guidelines range of fine was from $25,000 to $4,000,000. The offense carried a mandatory minimum sentence of ten years. *See* 18 U.S.C. § 824(b)(1)(A).

### c.    Sentence

Tatum was sentenced on November 16, 2010 to fifteen years' incarceration and five years' supervised release. A $10,000 fine and a $100 special assessment were imposed. The remaining counts of the indictment were dismissed.

A non-guideline sentence was imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. This sentence is appropriate in light of defendant's criminal history, his impoverished background, his professed desire to lead a lawful life, and his desire to provide a stable home for his family. Defendant was sentenced to a significantly longer term of imprisonment than any of his coconspirators, consistent with the court's practice of giving heavier sentences to those who have played senior roles in criminal conspiracies or who for their own gain have induced or encouraged others to enter into criminal enterprises. This sentence provides substantial incapacitation and ample specific and general deterrence. Given defendant's background, an excessively harsh sentence would lead only to a greater risk of recidivism.

119

7.    **Jawara Tatum**

a.    **Background**

Jawara Tatum is African American.  Jawara Tatum PSR 2.  He was born in 1988 in

Brooklyn.  *Id.* at ¶ 35.  His parents were unmarried.  *Id.* at ¶ 7.  He is the nephew of Derrick

Tatum and the cousin of Indio Tatum, both leaders of the conspiracy; his mother is Derrick

Tatum's sister.  *Id.* at ¶ 34; *see* Derrick Tatum PSR ¶ 47, Indio Tatum PSR ¶ 7.

Defendant's father was only intermittently present during his childhood.  Jawara Tatum

PSR ¶ 35.  He and his siblings were raised primarily by his mother, who works as a home health

aide, with assistance from his maternal grandmother.  His mother received financial assistance

from his father and from welfare.  *Id.* ¶¶ 35, 38.  Deprived of a male role model, Tatum relied for

guidance on his maternal grandparents; on a maternal uncle, Jermaine Tatum; and on a maternal

aunt, Barbara Judkins.  *Id.* at ¶ 38.

Jawara Tatum appears to have a serious learning disability.  As a child, he was "cursed

out" by his mother for being "not smart."  *Id.* at ¶ 35.  He struggled in school and was held back

twice in the fifth grade.  *Id.*  He was enrolled in special education classes and was identified by

teachers as being emotionally disturbed and having skills far below his grade level.  New York

City Bd. of Educ., Individualized Education Program for Jawara Tatum, Nov. 14, 2001, at 1, 3.

When he was in the sixth grade, at age thirteen, a teacher wrote, "Student has severe problems in

self-control and, at the same time, is beginning to perceive external events as over-whelming. He

relies upon physical aggression to avoid emotional pain.  This dynamic when combined with his

physical strength creates a dangerous situation."  *Id.* at 4.  He is functionally illiterate and is able

to read "only a little bit."  Addendum to the Presentence Report of Jawara Tatum 2 ("Jawara Tatum Addendum"); Tr. of Sent'g of Jawara Tatum 19 (Nov. 16, 2010) ("Jawara Tatum Tr.").

Defendant suffered grave physical abuse at the hands of his father as punishment for his continued difficulties in school.  On one occasion, his father burned him in the face with an iron.  On another, defendant was beaten fiercely and found by police in a nearby park, covered with blood.  Between the ages of fourteen and fifteen, he ran away from home three times to escape his father's abuse, sometimes after his mother informed his father that he was doing poorly in school.  Once, after running away, he slept in a park and begged publicly for food.  His mother stated that she never abused him and never witnessed his father treat him badly.  Jawara Tatum PSR ¶ 35.

While fourteen, defendant was hit in the head with a rock while playing with friends; his mother declined to take him to the hospital for treatment because he was being "dumb."  He suffers sporadic headaches that he associates with this injury and with previous head trauma suffered at the age of thirteen.  *Id.* at ¶ 53.

While thirteen, Tatum began suffering from depression caused by the physical abuse his father inflicted.  *Id.* at ¶ 47.  He began living in the apartment of Jean Patrick, a family friend and the mother of codefendant Roger Patrick, in Louis Armstrong Houses.  *Id.* at ¶ 43.

Tatum began drinking alcohol and using drugs as a means of coping with his depression.  He regularly drank cognac and used marijuana, ecstasy, and PCP.  *Id.* at ¶¶ 47, 56.

Between 2003 and 2004, while he was a middle-school student, he worked periodically for a moving and storage company.  The job was arranged by his uncle, Jermaine Tatum.  After this job he worked briefly at a pet store and at a different moving company.  *Id.* at ¶¶ 68, 70.

121

Defendant was promoted to the ninth grade at sixteen, in 2004, and attended William E. Grady Career and Technical Education High School, in the Brighton Beach section of Brooklyn. *Id.* at ¶ 59. His grades were poor, and he was occasionally suspended for fighting and skipping class. *Id.* at ¶ 60. He was ridiculed by his peers for his poor academic performance. Jawara Tatum Tr. 25. He acknowledges that he has had difficulty controlling his anger. *Id.* at 24.

In 2004 and 2005, a series of violent events occurred that culminated in defendant's conviction for robbery and attempted robbery. In 2004, his uncle Jermaine, the only positive male role model he had known for most of his life, was struck and killed by a car. Jawara Tatum PSR ¶ 38. In the same year, defendant was stabbed at a house party after he punched someone who had insulted his mother. A stab wound punctured his lung; he still bears scars from the stab and from a chest tube that was inserted so that he could breathe while in the hospital. *Id.* at ¶ 52.

When sixteen, in December 2004 and January 2005, Tatum participated in a series of robberies. On December 19, 2004, he and four other individuals surrounded a victim and demanded his wallet, then knocked him to the ground and repeatedly kicked him in the face. *Id.* at ¶¶ 25–26. On January 9, 2005, Tatum and four others surrounded a victim and punched him, knocking out his teeth, and struck him on the head with a weapon. *Id.* at ¶¶ 21–22. They robbed him of money and a mobile phone. On January 14, 2005, Tatum was arrested for another assault and robbery. After this incident, he was seen running into a nearby apartment and throwing a bb gun out of a window. *Id.* at ¶ 22.

In March 2005, his brother, Ras-Sahara Tatum, filed for a protection order against him after the two got into a fight at their mother's home. The police were called, and defendant was detained overnight, but no charges were filed. *Id.* at ¶ 42.

In November 2005, Jawara Tatum was convicted of robbery and attempted robbery and sentenced to forty-two months confinement.  *Id.* at ¶ 21.  While in custody he committed numerous violations, including drug possession, fighting, assault, and gang activity.  *Id.* at ¶ 23. He is a member of the Bloods gang.  *Id.* at ¶ 45.  He took a number of classes while incarcerated, including special education and maintenance.  *Id.* at ¶ 61.

He was released on parole on March 9, 2009 at the age of twenty.  *Id.* at ¶ 21.  He lived at his mother's home and that of Jean Patrick and Roger Patrick.  *Id.* at ¶ 43.  Roger Patrick had been working with the crew as a drug dealer since August 2008.  Roger Patrick PSR ¶ 6.  After his release, Jawara Tatum worked full-time in a job training program.  He also helped out at a corner store on an unpaid basis in exchange for food and other items.  Jawara Tatum PSR  ¶ 66.

Tatum resumed heavy drug use after his release, usually taking drugs alone, at home.  He smoked marijuana about ten times daily and took ecstasy and drank cognac every second or third day.  For part of this period he used cocaine.  *Id.* at ¶ 56.  He underwent drug counseling after his release, from March 2009 to May 2009, but he was discharged from the program because he failed to file for Medicaid.  From May 2009 until his arrest in January 2010, he was enrolled in an outpatient drug treatment program, but his drug use went undetected because the program failed to require on-site drug testing.  *Id.* at ¶ 57.

Tatum has few family ties.  He lost contact with the majority of his family after his prior imprisonment began in 2005, and his brother, Ras-Sahara Tatum, was incarcerated on a drug conviction from 2008 to 2010.  Only his mother and his sister Shakeyia Tatum, the girlfriend of Roger Patrick, remain in contact with and supportive of him.  *Id.* at ¶¶ 35, 37.  He has stated that he feels "alone and lonely."  *Id.* at ¶ 47.

123

He has never married and has no children. *Id.* at ¶¶ 39–41. Since April 2009, he has been involved in a relationship with a woman living in Staten Island. *Id.* at ¶ 43. She became pregnant but had a miscarriage after his arrest for the present offense. *Id.* at ¶ 39; Jawara Tatum Addendum 1. He believes that he may fathered a child with another woman and is willing to support the child financially if it is his. Jawara Tatum PSR ¶ 40.

### b.    Offense

Jawara Tatum began working for the crew in September 2009. *Id.* at ¶ 5. He was the last of the eleven defendants in this case to join the crew. He sold drugs at the street level on a daily basis and is charged with responsibility for selling 315 grams of crack and eighty grams of heroin. He had no managerial role. *Id.* at ¶ 5. He had access to firearms possessed by his coconspirators, but he did not personally carry a gun. *Id.* at ¶ 6.

Defendant was arrested on January 27, 2010. *Id.* at ¶ 35. On June 22, 2010, he pled guilty to a lesser included offense in Count One of a two-count indictment. Count One charged that between September 2007 and January 2010, he conspired to distribute and possess with intent to distribute 100 grams or more of heroin and five grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). *Id.* at ¶ 1.

The total offense level was twenty-three, and the criminal history category was III, yielding a guidelines range between fifty-seven and seventy-one months. The offense level included a two-point enhancement because Tatum maintained access to firearms used in the conspiracy. The guidelines range of fine was from $10,000 to $2,000,000. The offense for which he pled guilty under Count One carried a mandatory minimum sentence of five years. *See* 18 U.S.C. § 824(b)(1)(B).

124

c.      **Sentence**

Defendant was sentenced on November 16, 2010.  At his sentencing, he stated, "I learned from my mistakes, I just want to get a second chance in society, to live with my family and . . . help out others that wasn't helped and to have kids of my own and raise them and just do better in life and know how to read and write and go home."  Jawara Tatum Tr. 16.

Tatum was sentenced to five years' incarceration and five years' supervised release.  A $100 special assessment was imposed.  No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  The remaining counts of the indictment were dismissed.

This sentence, mandated by the Anti-Drug Abuse Act of 1986, is excessive under 18 U.S.C. § 3553(a) in view of defendant's upbringing in an atmosphere of horrific physical abuse; his functional illiteracy and apparent learning disability; the absence of a positive male role model in his childhood; his crippling addiction to drugs and alcohol; his continuing efforts to occupy himself with lawful work; the involvement of his uncle, Derrick Tatum, in bringing him into the conspiracy; his relatively brief involvement as a low-level member of the conspiracy; his lack of personal involvement with firearms; his lack of involvement as an adult in any crimes of violence; his sincere remorse for his crimes; his stated desire to lead an honest, healthy, and productive life; and the fact that all of his criminal history points stem from offenses committed during a short period of time while he was a minor.  A shorter period of incarceration would provide ample general and specific deterrence.  Given defendant's background, the excessive length of the sentence imposed will probably increase the risk of recidivism.

125

### 8.    Pedro Torres

#### a.    Background

Pedro Torres is White and Hispanic.  Torres PSR 2.  He was born in 1987 in Brooklyn.

His parents never married.  They had nine children.  His father was a crack cocaine addict and

spent much of Torres's childhood in and out of various drug treatment programs.  Defendant has

not seen his father since 2006.  *Id.* at ¶¶ 28–29.   Over a five-year period during Torres's

childhood, he and his family lived in four different shelters, including two for victims of

domestic violence.  *Id.* at ¶¶ 28, 33.  The family lives in an apartment in Louis Armstrong

Houses, a few doors from Roger Patrick's and Cyril McCray's apartments and near where the

crew sold drugs.  *See id.* at 2; McCray PSR 2; Patrick PSR 2.

Torres's mother was unemployed and depended on public assistance to support the

family.  The mother received no financial support from defendant's father or from their extended

family, which lives in Puerto Rico.  *Id.* at ¶ 28.  She receives a $170 public assistance check

every three weeks and $600 a month in disability benefits; she pays $450 a month in rent.  *Id.* at

¶¶ 30, 35.  The family receives clothing and food from their church.  They rarely had enough

money for school supplies.  *Id.* at ¶ 28.

Torres received little parental guidance while growing up because of his father's absence

and his mother's need to attend to his siblings.  Seven of them, ages twelve through twenty-five,

continue to reside with his mother in Brooklyn.  The eighth, age nine, was adopted by a Queens

family at birth so that he could receive medical attention for a severe birth defect.  *Id.* at ¶ 31.

Torres began smoking marijuana at the age of sixteen.  He was drinking alcohol to excess

at the age of seventeen.  Before his incarceration in July 2009, he smoked marijuana twice a day

and daily drank cognac to the point of inebriation.  He admits to having a substance abuse problem, but he says he is interested in treatment.  *Id.* at ¶ 45.  His mother reports that he has been depressed since 2007.  She attempted to obtain psychological treatment for him but was unable to afford it.  *Id.* at ¶ 40.

Defendant attended Abraham Lincoln High School, in the Coney Island section of Brooklyn, from 2003 to 2005, at which point he transferred to a school with a vocational training program.  *Id.* at ¶ 48.  He was enrolled in special education classes and was able to graduate despite never having learned to read or write.  Tr. of Sent'g. of Pedro Torres 10 (Nov. 16, 2010).  He worked intermittently at pet stores from 2003 to 2009 and from 2007 to 2009.  Torres PSR ¶ 53.

For the past six years, Torres has been in a relationship with a woman, now twenty years old, who plans to attend St. Francis College.  The two expect to be married.  He has no children.  *Id.* at ¶ 32.

He was injured in a shooting in July 2006.  He had returned home from a funeral when three individuals walked down his street firing randomly into houses.  He was shot in his chest, back, right leg, and right forearm.  Doctors were unable to remove a bullet from his chest because it was lodged near his heart.  As a result of his injuries, Torres continues to suffer pain in his chest and nerve damage that limits the use of his right hand.  *Id.* at ¶ 42.

Torres has two prior convictions.  In July 2007, he was arrested for possession of two loaded firearms.  *Id.* at ¶¶ 22–23.  In April 2008, he was arrested for possession of narcotics after he was seen exchanging an envelope containing heroin.  *Id.* at ¶ 24–25.

### b.    Offense

Torres became involved in the conspiracy as a street-level dealer in September 2007 and distributed a total of more than 300 grams of crack.  Torres PSR ¶ 5; Addendum to the Presentence Report of Pedro Torres 1.  He had no managerial responsibility.  He carried guns and had access to firearms shared by the crew's members.  Torres PSR ¶ 5.  In September 2008, he and defendant Hall were approached by six armed men at a location where the two regularly sold drugs.  A gunfight ensued.  Torres was shot four times in the legs, and another individual was hit in the leg and chest.  *Id*. at ¶¶ 6, 42.

Defendant's involvement in the conspiracy ended in July 2009, when he began serving a forty-two month sentence for a July 2007 firearms possession charge.  *Id.* at ¶¶ 7, 22.  On July 22, 2010, he pled guilty to an amended Count One of a 24-count superseding indictment.  Count One charged that between September 2007 and January 2010, he conspired to distribute and possess with intent to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), and 84l(b)(1)(A).  *Id.* at ¶ 1.

The total offense level was thirty-one, and the criminal history category was II, yielding a guidelines range of 121 to 151 months.  The offense level included a two-point enhancement because defendant maintained access to firearms used by the conspiracy.  The guidelines range of fine was from $15,000 to $4,000,000.  The offense carried a mandatory minimum sentence of ten years.  *See* 18 U.S.C. § 824(b)(1)(A).

### c.    Sentence

Defendant was sentenced on November 16, 2010 to 104 months' incarceration and five years' supervised release.  This sentence, combined with the sixteen months he had already

served for his July 2007 firearms offense, satisfies the ten-year mandatory minimum sentence. *See United States v. Rivers*, 329 F.3d 119 (2d Cir. 2003). A $100 special assessment was imposed. No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. The remaining counts of the indictment were dismissed.

The sentence, mandated by the Anti-Drug Abuse Act of 1986, is excessive under 18 U.S.C. § 3553(a) in view of Torres's background of deprivation, physical abuse, and fatherlessness; his learning disability and illiteracy; his addiction to drugs and alcohol; his limited criminal history; his sincere remorse for his crime; his efforts to hold lawful employment; his commitment to his girlfriend of six years; his continuing medical difficulties; and the lack of evidence that he has engaged in violence against anyone. Because of his possession of guns, he poses a greater threat to the community than defendants who received sentences of four or five years in prison. But this threat is not so great that he must be incapacitated for ten years. A shorter sentence would provide ample specific and general deterrence. Given defendant's background, the excessive length of this sentence will probably lead to a greater risk of recidivism.

C.      **Summary of Sentences Covered in this Memorandum**

Defendants were sentenced as follows:

Table D: Summary of Sentences

| Name | Supervised Release | Special Assessment | Incarceration | Fine | Forfeiture | Evaluation of Appropriateness |
|---|---|---|---|---|---|---|
| Damien Bannister | 5 years | $100 | 36 months (plus 12 months state time) | None | None | Appropriate |
| Darrell Bannister | 5 years | $100 | 60 months | None | None | Too High |
| Christopher Hall | 5 years | $200 | 120 months | None | None | Appropriate |
| Cyril McCray | 5 years | $200 | 120 months | None | None | Appropriate |
| Roger Patrick | 5 years | $100 | 60 months | None | None | Too High |
| Derrick Tatum | 5 years | $100 | 180 months | $10,000 | None | Appropriate |
| Jawara Tatum | 5 years | $100 | 60 months | None | None | Too High |
| Pedro Torres | 5 years | $100 | 104 months (plus 16 months state time) | None | None | Too High |

IV.      **Conclusion**

Several of the sentences in this case, imposed only because of statutory minima, are disproportionate to the crimes committed and the backgrounds of the defendants. Their excess causes particular concern when applied to youthful defendants. *See United States v. C.R.*, No. 09-CR-155, draft op., at 394–402 (E.D.N.Y. Mar. 10, 2011) (discussing unconstitutionality of

five-year mandatory minimum as applied to a defendant who possessed and distributed child pornography between the ages of fifteen and nineteen). *Cf. Roper v. Simmons*, 543 U.S. 551, 575 (2005) (holding that the death penalty is disproportionate for offenders under the age of eighteen); *Graham v. Florida*, 130 S.Ct. 2011, 2034 (2010) (holding that sentences of life without parole are unconstitutional for juvenile offenders who have not committed homicides). That concern is multiplied by the imposition of these sentences upon young defendants subject to abuse, poverty, drug and alcohol addiction, unemployment, illiteracy, and learning disability, largely attributable to their backgrounds.

Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth. Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.

As part of defendants' sentences, it has been ordered that every reasonable effort be made to provide counseling, drug and alcohol treatment, gambling rehabilitation, anger management therapy, education, and job training while defendants are incarcerated and during supervised release.

Considering the limited resources devoted to such rehabilitative measures, however, it is by no means clear that these aids will be effectively provided. *See* Petersilia, *supra*, at 5–6.

131

When the defendants are released from prison, they will probably have to return to all of the problems that led them to engage in crime.  Whatever tenuous connection they retain to the lawful, supportive world will likely be diminished after years of forced separation in prison.  Incarceration will make entry into the job market more difficult.  Remaining will be the root problems that have largely brought them to this pass: poverty; dysfunctional families; mental and physical problems; legal and *de facto* housing segregation; segregated and inferior schools; and an economy that appears to have little need or concern for low- and semi-skilled workers.  Such individuals constitute a permanent underclass with almost no opportunity to achieve economic stability, let alone the American dream of upward mobility.

These problems are concentrated among low-income African Americans, but they affect the country as a whole.  Our rates of imprisonment, income inequality, and unemployment are either the highest or among the highest of the world's advanced economies, while our rates of food security and life expectancy are among the lowest.  Charles M. Blow, *Empire at the End of Decadence*, N.Y. Times, Feb. 19, 2011, at A23 (reporting statistics on thirty-two countries).  The hardships of poverty fall most severely on the youngest Americans.  *See* Charles M. Blow, *Suffer the Little Children*, N.Y. Times, Dec. 25, 2010, at A29 ("[A]ccording to a 2007 Unicef report on child poverty, the U.S. ranked last among 24 wealthy countries.").

Significant reforms are needed in our sentencing regime.  The Fairness in Sentencing Act of 2010 reduced the dubious 100:1 powder/crack ratio to a 17.8:1 ratio.  It did nothing to remove the sentencing regime's dependence on arbitrary drug quantities—not just with regard to crack cocaine but other drugs as well—that bear little relationship to the harm a defendant has done to society or to the danger of his inflicting further harm.  Harsh, disproportionate mandatory

sentences impose grave costs not only on the punished but on the moral credibility upon which our system of criminal justice depends.  *See* Robinson, *supra*, at 2025.  Such sentences, aimed at the drug trade's lowest levels of labor, appear to have no effect on illegal drugs' price or availability.  Osler, *supra*, at 3.

Judges approach the grave responsibility of sentencing criminals with all the thoughtfulness and limited insight that their knowledge and wisdom can muster.  "Sentencing . . . is in its essence subjective. . . .  It is not possible to determine a condign sentence without looking closely at all relevant facts and circumstances, and making a nuanced decision."  Hon. John L. Kane, *Sentencing: Beyond the Calculus*, Litig., Fall 2010, at 5.  *See also* Hon. David L. Bazelon, *Questioning Authority: Justice and Criminal Law* 27 ("We have to conduct this searching inquiry into the criminal's life history, not to excuse, but to appreciate the conditions that inevitably attend and may lead to criminal behavior.  Focusing on the individual offender is not part of the problem of crime; it is part of the solution.").

Mandatory minimum sentencing provisions, leaving no alternative but lengthy incarceration, prevent the exercise of this fundamental judicial duty.  Such laws are "overly blunt instruments, bringing undue focus upon factors (such as drug quantities) to the exclusion of other important considerations, including role in the offense, use of guns and violence, criminal history, risk of recidivism, and many personal characteristics of an individual defendant."  Sessions, *supra*, at 42.  It is difficult to conceive of a system of mandatory minimum sentences that could effectively anticipate and provide for such factors.

For nonviolent, low-level drug crimes, the goals of sentencing—general and specific deterrence, incapacitation, retribution, and rehabilitation—could in most cases be achieved with

133

limited incarceration, through a system of intense supervised release utilizing home visits; meetings with parole officers; a combination of counseling, drug and alcohol treatment, education, job training, and job placement; and electronic monitoring to prevent flight, promote positive choices, and deter and detect incipient crime. Such a regime would likely be more effective in reducing crime and much less costly than imprisonment. Given discouraging economic, social, and psychological conditions, it seems doubtful that the long sentences of incarceration imposed will appreciably reduce crime.

Pragmatism and a sense of fairness suggest reconsideration of our overreliance on incarceration. Though defendants are hemmed in by circumstances, the law must believe that free will offers an escape. Otherwise, its vaunted belief in redemption and deterrence—both specific and general—is a euphemism for cruelty. These defendants are not merely criminals, but human beings and fellow American citizens, deserving of an opportunity for rehabilitation. Even now, they are capable of useful lives, lived lawfully.

Jack B. Weinstein
Senior United States District Judge

Dated: April 8, 2011
      Brooklyn, New York

134